UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————————

MOOG INC.,

                         Plaintiff,

      v.                                       Case No.: _____

SKYRYSE, INC., ROBERT ALIN
PILKINGTON, MISOOK KIM, and DOES NOS.
1-50,

                         Defendants.

———————————————————————

## <u>DECLARATION OF MICHAEL HUNTER</u>

       MICHAEL HUNTER, under penalty of perjury and pursuant to 28 U.S.C. § 1746, declares the following to be true and correct:

       **I.**      **<u>Background</u>**

       1.      My name is Michael Hunter.  I provide this declaration in support of Moog Inc.'s Petition for a Temporary Restraining Order/Preliminary Injunction.  I am over the age of 18 years old. I have personal knowledge of the matters set forth herein and if called as a witness, I could and would competently testify as to all facts set forth herein.

       2.      I graduated from Utah State University in 1996, receiving a Bachelor's of Science degree in Electrical Engineering with a Computer Science minor.

       3.      I have worked at Moog Inc. ("Moog") since 2000. My entire time at Moog, I have worked in the software group.  Initially, I was a flight software developer living in Salt Lake City, Utah.  I progressed to lead.  I then became software manager over the Salt Lake and Torrance software groups.  In 2013, I moved to Buffalo, New York and became the Software

Manager for the East Aurora Software Group.  From 2016 through 2019, I served as Chief

Software Engineer.  Since 2019, I have served as Moog's Software Senior Manager.

4.      My duties as Software Senior Manager include managing 100 software engineers.

I have 5 software managers that report to me directly and 2 indirectly in India.  I am responsible

for the software at 6 Moog sites.  As software senior manager, I am responsible for the software

group's execution on programs, the software employees and the budget for software in the

aircraft group. Throughout my tenure at Moog, I have worked on the development of Moog's

flight control software and project-specific applications.

**II.      <u>Platform Software</u>**

5.      Moog designs and manufactures the most advanced motion control products for

aerospace, defense, industrial and medical applications – applications where precise control of

velocity, force, acceleration and fluid flow are critical. Their motion control portfolio includes all

forms of actuation technology, sophisticated control electronics and system software. Moog is a

leading integrator of precision motion control systems.

6.      As part of its motion control product portfolio, Moog develops software that

governs flight controls for airplanes and other aircrafts, including helicopters. I have been

involved in the development, testing, and certification of Moog's flight control software and

applications since joining Moog in 2000.

7.      Essentially, Moog develops software that pairs up with the hardware computer

contained in aircraft. Moog's flight control software reads pilot and avionics inputs to control the

motion of the aircraft.  For example, when a pilot moves a control in the cockpit, Moog's

software reads the control and moves the particular control surface of the airplane to the correct

position. In short, Moog's flight control software works in tandem with an aircraft's avionics computer to control its flight functionality.

8.      Moog's base flight control software is called Platform.  Platform is in essence the "operating system" that our flight control computers use, similar to Windows or Mac OS for a standard home computer.  On top of the base operating system, applications specific to the particular aircraft involved are built and sit on top of the Platform base operating system to tailor its functionality to the particular aircraft.  This is akin to downloading a program or application and running it on a Windows or Mac OS operating system on a standard computer.  The particular application provides a specific use, but the underlying operating system allows the entire system and machine to work.

9.      Over the past 15 years, Moog has developed three major branches of the Platform base flight control operating system software: one for commercial aircrafts, one for military use (called "eRTOS"), and one for motor applications (called "AMP").

10.      Platform is the generic name for the first iteration used on all commercial programs.  Platform is being used in many widespread and common commercial airplanes today, including aircrafts such as 747, G280, G650, and C919.



I was involved in the development and construction of the Platform base software for commercial programs.  I, along with Todd Schmidt, were the managers of the

programs that created eRTOS, AMP, and the project-specific applications related to eRTOS and AMP.

11.     The base Platform software allows Moog to get the operating system, startup code and basic software up very quickly and then quickly tailor its aircraft-specific software based on the particular needs of that aircraft or project.  Platform provides the base flight control software such that Moog only needs to develop the software needed for the specific flight controls of a particular type of aircraft.

**III.     <u>Value to Moog</u>**

12.     The Platform base software, and related project-specific applications, constitute very valuable, sensitive, and proprietary information to Moog.

13.     The Platform software provides Moog a huge competitive advantage in the marketplace.  Platform allows Moog to be a front-runner in obtaining bids from commercial or military parties. Our costs are lower and our schedule time is faster due to this Platform software. Moog can have a product in the lab and flying faster than our competitors due to this Platform software.

14.     The three iterations of the Platform base software (commercial, military, motors) took 15 years in total to develop.  I have been involved in the development of all iterations of Platform since its inception in 2007.  ██████████████████████████████████ ██████████████████████████████████████████.

15.     On top of the multiple years it took to build Platform, the testing requirements for flight control software are extremely vigorous and costly.  Before any flight control software is approved by the Federal Aviation Administration ("FAA") or similar governing bodies around the world, it must be vigorously tested and certified.  Different types of testing and analyses are

required.  It takes twice as many engineers to test and certify flight software than it does to create it. Testing and certification generally constitutes two-thirds of Moog's total cost to build flight software.

16.      Based on my experience working on the Platform software since its inception in 2007, as well as decades of experience in software engineering for flight control systems, I estimate that Moog has invested approximately ████████ in building, testing, and certifying its Platform software over the past 15 years.  I further estimate that Moog has invested approximately ██████ in building, testing, and certifying its aircraft project-specific software applications that sit on top of the Platform software.

17.      If another party was able to obtain Moog's Platform base software, or any component of it, it would provide a huge competitive advantage to that company.

18.      If a third party had possession of Moog's Platform software, including its underlying code, testing, and certification requirements, the third party company could easily "click and build" a project specific software on top of the base software in a short amount of time. The only additional item the party would need to build a flight control computer would be an electronic flight computer and the requirements to start building the flight control application.

**IV.      Efforts to Keep Secret**

19.      The Platform software itself is designed to prevent hacking or reverse engineering. It cannot be reverse engineered from an aircraft computer that the software is used on.  It is password protected and Moog does not usually provide the source code to partners.  The software is uploaded onto Moog electronics at Moog facilities.

20.      Further, based on my employment at Moog since 2000 as well as my review of Moog's internal business and employment records and process, I understand many Moog

employees are required to sign Moog internal proprietary information agreements, as well as third party proprietary information agreements when working on certain project-specific applications.

21.     Based on my review of Moog's internal business and employment records and process, I understand that every new hire (including any software engineer) is required to review the then-current Moog employee handbook and acknowledge the requirements therein in writing, either through a signed paper form or an electronic acknowledgment.  Attached as **Exhibit A** are true and correct copies of signed acknowledgments of receipt of Moog's Employee Handbook signed by former Moog employees Robert Alin Pilkington on July 30, 2012 and Misook Kim on January 21, 2013. Attached hereto as **Exhibit B** is a true and correct copy of the Moog Employee Handbook in effect at the time Mr. Pilkington and Ms. Kim signed the acknowledgments.

22.     Moog has several security measures to safeguard its proprietary and confidential measures.  Moog has controlled access into its buildings.  All employees go through security screening and background check before being hired.

23.     Moog has a robust written policy regarding its intellectual property, and its confidential, proprietary, and trade secret information.  I have read this policy. This written policy is made available to every Moog employee, including all software engineers.  This written policy, among other things, defines Moog's proprietary and trade secret information, provides strict protocols for storing, designating, and transmitting such information, and prevents any third party disclosure of such information. A true and correct copy of Moog's current IP policy which has been in effect over the past year is attached hereto as **Exhibit C**.

24.     Moog also requires its software engineers to complete a training regarding company "trade secrets" and other proprietary information, which confirms the contents of

Moog's written IP policy.  I have completed these trainings multiple times.  A true and correct copy of a transcription of Moog's trade secrets training, as well as a list of questions that all participants are required to complete after the training, is hereby designated as **Exhibit D**. Attached hereto as **Exhibit E** is an internal Moog log showing dates of completion of various Moog training seminars, including its Trade Secrets training, by former Moog employees Robert Alin Pilkington and Misook Kim.

25.     Platform, including all attendant project-specific software, is housed on a secure server at Moog's East Aurora, New York offices. Not all employees at Moog have access to the software database.

26.     Access to the software database is on a "need to know" basis that must be approved by the lead on the software program. For example, an employee can work on a software program but not be given access to the software database if the program lead determines that employee does not require access to the software database.

27.     In order to have access to Platform and related project-specific software, a Moog employee would need specific access to Moog's general network, then a separate set of credentials to Moog's software database. In total, the employee would need five separate approvals to access the Platform software (Moog employee, building access, network access, server access, project access).

28.     The most confidential and proprietary information related to Platform and related project-specific applications, and the types of information that Moog always treats as internal trade secrets which are never disclosed to other parties, are: 1) the underlying source code for each program; and 2) certain documents and checklists prepared by Moog's Software Engineering Process Group ("SEPG"), which contain processes to ensure that the software is

being developed in a manner to meet certification requirements by the FAA and other similar authorities around the world. The SEPG documents have been optimized over 20 years of working with aviation authorities around the world. Many companies hire Moog for software development specifically because Moog knows how to efficiently create and certify software with the world's various aviation authorities.

29.    Regarding Moog's source code for its programs, every flight software source code file contains restrictive language similar to the following: "MOOG PROPRIETARY and CONFIDENTIAL INFORMATION; This technical Data/Drawing/Document contains information that is proprietary to, and is the express property of Moog Inc., or Moog Inc. subsidiaries except as expressly granted by contract or by operation of law and is restricted to use by only Moog employees and other persons authorized in writing by Moog or as expressly granted by contract or by operation of law. No portion of this Data/Drawing/Document shall be reproduced or disclosed or copied or furnished in whole or in part to others or used by others for any purpose whatsoever except as specifically authorized in writing by Moog Inc. or Moog Inc. subsidiary."

### V.    Moog Team Working on Platform

30.    Gonzalo Rey (former Director of Engineering and Chief Technology Officer) and Sathya Achar (former Engineering Technical Fellow) were the first two Moog employees to sponsor and oversee the development of Moog Platform base software beginning in 2007.  At the time in 2007, I was a Software Manager and worked under Messrs. Rey and Achar in building the Platform base software.  Because they are in essence the architects behind the Platform base software, Messrs. Rey and Achar are the individuals with the most institutional and technical knowledge regarding the software, as well as its relationship with project-specific applications

which sit on top of the base software.  Messrs. Rey and Achar are intimately familiar with the Platform software code, as well as its testing and certification processes and methods.

31.     Robert Alin Pilkington (former Senior Staff Engineer) was the lead architect on the second iteration of the Platform base software for military purposes, eRTOS. Mr. Pilkington reported directly to me from 2016 until the date he departed Moog, as described more fully below. Misook Kim and Eric Chung were Senior Staff Engineers who worked under Mr. Pilkington.  Ms. Kim and Mr. Chung worked on eRTOS, as well as "Sensitive Government Program 2."

32.     As of fall 2021, there were 29 software developers/engineers in Buffalo and 22 in Los Angeles and 12 in India working on the Platform software and related project-specific applications.

**VI.    Skyryse**

33.     The majority of Moog's developers in the Torrance, California office who built Platform and resulting project-specific applications have been hired by Skyryse, with most of these departures occurring in the past few months. Many of the primary individuals involved in the development, testing, and certification of the second Platform iteration (eRTOS) now work at Skyryse.

34.     Based on my familiarity with and managing Moog's software engineering team, as well as my review of Moog's internal employment records, the following is a list of current and former Moog employees who have joined Skyryse or have notified Moog that they will be leaving Moog to join Skyryse (as well as showing reason for departure, final day at Moog, their position, and Moog office location):

- Gonzalo Rey – Voluntary termination 8/1/2017; Role: Chief Technology Officer; Location: East Aurora, New York

- Tony Chirico: Retired 9/28/2019; Role: Senior Staff Engineer; Location: East Aurora, New York

- Tim Baptist – Retired 2/29/2020; Role: Group Vice President; Location: East Aurora, New York

- Robert Alin Pilkington – Voluntary termination 11/12/2021; Role: Sr. Staff Engineer; Location: Torrance, California

- Sathyanarayana Achar: Retired 1/2/2022, Role: Engineering Technical Fellow; Location: Torrance, California

- Nigel Cranwell: Retired 11/1/2021, Role: Electronic Operations Manager; Location: East Aurora, New York

- Eric Chung – Voluntary termination 12/3/2021; Role: Sr. Staff Engineer; Location: Torrance, California

- Misook Kim – Voluntary termination 12/17/2021; Role: Sr. Staff Engineer; Location: Torrance, California

- Lawrence Chow – Voluntary termination 12/17/2021; Role: Software Design Engineer; Location: Torrance, California

- Reid Raithel – Voluntary termination 1/7/2022; Role: PE/NPI Sr. TE Engineering Manager; Location: Torrance, California

- Victor Nicholas – Retired 1/21/2022; Role: Supply Chain Manager; Location: Torrance, California

- Mario Brenes – Voluntary termination 2/5/2022; Role: Software Engineer; Location: Torrance, California

- Cynthia Le – Voluntary termination 2/10/22; Role: Software Engineer; Location: Torrance, California

- Tri Dao – Voluntary termination 2/10/22; Role: Senior Laboratory Engineer; Location: Torrance, California

- Santiago Correa-Mejia – Voluntary termination 2/18/22; Role: Development Engineer; Location: Torrance, California

- Chi Hsin Alex Wang – Voluntary termination 2/20/22; Role: Test Equipment Section Head; Location: Torrance, California

- John Stafford – Voluntary termination 2/25/22; Role: Associate Engineer; Location: Torrance, California

- Alan Lee – Voluntary termination 2/28/22; Role: Development Engineer; Location: Torrance, California

- Dan Gunderson – Voluntary termination 3/4/22; Role: Design Engineer Location: Torrance, California

- Paul Kapuan – Planned voluntary termination 3/31/22; Role: E1 Sr. Staff Engineer; Location: East Aurora, New York

35.     Certain key, senior individuals such as Messrs. Rey, Achar, Baptist and Pilkington are extremely familiar with and knowledgeable regarding Moog's Platform base software and related project-specific applications, as well as the more capable members of Moog's software engineering teams who worked on these programs.

36.     Mr. Rey reached out to me in or around August 2021 and asked me to join Skyryse. I declined Gonzalo's offer.

37.     Mr. Pilkington reached out to me in or around November 2021 and asked me to join Skyryse. Mr. Pilkington advised there was "urgency" at Skyryse. I declined Mr. Pilkington's offer.

38.     Based on my conversations with Moog employees and management, it is my understanding that Skyryse has reached out to many software engineers at Moog, and has specifically targeted Moog's Los Angeles-area office.

39.     To date, Skyryse has hired 20 former Moog employees (including pending resignations).  The first employees at Moog that were targeted were the lead software engineers and developers.  For example, in the California office, there were 9 developers who could write software code. 5 out of these 9 developers have left Moog to join Skyryse.  Every software developer who worked on military portion of Platform software, eRTOS, has been hired by Skyryse.

**VII.     Copying of Moog's Data**

40.     Based on my review of Moog's internal and business records, it is my understanding that in late January 2021, the Moog IT department was asked to look into whether individuals who had left Moog for Skyryse, or were soon leaving Moog to join Skyryse, had taken or copied any Moog data before their departure.

41.     It is my understanding that Moog's security investigation revealed that Moog

employee Misook Kim had copied certain Moog data to an external hard drive. It is my

understanding based on my personal investigation, communications with the Moog IT and

security teams, and review of Moog's internal business records, that Ms. Kim's copying of Moog

data was performed on November 19, 2021, less than one month before her last day at Moog,

and less than one week after Mr. Pilkington, her supervisor, left Moog for Skyryse.  It was on the

exact day she notified Moog that she would be leaving for Skyryse.

42.     I have personally reviewed the file log for the data copied by Ms. Kim (the "File

Log"), and have investigated its contents.  The file log was provided by the Moog IT department

from a software program that monitors users who copy data to external devices. A true and

correct copy of the File Log is attached as Exhibit A to the concurrently filed Declaration of Ian

Bagnald.

43.     I, along with my colleague Todd Schmidt, have analyzed the File Log in detail to

determine its contents and scope.  The total amount of files copied by Ms. Kim is 136,994.  The

overall file metrics are broken down as follows:

| Type | Number |
|------|--------|
| Source Code | 43,960 |
| Spreadsheets | 5,377 |
| Documents | 2,831 |
| Executables | 954 |

| Images | 9,003 |
| --- | --- |
| MAP Files | 2,010 |
| Models | 7,898 |
| Object Files | 1,026 |
| Plain Text | 4,613 |
| Presentations | 404 |
| Misc. | 20,655 |
| SVN Logs | 38,263 |
| Total Files | 136,994 |

44.     My review of the File Log shows that the following program classifications were

found (showing which program data and code had been copied by Ms. Kim):





45.     My review of the File Log confirmed that the entire source code for Platform was copied by Ms. Kim, meaning that 100% of the base Platform software and its code were copied for at least 2 of the 3 microprocessor applications. All three iterations (commercial, military, motors) of Platform were copied, as well as test artifacts related to some of the iterations.  The types of files copied by Ms. Kim for Platform and other software programs and applications include source code, spreadsheets, standalone documents, executables (software executable files including flight programs), images, models (containing pictures or models of functionality), presentations, MAP files (containing variables and addressing of flight code), object files (files created from a compiler containing executable object code—used to link together a flight program), and SVN Logs (files autogenerated from Moog's Subversion network).

46.     In addition to the Platform base software, the data and code for several project-specific applications were also copied, as reflected above.  This includes several military programs. The data copied by Ms. Kim includes all of the code, documentation, and related information regarding the composition, testing, and certification of some Platform and project-specific applications. Some projects were copied in their entirety and some projects had select files copied. Kim copied all 76 of Moog's SEPG checklists as well as other documents from its SEPG repository.

47.     My investigation of the File Log and related data shows that Ms. Kim used Mr. Pilkington's file path to copy the data onto the external hard drive. The file path used by Ms. Kim was: "D:\Misook\ENG_Alin_Branch\Software…"  Therefore, the file path shows that Ms. Kim went into one of Mr. Pilkington's branches and copied items from that branch.   Ms. Kim had credentials to create and use her own file path, on which much of the same data and more recent data was stored including the Platform base software, but instead used Mr. Pilkington's.

48.     I also understand that Ms. Kim copied the data onto an external hard drive.  There would be no legitimate reason in Ms. Kim's ordinary job duties for her to attach an external hard drive and copy any data onto it, much less the Platform.  The standard way in which Moog employees worked on Platform-related projects would have been to connect to the Moog server and access data that way.  If necessary, a copy of the data would be stored to the user's hard drive on their laptop computer – not an external hard drive.

49.     Moreover, Ms. Kim was a tester, not a development engineer.  Her knowledge of the platforms, their architectures and the source code files would not be useful to her.  She would only need her current program data she is working on, while she was working it.  She had no use for the project data after she was complete with that project.  That data is specific to a current Moog project.

50.     Mr. Pilkington and Ms. Kim did not work directly on the third iteration of the Platform software for motors (AMP). They instead worked exclusively on the second iteration for military projects (eRTOS).  However, knowledge of the military base software can be easily used and applied to the motors base software given substantial overlap and similarity between the two base software. Many areas where Ms. Kim did not directly work on were also copied. For example, a military program called Sensitive Government Program 1, control laws for the

G280 aircraft, and the original Platform software.  Additionally work products from our

electrical engineering group were also copied including firmware requirements used by our

electrical engineers to create firmware for ████████████████████████████████

████████████████████████

51.     I spent many years working with Mr. Pilkington and Ms. Kim.  They were hired

on together and Mr. Pilkington would not join without Moog agreeing to hire Ms. Kim also.  Mr.

Pilkington was the software architect and source code writer and he would task Ms. Kim's daily

duties to assist him.  She sat right next to him.  In my experience, Ms. Kim never did anything

without Mr. Pilkington's express instruction and approval.  Based on my experience of working

with them for many years, I do not believe that Ms. Kim would have accessed and copied this

data unless Mr. Pilkington had expressly instructed her to do so.  Most of the copied data would

have been useless to her.

52.     I have read the declaration of Jamie Daly filed concurrently herewith.

Specifically, I have reviewed the correspondence between Ms. Kim and Ms. Daly on February

21, 2022 regarding the external hard drive used by Ms. Kim and her alleged reasoning for

copying Moog's data. Based on my knowledge of the Platform software and related applications,

and having managed Ms. Kim for several years, Ms. Kim's alleged reasoning for copying

Moog's data does not support a legitimate business reason for several reasons.

53.     First, when Ms. Kim sent her resignation notice to me via e-mail on November

19, 2021, she advised that she would work hard and wrap up her matters before she leaves.

There was no plan for her to help Moog employees after her departure.  Even if she was

supposed to assist Moog employees after her departure (which she was not), she likely would

have copied the most recent Moog data on December 17, 2021 (her last day at Moog), and not older data on November 19, 2021 before she spent four additional weeks working on her project.

54.     Second, even if Ms. Kim wanted to assist with her projects after her departure, as stated further above, she only would have needed to download certain testing data related to the specific project that she was working on, Sensitive Government Project 2.  Based on my review of the File Log, this would have comprised, at most, 0.5% of the total data that Ms. Kim copied. Ms. Kim copied several file classifications, and the entire contents of several programs, that she never had any involvement with.

55.     Third, having reviewed the Declaration of Ian Bagnald filed concurrently herewith and been personally involved in the investigation described therein, I understand that a first hard drive was returned by Miyoung Ryu (Ms. Kim's sister) on behalf of Ms. Kim. However, I understand that this initial hard drive was not the same hard drive that Ms. Kim used to copy Moog's data.  If Ms. Kim had indeed copied Moog's data for legitimate business purposes and did not intend to disclose its contents to anyone else, she should have had Ms. Ryu return both external hard drives the first time.

56.     Fourth, there is no justification for why Ms. Kim deleted the Moog data she copied.  If Ms. Kim had copied Moog's data for legitimate business purposes, she should have returned the external hard drive with the data intact so Moog could verify the data she copied and its alleged purpose.

57.     Finally, I am familiar with and have personally reviewed the exit form Ms. Kim signed on her last day of employment, December 17, 2021, attached to the Declaration of Jamie Daly as Exhibit B.  Therein, Ms. Kim confirmed in writing that she had returned to her direct supervisor all "TRADE SECRET/COMPANY CONFIDENTIAL INFO."  She also affirmed that

she does "not maintain access to, or have possession of, any tangible or digital record of Moog IP—whether in hard copy or digital form—on any device, cloud, or digital storage facilities." If Ms. Kim had taken a large volume of Moog data for legitimate business purposes, she should have disclosed this in her exit form and during her exit interview.

**VIII.**   **Irreparable Harm**

58.     The data copied by Ms. Kim, and possession thereof by Skyryse, presents substantial and irreparable harm to Moog.

59.     Unmanned helicopter aviation, which Moog is pursuing and  I understand Skyryse is also pursuing, is a new market.  There is no established market and no industry leader yet. About 20 companies, including Moog and Skyryse, have entered the market and are rushing to become the market leader. If another party gained access to Moog's flight control software and related data, this would give that party a substantial advantage as it would save tens of millions of dollars and several years of developing that software.  Moog has invested about 5 years of research and development into unmanned helicopters and 15 years in developing the Platform software.  This software takes many years to build, test, and certify.

60.     There is generally a high barrier to entry in the flight control software market. Companies that have an established, tested, and proven software and have successfully delivered on contracts before have a huge advantage in securing contracts from the government and other third parties. Platform provides Moog with that competitive advantage.  Contracting parties understand that because of Moog's Platform software, it will be faster and less expensive to tailor its flight control software to a particular aircraft because the substantial foundation has already been built.

61.     Based on my experience, other companies would have to pay two to three times what Moog does because Moog has an established flight control operating system software. As a result, Moog wins many of the flight control projects that it bids on.

62.     One of the notable programs copied by Ms. Kim is the commercial program G280. ██████████████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████     Based on my personal research as well as review of Moog's internal business records regarding its prior business history and relationship with Skyryse, I understand that Skyryse is now pursuing flight control systems for aircraft.  The data from the G280 project is directly related to what Skyryse is pursuing and, based on my experience and knowledge of this project, would be extremely valuable to Skyryse and would save it tremendous time, money, effort, and resources in having to build these programs from scratch.

63.     If a third party was able to obtain the entire code and underlying data to Moog's Platform software, a large barrier to entry would be removed. Ms. Kim essentially copied almost every piece of data related to Moog's platforms for flight control software and some applications that Moog has worked on over the past 15 years. It is impossible to quantify the value to Moog of the amount of monetary investment, software engineering hours, and other resources that have gone into developing, testing, and certifying all of these programs and applications.

64.     Further, by gaining access to Moog's Platform software, a third party could get access to perform software upgrades. A third party would not be able to pull information from an airplane box that has used the Platform software in order to re-program it unless it has access to Moog's software.  Right now, only Moog can re-install or service an upgraded equipment or

product which uses the Platform software.  Re-programming an airplane computer has several security concerns.  Moreover, it potentially allows third parties to take over performing work for Moog clients that currently only Moog can perform.

65.     Further, Moog's Platform software has been used for several military programs. There are heightened credentials that must be obtained for Moog employees to work on those projects.  It generally takes a new hire one year or longer to obtain sufficient clearance to work on military projects.  Moog is not able to immediately re-allocate new employees to fill the void of its military software developers that left for Skyryse because it takes considerable time to establish required access credentials.

66.     Finally, and perhaps most importantly, there are substantial security, goodwill, and reputational issues posed by Ms. Kim's copying of Moog's proprietary and confidential software and related data.  Under almost every contract that Moog enters into for flight software development, there is a requirement that Moog notify its customers if certain proprietary or confidential data was copied or stolen.  Moog is now required to notify each of its military customers of the data theft at issue, including the US Government.  I am not aware of any prior instance where Moog has had to notify the US Government of anything close to the type of data breach presented by Ms. Kim's actions. And based on my decades of experience in the software engineering field and staying on top of news of government contracting issues with competitors, my understanding is that the US Government often reacts strongly when its data has been compromised.

67.     Moog's required disclosure will inevitably cause tremendous harm to Moog's reputation and goodwill in the industry.  Data and information security is of paramount concern in this industry, especially with the US Government.  Moog has historically been regarded as

excellent and trustworthy in terms of data security and confidentiality.  Any notion that Moog is

unsafe with its customers' data will likely bring tremendous reputational harm and cause Moog

to lose future contracts that it otherwise would obtain.

I declare that the foregoing is true and correct under penalty of perjury under the

laws of the United States of America.


Dated:    February 28, 2022

_Michael Hunter_
_____
Michael Hunter