# Exhibit F
# Public Redacted Version

**SheppardMullin**

Sheppard Mullin Richter & Hampton LLP
12275 El Camino Real, Suite 100
San Diego, CA 92130-4092
858.720.8900 main
www.sheppardmullin.com

858.720.8940 direct
tanderson@sheppardmullin.com
File Number: 02HL-350124

April 19, 2022

**VIA E-MAIL ONLY**

| | |
|---|---|
| Josh Krevitt, Esq. | jkrevitt@gibsondunn.com |
| Kate Dominguez, Esq. | kdominguez@gibsondunn.com |
| Ilissa Samplin, Esq. | isamplin@gibsondunn.com |
| Angelique Kaounis, Esq. | akaounis@gibsondunn.com |
| Michael M. Polka, Esq. | mpolka@gibsondunn.com |
| Justine Goeke, Esq. | jgoeke@gibsondunn.com |

GIBSON, DUNN, & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193

Re:     *Moog Inc. v. Skyryse, Inc., et al.*
        U.S. District Court, Western District of New York – Case No. 1:22-cv-00187
        Meet and Confer Regarding Discovery Responses

Dear Counsel:

Pursuant to the parties' March 17, 2022 Stipulation Re: Expedited Discovery (ECF 33, 36) and Magistrate Judge McCarthy's Standing Order, we write to meet and confer regarding defendant Skyryse, Inc.'s ("Skyryse") April 13, 2022 objections and responses to plaintiff Moog Inc.'s Requests for Production of Documents ("RFPs") and Requests for Admission ("RFAs"), and its April 19, 2022 supplemental objections and responses to Moog's Interrogatories.  Many of Skyryse's objections and responses directly contradict its representations to the Court regarding providing transparency in this case. Regardless, as part of a good faith meet and confer process with the hopes of reaching mutually agreeable resolutions, please find below a factual and legal explanation as to why the majority of Skyryse's responses are deficient and must immediately be rectified.

Because of the urgency of these expedited discovery proceedings and Moog's need for immediate preliminary injunctive relief, the Parties must seek to resolve these issues as quickly as possible.  To this end, please provide your availability for a telephonic meet and confer to discuss the below issues no later than 5:00 p.m. EST on Friday, April 22, 2022. Intend to provide Skyryse one further opportunity to provide complete and proper supplemental discovery responses on or before April 27, 2022. To the extent any outstanding issues remain, Moog will promptly address them with Magistrate Judge McCarthy pursuant to the joint-submission procedure in the Stipulation Re: Expedited Discovery (ECF 33).

A.     **Skyryse's Stated Commitment to Transparency**

During the April 8, 2022 hearing with Magistrate Judge McCarthy, Skyryse made the following representations to the Court on the record:

**SheppardMullin**

Josh Krevitt, Esq.
Kate Dominguez, Esq.
April 19, 2022
Page 2

- "We don't want any Moog information . . . if somehow some Moog confidential information found its way to Skyryse, and that happens, we will return it. If we can find it, we will return it immediately. We don't want it." (4/8/22 Transcript, 13:24-14:4);

- "we're happy to be transparent about what we're doing because we feel that strongly that we don't want the material . . . " (*Id*. at 14:4-8).

- Skyryse's "commitment to return any Moog confidential information that we have." (*Id*. at 14:11-12).

Unfortunately, Skyryse's discovery conduct to date is not consistent with a party that is both committed to transparency and to returning all of Moog's Confidential Information.

**B.     Skyryse's General and Specific Objections**

Skyryse's responses and objections to Moog's RFPs, Interrogatories, and RFAs total 74 pages, the vast majority of which constitutes insufficient boilerplate and copy/paste objections. *See In re Air Crash Near Clarence Ctr., New York, on Feb. 12, 2009*, 277 F.R.D. 251, 254 (W.D.N.Y. 2011). ("Objections must clearly set forth the specifics of each objection and how that objection relates to the discovery being demanded. . . . "Pat, generic, boilerplate, and non-specific objections will not suffice.").  Skyryse's substantive responses total just a few pages. Without waiving any of its rights or the impropriety of each of Skyryse's boilerplate general and specific objections, Moog addresses certain of the consistent objections that Skyryse asserts throughout its responses. For efficiency purposes, these issues are incorporated by reference into each of the specific requests discussed below where such objections are interposed.

**1.     Skyryse's Improper Limitation of the Definition of "Skyryse"**

In its general objections and specific objections in response to every Moog discovery request, Skyryse copies/pastes a long-winded objection to Moog's definition of "Skyryse." Skyryse claims that it does not consider "actions by individual employees acting without the knowledge of, and outside the direction of, Skyryse, Inc." to constitute "actions of Skyryse." Skyryse then concludes it will interpret "Skyryse" to mean "Skyryse, Inc." only.  This suggests that Skyryse is answering discovery only on behalf of the corporate form of Skyryse the corporation, and disclaiming the actions and knowledge of *any* of its employees, including Kim and Pilkington. This is wholly improper, as Skyryse must account for the actions and knowledge of its directors, officers, and employees, including Kim and Pilkington.

 "Corporate defendants can only act through their employees and agents." *Suez Equity Investors L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001). An act falls within the scope of employment **"if it is in furtherance of, or reasonably necessary or incidental to, the employer's business or interest**." *Hamilton v. City of New York*, No. 15-CV-4574, 2019 WL 1452013, at *31 (E.D.N.Y. Mar. 19, 2019) (citation omitted) (emphasis added); *Nokaj v. N. E. Dental Mgmt., LLC*, No. 16-CV-3035 (KMK), 2019 WL 634656, at *12 (S.D.N.Y. Feb. 14, 2019) ("an employer may be held responsible where an employee's actions were at least partially in furtherance of his employer's interests.").

**SheppardMullin**

Josh Krevitt, Esq.
Kate Dominguez, Esq.
April 19, 2022
Page 3

"An act is within the scope of employment if it is performed while the employee is engaged generally in the business of the employer, or if his or her act may be reasonably said to be necessary or incidental to such employment. […] ***This is the case even if the knowledge of the employee performing the act is never communicated to his or her superior***." *City of NY v. Fedex Ground Package Sys. Inc.*, 351 F. Supp 3d 456, 479 (S.D.N.Y. 2018): (emphasis added). "A corporation must, therefore, be responsible for the acts of its authorized agents, ***even if particular acts were unauthorized***. The risk of loss from the unauthorized acts of a dishonest agent falls on the principal that selected the agent." *Kirschnger v. KPMG LLP*, 15 N.Y.3d 446, 465 (N.Y. 2010) (emphasis added) ("Agency law presumes imputation even where the agent acts less than admirably, exhibits poor business judgment, or commits fraud.").

While Skyryse is attempting to distance itself from the severe actions of Kim and Pilkington in copying without authorization over 1.3 million files of Moog data, that ignores both the facts and the applicable law. Even if someone else at Skyryse never knew of or authorized Kim and Pilkington's actions (which will be determined through discovery), Skyryse is responsible and can be held accountable for Kim and Pilkington's actions as of the time period after each left Moog and joined Skyryse. Indeed, Pilkington has been operating as a manager for Skyryse since he joined, and appears to have orchestrated Kim's taking of Moog data on behalf of Skyryse. As alleged in the Complaint, Kim and Pilkington's acts were made in concert with Skyryse and to benefit Skyryse's flight control software development. Notably, in its motions to dismiss Skyryse does not disclaim any agency relationship with Kim and Pilkington, and has confirmed multiple times that they remain Skyryse employees today.

Skyryse must provide complete supplemental responses on behalf of Skyryse, including all knowledge and actions of its personnel taken for the sole or partial benefit of Skyryse, or otherwise arising in the course and scope of employment for Skyryse.[1]

## 2.  Skyryse's Trade Secret Identification Objection

In its general objections and in response to every discovery request propounded by Moog, Skyryse asserts a long, convoluted objection that Moog has not identified its trade secrets with sufficient particularity. Given the specificity of Moog's descriptions of the underlying trade secrets in the complaint and motion for preliminary injunction papers, and given that Skyryse did not file a Rule 12 motion challenging the sufficiency of Moog's trade secrets, any objections on this ground lack merit and cannot be used to impede discovery.

The standard for trade secret identification "generally requires that the plaintiff provide enough information about the alleged trade secrets (1) to put the defendant on notice of the nature of plaintiff's claims, and (2) to allow defendant to discern the relevancy of any discovery requests." *Uni-Sys., LLC v. U.S. Tennis Ass'n*, No. 17CV147KAMCLP, 2017 WL 4081904, at *4 (E.D.N.Y. Sept. 13, 2017). Enough "[s]pecificity is required at the moment of divulging so that the party to whom the secret is revealed understands the contours of the secret information and does not

---

[1] Moog also hereby places Skyryse on notice that the more Skyryse continues to attempt to treat Kim and Pilkington as somehow separate from Skyryse, the less likely any purported common interest between Skyryse and Kim and Pilkington could exist, resulting in defendants being required to produce all communications between them and their respective counsel arising in the course of this litigation.

**Sheppard**Mullin

Josh Krevitt, Esq.
Kate Dominguez, Esq.
April 19, 2022
Page 4

inadvertently or purposefully transgress its boundaries." *Sit-Up Ltd. v. IAC/InterActiveCorp.*, No. 05 CIV. 9292(DLC), 2008 WL 463884, at *11 (S.D.N.Y. Feb. 20, 2008).

There can be no colorable claim that Skyryse cannot understand the contours of the trade secret information at issue in this case. On March 8, 2022, Skyryse was served with Moog's Complaint and initial filings containing the following information regarding Moog's trade secrets:

- Specification of the two Moog-issued laptop and two external hard drive devices used by Kim to copy Moog's data (that Moog is aware of and has possession of). (Bagnald Dec., ¶ 11) (*See generally* Pixley Dec.);

- The dates, time, and manner in which Moog's data was copied by Ms. Kim on November 19, 2021 and December 15, 2021. (Bagnald Dec., ¶ 10) (Pixley Dec., ¶¶ 22-27);

- A detailed breakdown by category of the 136,994 Moog files copied by Ms. Kim, including that 43,960 files constitute Moog source code. (Complaint, ¶ 115) (Bagnald Dec., ¶ 13) (Hunter Dec., ¶ 43) (Schmidt Dec., ¶ 19);

- A detailed list of the commercial and military program classifications amongst the 136,994 files copied by Ms. Kim on November 19, 2021. (Complaint, ¶ 117) (Hunter Dec., ¶ 44) (Schmidt Dec., ¶ 20);

- A file log containing the file name, file path, external hard drive involved, encryption status, folder/hard drive name and location, file size, date and time of copying, and other unique identifiers *for each of the 136,994 files copied by Ms. Kim on November 19, 2021*. (the "File Log") (Bagnald Dec., Ex. A);

- A detailed explanation regarding how the data copied by Ms. Kim on November 19, 2021 was intentionally altered, manipulated, and or deleted from Ms. Kim's Moog-issued laptop devices and/or the external hard drives used in the copying. (Complaint, ¶¶ 133-140) (*See generally* Pixley Dec.);

- Specification that the Moog trade secrets at issue in this case are its flight control source code and Software Engineering Process Group ("SEPG") documents (as opposed to all data copied by Defendants). (Complaint, ¶¶ 39) (Hunter Dec., ¶¶ 28, 46).

In a March 21, 2022 letter, Moog notified Defendants' counsel that it had found evidence of another series of downloads, this time by Pilkington.  Moog explained that there was evidence that Pilkington had downloaded approximately 1.1 million files of Moog data from his Moog-issued laptop onto an external hard drive, and then subsequently downloaded another 130,000 files to another hard drive on his last day of employment by Moog.

On March 23, 2022, at Skyryse's request and as a supplement to the file log Moog had attached as an exhibit to the Complaint, Moog provided a log with MD5# values for approximately 62,000 files from Kim's Moog-issued laptop that may correspond to certain of the 136,994 files that Kim copied from that laptop on November 19, 2021 (the "Hash Log"), and that this was all the hash information that Moog could generate in connection with the 136,994 files. Moog further

# SheppardMullin

Josh Krevitt, Esq.
Kate Dominguez, Esq.
April 19, 2022
Page 5

advised that the MD5# values are of limited probative value because, among other things, they were generated from files that could have been edited, altered, and/or manipulated by Kim or in the normal course of business after the copying occurred.

On April 4, 2022, Moog provided Defendants' counsel with a log showing, among other things, folders copied by Pilkington and the timeline of his related conduct. Moog has provided to date every piece of information in its possession, custody or control or that it could generate regarding the over 1.3 million files copied by Skyryse employees Kim and Pilkington. Skyryse evidently knows the trade secrets at issues in this case (Moog's flight control source code and SEPG documents), and its own employees are the ones who know exactly what was copied and what has happened with Moog's Confidential Information. Indeed, Kim and Pilkington admit in their discovery responses that they retained possession of Moog Confidential Information (including source code) upon beginning employment at Skyryse.

Indeed, Moog's trade secret descriptions far exceed the particularity requirements applied by district courts in this circuit.  *See, e.g., Capricorn Mgmt. Sys., Inc. v. Gov't Emps. Ins. Co.*, 2016 WL 1370937, at *3 (E.D.N.Y. Apr. 6, 2016) (claim that plaintiff's proprietary program "enhanced" fraud detection, enabled "customization and automation of the claims management process," monitored employee efficiency and detected fraudulent prescriptions was sufficient to identify trade secrets); *Medtech Prod. Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 789 (S.D.N.Y. 2008) ("The Court recognizes that Medtech, for the most part, does not specify the particular trade secrets at issue in this case, but instead categorizes them generally as 'manufacturing cost details, drawings, test data, and other information about the design and manufacturing process for its dental protectors.' However, specificity as to the precise trade secrets misappropriated is not required in order for Medtech to defeat the present Motions to Dismiss."); *Sorias v. Nat'l Cellular USA, Inc.*, 124 F. Supp. 3d 244, 259 (E.D.N.Y. 2015) ("though general," complaint's identification of trade secrets as "data and designs of a specific phone charger with horizontally folding A/C prongs" was sufficient to give defendants fair notice of the claim); *Liberty Power Corp., LLC v. Katz*, No. 10-CV-1938, 2011 WL 256216, at *2 (E.D.N.Y. Jan. 26, 2011) (one of the trade secrets identified by the plaintiff was described as "specific contact information for individual contacts at Plaintiff's customers," and this was considered sufficient); *Dardashtian v. Gitman*, No. 17-CV-4327, 2017 WL 6398718, at *5 (S.D.N.Y. Nov. 28, 2017) (Court concluded that a trade secret disclosure of  "customer lists and addresses, vendor lists and addresses, computer software programs; computer pass codes and other protectable intellectual property and proprietary information" provided a "level of detail ... adequate for defendants to discern the trade secrets at issue."); *In Next Communications, Inc. v. Viber Media, Inc.*, 2016 WL 1275659, at *4 (S.D.N.Y. Mar. 30, 2016) (complaint's description of a "unique technique for routing calls, allowing for detailed traffic monitoring, reporting, and billing" was adequate to identify the claimed trade secret.).

Notwithstanding this standard, Moog has been fully transparent with Skyryse and has provided substantial information regarding the over 1.4 million files downloaded by Pilkington and Kim. All of this has been provided notwithstanding the highly intentional steps Pilkington and Kim took to cover their tracks.  Moog does not have a complete set of either Kim's or Pilkington's downloaded files because of Kim's and Pilkington's obfuscation – only Kim, Pilkington and Skyryse could potentially have that information.  Under these circumstances, it is neither fair nor sensible to blame Moog for Defendants' subterfuge.   Any complaints regarding the

**Sheppard**Mullin

Josh Krevitt, Esq.
Kate Dominguez, Esq.
April 19, 2022
Page 6

incompleteness of Moog's identification of its materials should be directed to Skyryse's employees Pilkington and Kim, whom Skyryse presumptively controls, not Moog.

Moog demands that Skyryse confirm in writing that it is not withholding responsive information or documents pursuant to its baseless trade secret identification objections.

### 3.    Relevance

In its general objections and in response to a vast majority of Moog's discovery requests, Skyryse objects on relevance grounds.

Parties "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ."  Fed. R. Civ. P. 26(b)(1). This rule is "broadly interpreted." *Cox v. McClellan*, 174 F.R.D. 32, 34 (W.D.N.Y. 1997). "Discovery in federal court is broad and permissive." *In re Air Crash Near Clarence Ctr., New York, on Feb. 12, 2009*, 277 F.R.D. 251, 253 (W.D.N.Y. 2011). This relevance standard is "necessarily broad in scope in order 'to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Laforest v. Honeywell Int'l Inc.*, No. 03–CV–6248, 2004 WL 1498916, at *2 (W.D.N.Y. July 1, 2004). "[D]iscovery is to be considered relevant where there is *any possibility* that the information sought may be relevant to the subject matter of the action." *United States v. International Business Machines Corp.*, 66 F.R.D. 215, 218 (S.D.N.Y.1974) (emphasis in original). "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."  Fed. R. Civ. P. 26(b)(1)

As demonstrated further below, each of Moog's discovery requests are relevant to the claims and defenses in this case.

### 4.    Overbreadth or Undue Burden

In its general objections and in response to a vast majority of Moog's discovery requests, Skyryse objects on burden and overbreadth grounds.

"Once relevance has been shown, it is up to the responding party to justify curtailing discovery. The objecting party must show specifically how, despite the broad and liberal construction afforded the federal discovery rules, each request is not relevant or how each question is overly broad, burdensome or oppressive." *Chen-Oster v. Goldman, Sachs & Co.*, 293 F.R.D. 557, 561–62 (S.D.N.Y. 2013).

A "[d]efendant cannot evade its discovery responsibility by simply intoning [the] familiar litany that the interrogatories are burdensome, oppressive or overly broad." *Compagnie Francaise D'Assurance v. Phillips Petroleum Co.*, 105 F.R.D. 16, 42 (S.D.N.Y.1984) (Objections based on burden must be supported by specific evidence "by submitting affidavits or offering evidence revealing the nature of the burden."). "It is settled law that to support an objection based upon burdensomeness the objecting party must particularize the basis for the objection as generalized assertions are inadequate.*" Nagele v. Elec. Data Sys. Corp.*, 193 F.R.D. 94, 109 (W.D.N.Y. 2000).

**SheppardMullin**

Josh Krevitt, Esq.
Kate Dominguez, Esq.
April 19, 2022
Page 7

Skyryse has not supported any of its burden of overbreadth objections with a specific showing of the nature of the burden, including through affidavits or other admissible evidence.

###    5.    Vagueness and Ambiguity

In its general objections and in response to a vast majority of Moog's discovery requests, Skyryse objects that certain terms, phrases, or entire requests are vague and ambiguous.

Objections claiming a request is vague or unduly burdensome is "not sufficiently specific to allow the court to ascertain the claimed objectionable character of the Discovery Request, further, this type of general objection is not proper." *Burns v. Imagine Films Ent., Inc.*, 164 F.R.D. 589, 593 (W.D.N.Y. 1996). Such objections must be specifically substantiated. *Dorchester Fin. Holdings Corp. v. Banco BRJ, S.A.*, No. 11-CV-1529 KMW KNF, 2014 WL 3747160, at *8 (S.D.N.Y. July 3, 2014) (holding responding party failed to meet its burden where it "failed to address each specific objection by the defendant and explain why it believes certain requests are not overly broad, ambiguous, vague and seek irrelevant information"); *NexGen HBM, Inc. v. ListReports, Inc.*, 2018 WL 6438572, at *2 (C.D. Cal. Sept. 6, 2018) (rejecting the defendants' objections that numerous terms are "vague or ambiguous" given that they "offer no argument to support the objection").

Further, parties have "an obligation to construe . . . discovery requests in a reasonable manner." *Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 618-19 (D. Colo. 2007). *See also King-Hardy v. Bloomfield Board of Education*, 2002 WL 32506294, *5 (D. Conn. 2002) (responding party must give discovery requests a reasonable construction, rather than strain to find ambiguity); *McCoo v. Denny's Inc.*, 192 F.R.D. 675, 694 (D. Kan. 2000) ("A party responding to discovery requests should exercise reason and common sense to attribute ordinary definitions to terms and phrases utilized . . . .") (internal quotation marks omitted).

Skyryse's objections are not provided in good faith, and it has not met its burden of substantiating its purported vagueness and ambiguity objections. For example, in response to RFA No. 1, Skyryse objects to the definition of "Used" because it "incorporates vague, ambiguous, and undefined terms" including "held," "deployed," "employed," "adopted," and "applied." None of these words are complicated, and Skyryse is obligated to construe such terms in a reasonable manner. It is not practical for Moog to define each and every substantive word that is used in a request or definition. If Skyryse has a genuine confusion about any particular term, Moog is prepared to immediately provide clarity as to the intended meaning.

Moog demands that Skyryse confirm in writing that it is not withholding responsive information or documents pursuant to its vagueness or ambiguity objections.

###    6.    Premature

In its general objections and in response to Interrogatory No. 3, Skyryse objects that the request/interrogatory is premature and calls for expert testimony.

"Premature" objections are improper and parties must respond fully and provide information they currently have. *See Sony Corp. v. Vizio, Inc.*, No. SACV 08-1135-RGK (FMOx),

**SheppardMullin**

Josh Krevitt, Esq.
Kate Dominguez, Esq.
April 19, 2022
Page 8

2009 WL 10675358, at *2 (C.D. Cal. Oct. 23, 2009) (overruling objection that discovery requests are premature because they call for expert discovery and holding "the parties must respond fully and completely to all discovery requests to the best of their knowledge, based on the information they have to date").

Skyryse is required to provide all responsive information in its current possession.

### 7.      Information Allegedly in Moog's Possession

In its general objections and in response to Interrogatory No. 4 and RFP No. 4, Skyryse objects on the grounds that the information sought is equally available to Moog and/or in its possession. This is not a proper objection.  *See Charter Practices International, LLC v. Robb*, 2014 WL 273855, *2 (D. Conn. 2014) ("plaintiffs' objection that the information and documents sought are equally available to the propounding parties ... is a 'meritless' basis for objection"); Foti ex rel. Louisiana v. Eli Lilly & Co., 2008 WL 2858617, *3 (E.D.N.Y. 2008) ("Mississippi's 'equally available' objection deprives Lilly of basic information concerning the nature of that State's claims").

Moog demands that Skyryse confirms in writing that it is not withholding responsive information or documents pursuant to this objection.

### C.      Skyryse's Responses to Moog's Interrogatories

### 1.      Interrogatory No. 2

Interrogatory No. 2 asks Skyryse to: "Identify all security measures Used by Skyryse that would detect the insertion of any external hard drive or other data storage device by any user." In response, after rattling off several boilerplate objections, Skyryse answers: "Skyryse is not aware of security measures it currently has in place that are designed to detect the insertion of an external hard drive or other data storage device."

It is not clear whether Skyryse intentionally failed to squarely address the interrogatory or not, so we need clarification here.  This interrogatory asks for security measures "that would detect" insertion. Skyryse's response states it is not aware of security measures "***designed*** to detect" insertion. We interpret this to mean that Skyryse does not have any specific security software in place to detect insertion of external drives (such as Ivanti). However, Skyryse's counsel has told us that Skyryse has no central servers, and instead operates by each of its employees having his/her own Skyryse-issued laptop that is connected directly to Skyryse's networks. These laptops all have capability to track the connections to and from other external devices.

To the extent there is any confusion on Skyryse's part as to what "security measures" means, Moog seeks information regarding the manner in which information about the timing, manner, and duration of external device connection to Skyryse-issued laptops or networks is maintained by Skyryse. Skyryse must promptly provide a supplemental response agreeing to provide such information, and further clarify its answer to this interrogatory.

**Sheppard**Mullin

Josh Krevitt, Esq.
Kate Dominguez, Esq.
April 19, 2022
Page 9

2.      **Interrogatory No. 3**

Interrogatory No. 3 asks Skyryse to: "Describe in Detail the locations in which any Moog Confidential Information has been identified by Skyryse on its systems." In response, Skyryse answers: "Skyryse has not identified locations of Moog Confidential Information on its network drives."

This response is improper and appears to be a semantic sleight of hand by Skyryse. Skyryse improperly interprets "systems" to mean "network drives." Rather, Moog wants to know every Skyryse device or location (including laptops, desktops, mobile phones, external hard drives, USB drives, etc.) that contains Moog Confidential Information. Skyryse has already admitted in writing that Kim's Skyryse-issued laptop received data from the devices she used to copy Moog data, and that over 11,000 files identically matching the file names copied by Kim were located on Pilkington's Skyryse-issued laptop. So, Skyryse's response is evasive and false. *Trueman v. New York State Canal Corp.*, No. CIV.109-CV-049LEK/RF, 2010 WL 681341, at *3 (N.D.N.Y. Feb. 24, 2010) ("In order for an answer to be adequate it must be a complete response to the interrogatory, specific as possible and not evasive.").

Skyryse must immediately provide a supplemental response identifying all locations, not just its "network drives," where it has located Moog Confidential Information.

3.      **Interrogatory No. 4**

This interrogatory asks Skyryse to: "Identify all Skyryse employees or contractors who maintained or came into possession of any Moog Confidential Information upon commencing employment at Skyryse." In response, Skyryse answers: "No Skyryse employees have been identified who maintain or possess Moog Confidential Information."

Yet again, this is improper and transparent obfuscation by Skyryse. Moog's interrogatory asked for all employees or contractors who "maintained or came into possession" of Moog Confidential Information when starting employment at Skyryse. This does not ask which Skyryse employees *currently maintain* Moog Confidential Information. The word "maintained" is in the past tense, which would include any employee who had Moog information when they first started at Skyryse. Skyryse's answer uses the phrase "who maintain or possess," which is the present tense. This does not answer Moog's interrogatory. Kim and Pilkington have already provided discovery responses stating they retained Moog Confidential Information (including source code) upon beginning employment at Skyryse. So, Skyryse's response is improper and evasive. *Trueman v. New York State Canal Corp.*, No. CIV.109-CV-049LEK/RF, 2010 WL 681341, at *3 (N.D.N.Y. Feb. 24, 2010) ("In order for an answer to be adequate it must be a complete response to the interrogatory, specific as possible and not evasive.").

Skyryse must immediately provide a compliant supplemental response.

4.      **Interrogatory No. 5**

This interrogatory asks Skyryse to: "Identify each and every Skyryse employee who was aware that Skyryse was in possession of Moog Confidential Information prior to the

**Sheppard**Mullin

Josh Krevitt, Esq.
Kate Dominguez, Esq.
April 19, 2022
Page 10

commencement of this lawsuit." In response, Skyryse answers: "No Skyryse employees have been identified that were aware of any Moog Confidential Information in Skyryse's possession prior to the commencement of this lawsuit."

This answer is evasive and, quite frankly, makes no sense. Kim admitted in her RFA responses that both she and Pilkington maintained Moog Confidential Information, including source code, when beginning employment at Skyryse. Pilkington admits in his RFA response that he maintained Moog Confidential Information, including source code, when beginning employment at Skyryse. Kim's Skyryse-issued laptop received Moog data, and over 11,000 identical Moog files have been found on Pilkington's Skyryse-issued laptop. Given that Kim and Pilkington are Skyryse employees, there are at least two employees who were aware that Skyryse was in possession of Moog Confidential Information prior to March 7, 2022.

To the extent Skyryse is attempting to distance itself from and disclaim all actions of all its employees, as discussed at length above in Section B(2), that is improper and patently unfair to Moog's prosecution of this case. Skyryse must immediately provide a supplemental response that directly and fully answers this interrogatory.

5.      **Interrogatory No. 6**

This interrogatory asks Skyryse to: "Describe in Detail the structure and manner in which Skyryse stores data related to its flight control software. For the avoidance of doubt, Skyryse's answer should include (but not be limited to) identifying the configuration management tool, Source Code control tool, test equipment software, and problem reporting tool for Skyryse's flight control software (e.g., Jira, Github, Subversion, etc.)." In response, Skyryse answers: █████████
███████████████████████████████████████████████████████████

This response is deficient and incomplete. Skyryse only provided limited information in response to the examples offered by Moog. Notably, and as reflected in the request, the specific examples in the request are not exhaustive, and Skyryse has not answered the primary portion of the interrogatory. Skyryse has not described its policies for data storage and retention, or how often it stores data related to its flight control software. Skyryse has not described how often its engineers store data, and whether this data is stored on network drives, laptop computers, etc. Skyryse has not explained its data management structure on Gitlab, such as the structure of project folders or other repositories. This information is all relevant and necessary for Moog's experts to search for and direct or derivative Moog data and its incorporation into Skyryse's flight controls software.

Skyryse must immediately provide a supplemental response that directly and fully answers this interrogatory.

6.      **Interrogatory No. 7**

This interrogatory asks Skyryse to: "Describe in Detail the tools and processes Used by Skyryse to develop, test, and certify its flight control software. For the avoidance of doubt,

**Sheppard**Mullin

Skyryse's answer should include (but not be limited to) the processors Used by Skyryse to develop code, Skyryse's hardware architecture, Skyryse's software function names, and the tools and processes Used by Skyryse to conduct software testing." In response, Skyryse answers:

████████████████████████████████████████████████████████

This response is deficient and incomplete. Skyryse has only provided limited information about the processors and open source tool used for software development. Skyryse has not provided any hardware architecture or software function names. Skyryse has provided no detail about its software testing or test tools, or its software certification tools or processes. This information is relevant and necessary for Moog to determine whether it was possible for Skyryse to build its flight control software without incorporation or reference to Moog data, and whether Skyryse's testing and certification tools were specifically tailored to integrate Moog data.

Skyryse must immediately provide a supplemental response that directly and fully answers this interrogatory.

7.      **Interrogatory No. 8**

This interrogatory asks Skyryse to: "Describe in Detail Skyryse's current configuration management repositories and current software versioning and revision control systems that are Used in connection with the development of its flight control software. For the avoidance of doubt, Skyryse's answer should include (but not be limited to) the time periods in which these repositories and systems have been running as well as deletion logs and versioning logs." In response, Skyryse simply answered: ████████████████████████████████████

This answer is woefully deficient and not provided in good faith. Skyryse only identified its configuration management versioning tool. Skyryse has not described in any manner its configuration management repositories, software versioning, and revision control systems. Skyryse also has not described, among other things, the "time periods in which these repositories and systems have been running as well as deletion logs and versioning logs." This information is relevant and necessary because it will demonstrate how and over what period of time Skyryse has been building its flight control software code. The timing is relevant in conjunction with the timing of Kim and Pilkington's copying of Moog data and joining Skyryse. Moog is also entitled to information regarding deletions and changes made to Skyryse's software code to demonstrate incorporation and alterations to accommodate Moog code or other data.

Skyryse must immediately provide a supplemental response that directly and fully answers this interrogatory.

8.      **Interrogatory No. 9**

This interrogatory asks Skyryse to: "Identify all electronic devices Used by Kim and Pilkington while working at Skyryse, including but not limited to all desktop computers, laptop

**Sheppard**Mullin

computers, USB drives, external hard drives, flash drives, mobile devices, and thumb drives." In response, Skyryse answers: ███████████████████████████████████████

███████████████████████████████████████████████████████████████████████

Moog's interrogatory was not limited to devices used by Kim and Pilkington as of the date of the filing of this action. And, it was not limited to laptop devices. Skyryse's answer suggests that Kim and Pilkington received and are using additional Skyryse-issued laptops other than the ones identified and turned over to iDS. Moog is entitled to this information, as such devices may contain direct or derivative Moog data. Further, Skyryse's answer makes no mention of mobile devices, external hard drives, thumb drives, etc. It is unlikely that Kim and Pilkington used no other electronic devices in connection with their work for Skyryse.

Skyryse must immediately provide a supplemental response which: 1) identifies any other Skyryse-issued computers used by Kim and Pilkington; 2) identifies all other electronic devices used by Kim and Pilkington for Skyryse work; and 3) if no other such electronic devices exist, Skyryse must state so in a verified response under oath.

9.      **Interrogatory No. 10**

This interrogatory asks Skyryse to: "Identify all Skyryse employees who have worked on the development, testing, or certification of Skyryse's flight control software." In response, Skyryse identifies 9 employees.

This does not add up. Skyryse has represented that it has 71 employees. It has hired at least 20 former Moog employees, more than 9 of which were software engineers. Skyryse did not include in its response ██████████████████████████████████████████████████████ All of these individuals are former Moog engineers. ████████████ for example (and per his LinkedIn Profile), is the "VP Systems & Software at Skyryse" and describes Skyryse as "developing Flight OS, the world's first universal flight deck and operating system." He and others are evidently responsive to this interrogatory.

Skyryse must immediately provide a full and complete supplemental response. If Skyryse takes the position that none of the above-referenced individuals have worked on the development, testing, or certification of Skyryse's flight control software, it must state as much in a verified supplemental response.

D.      **Skyryse's Responses to Moog's Requests for Production**

1.      **RFP No. 1**

This request seeks: "All Documents and Communications related to Skyryse's access, use, or disclosure of any Moog Confidential Information, including but not limited to any Moog Confidential Information that was copied by Kim or Pilkington prior to becoming employed by Skyryse." In response, Skyryse (in convoluted fashion) appears to agree to produce responsive documents "to the extent they exist."

**SheppardMullin**

Josh Krevitt, Esq.
Kate Dominguez, Esq.
April 19, 2022
Page 13

This response is improper. Pursuant to Fed. R. Civ. P. 34(b)(2)(B), a response to a request for production "must either state that inspection and related activities will be permitted as requested or state an objection to the request, including reasons." Skyryse is required to produce all non-privileged, responsive documents within its possession, custody or control that can be located following a reasonable and diligent search. There can be no limitations or qualifiers. By stating it will produce responsive records only "if they exist," Skyryse is failing to comply because it does not identify whether such documents do exist, and therefore will be produced. Conversely, if responsive documents do not exist, Skyryse must explain why that is the case, e.g., they never existed, they were destroyed, lost, etc.

Indeed, federal courts have found such conditional language improper and evasive. *See Kemp v. Hudgins*, No. 12-2739-JAR-KGG, 2015 WL 866905, at *5 (D. Kan. March 2, 2015) (holding that responses conditioned with "to the extent" they exist are improper); *Ezfauxdecor, LLC v. Smith*, No. 15-9140-CM-KGG, 2017 WL 2721489, at *1 (D. Kan. June 23, 2017) (instructing defendant to "submit amended discovery responses removing all conditions such as 'to the extent such documents exist and are in Defendants' possession, custody, or control' because "Either the documents exist and are in Defendants' possession or they do not/are not.").

Skyryse has had several weeks to search for responsive documents. Either they exist or they do not. Moog is entitled to know with certainty. To the extent such responsive documents exist, Skyryse must provide a supplemental response removing any conditional language and confirm that they will be produced on or before April 27, 2022. If such documents do not exist, then Skyryse must provide a supplemental response explaining why they do not exist.

**2.     RFP No. 2**

This request seeks: "A complete forensic image of all electronic devices Kim and Pilkington have used in the course of working at Skyryse, including but not limited to desktop computers, laptop computers, cell phones, mobile devices, tablet devices, USB devices, or external hard drives." Skyryse responded: "Skyryse has delivered Defendant Misook Kim's Skyryse-issued laptop to the third-party forensics firm, iDiscovery Solutions, in conformity with its obligations under the March 11 Order. Skyryse will deliver Defendant Alin Pilkington's Skyryse-issued laptop in use as of the date of the filing of this action to the third-party forensics firm, iDiscovery Solutions."

Skyryse indicates it "will deliver" Pilkington's Skyryse-issued laptop. However, Skyryse has represented in writing multiple times that it already turned over Pilkington's Skyryse-issued laptop to iDS on April 1, 2022. Is there another Pilkington Skyryse-issued laptop that Skyryse will turn over to iDS? Please clarify.

Further, Skyryse states it will only deliver Pilkington's Skyryse-issued laptop "in use as of the date of the filing of this action." This is improper, as described above in Section C(7). Moog is entitled to an image and information regarding all Skyryse issued laptop devices used by Kim and Pilkington.

Also absent from this response is any agreement to turn over images of cell phones, tablets, USB devices, external hard drives, etc. used by Kim and Pilkington at Skyryse. It is

**Sheppard**Mullin

Josh Krevitt, Esq.
Kate Dominguez, Esq.
April 19, 2022
Page 14

unlikely that Kim and Pilkington used no other electronic devices in connection with their work for Skyryse.

Skyryse must immediately provide a supplemental response which: 1) agrees to provide images or to turn over to iDS all electronic devices used by Kim and Pilkington in connection with Skyryse work; and 2) if no other such electronic devices exist, Skyryse must state so in a supplemental response.

3.      **RFP No. 3**

This request seeks: "All Documents and Communications showing the tasks performed and job responsibilities of Kim and Pilkington while working at Skyryse." In response, Skyryse agreed to produce "responsive, non-privileged documents that are sufficient to show the job responsibilities of Kim and Pilkington while working at Skyryse, to the extent they exist."

Skyryse's use of the conditional phrase "to the extent they exist" is improper for the reasons described above in Section D(1). Further, Skyryse's response is evasive and deficient. Skyryse has not agreed agree to produce documents showing the tasks performed by Kim and Pilkington at Skyryse. Given the fact that they copied over 1.3 million Moog files, admittedly retained such information when starting employment at Skyryse, and have been employed by Skyryse for less than 6 months, Moog is entitled to that information. This information is relevant to showing what projects and software Kim and Pilkington worked on, the extent of overlap with projects they worked on at Moog, and the extent that Moog data was incorporated and used into Skyryse programs and data.

To the extent Skyryse maintains concerns based on burden or overbreadth, it has not provided any specific supporting evidence as required. If any such burden can be properly shown, we are willing to meet and confer with you to reach mutually agreeable resolutions. Absent such a showing, however, Skyryse must immediately provide a supplemental response agreeing to produce all non-privileged responsive documents.

4.      **RFP No. 4**

This request seeks: "All Documents and Communications between Skyryse and any Former Moog Employee, before such employee began employment at Skyryse, or any current Moog employee." In response, Skyryse responds: "Skyryse is willing to meet and confer with Moog regarding responding to a more reasonably tailored Request."

This response is deficient, and essentially amounts to no response at all. The relevance of this request is self-evident. Documents responsive to this request are relevant to Moog's claims regarding Skyryse's unlawful solicitation and raiding of Moog employees. Further, communications regarding the types of programs and software such individuals would work on, or incentives to join Skyryse, are relevant to Moog's trade secret misappropriation and related claims. For example, if Skyryse required a former Moog employee to copy and retain Moog data before joining Skyryse, that would be relevant for obvious reasons.

**SheppardMullin**

Josh Krevitt, Esq.
Kate Dominguez, Esq.
April 19, 2022
Page 15

To the extent Skyryse maintains concerns based on burden or overbreadth, it has not provided any specific supporting evidence as required. This request only seeks communications with current Skyryse and former Moog employees before they started employment at Skyryse, and current Moog employees. This would not include any communications about official Skyryse projects after such individuals started employment at Skyryse.

Skyryse must immediately provide a supplemental response agreeing to produce all non-privileged responsive documents.

5. **RFP No. 5**

This request seeks: "All Documents and Communications Concerning Moog, including but not limited to: 1) all Documents and Communications between Skyryse, on the one hand, and Kim or Pilkington, on the other hand, Concerning Moog; 2) all Documents and Communications Concerning Moog Confidential Information; or 3) all Documents and Communications Concerning the actual or potential hiring of Moog employees." In response, Skyryse essentially copied/pasted its response to RFP No. 1, where it agreed to produce copies of Moog's non-public information in its possession, as well as communications regarding access, use, or disclosure of Moog Confidential Information. RFP No. 5 is much broader and Skyryse's response is evasive and unacceptable.

Skyryse has not agreed to produce: 1) communications with Kim and Pilkington regarding Moog; 2) communications regarding Moog Confidential Information in general; 3) communications with former Moog employees who joined Skyryse regarding Moog Confidential Information; or 4) internal documents regarding the hiring or potential hiring of Moog's employees.

The relevance of these categories of documents are self-evident. Communications with Kim and Pilkington regarding Moog will show the level of involvement and knowledge of Skyryse in the various and substantial acts of copying and misappropriating Moog data committed by Kim and Pilkington. Communications regarding Moog Confidential Information in general are relevant for the same reasons. Communications regarding former Moog employees who joined Skyryse regarding Moog Confidential Information will reveal if there are other former Moog employees who misappropriated Moog data upon joining Skyryse, or if they helped use or reference Moog Confidential Information in connection with their Skyryse job functions. Documents regarding the hiring or potential hiring of Moog employees are relevant to Skyryse's raiding and solicitation of Moog's employees, Skyryse's scheme to target specific Moog employees with knowledge of its flight control source code and, Skyryse employees using Moog data to help build Skyryse's flight control software.

To the extent Skyryse maintains concerns based on burden or overbreadth, it has not provided any specific supporting evidence as required. If any such burden can be properly shown, we are willing to meet and confer with you to reach mutually agreeable resolutions. Absent such a showing, however, Skyryse must immediately provide a supplemental response agreeing to produce all non-privileged responsive documents.

6. **RFP No. 6**

**SheppardMullin**

Josh Krevitt, Esq.
Kate Dominguez, Esq.
April 19, 2022
Page 16

This request seeks: "All Documents and Communications Concerning the Western Digital Hard Drive, the Samsung Hard Drive, the Buffalo Hard Drive, the Samsung Thumb Drive, Kim's Moog-issued work laptops, or Pilkington's Moog-issued work laptops." In response, Skyryse answers: "Skyryse is willing to meet and confer with Moog regarding responding to a more reasonably tailored Request."

This response is deficient, and essentially amounts to no response at all. The devices at issue in this request involve the two hard drive devices involved in Kim's copying of over 136,000 files of Moog data (which she returned to Moog in February 2022), the two devices Pilkington used to copy over 1.3 million Moog files (which have been turned over to iDS), and Kim and Pilkington's Moog-issued laptops. ***None of these are Skyryse computers or devices***, and therefore presumptively do not contain any Skyryse data. All of these devices are squarely relevant to Moog's trade secret claims in this case.

To the extent Skyryse maintains concerns based on burden or overbreadth, it has not provided any specific supporting evidence as required. Indeed, if there are a large amount of communications regarding these Moog-issued laptops and other devices, that would be extremely concerning to Moog and we are entitled to all of them. Skyryse must immediately provide a supplemental response agreeing to produce all non-privileged responsive documents.

7.     RFP No. 7

This request seeks: "All Documents and Communications Concerning the hiring of Pilkington, Kim, or any other Former Moog Employee, including but not limited to all HR files, personnel files, and contracts signed." In response, Skyryse answers: "Skyryse will produce offer letters and Proprietary Information and Inventions Agreements ('PIAA') for the Former Moog Employees, to the extent they exist, and an employment review for defendant Misook Kim prepared by defendant Alin Pilkington."

Skyryse's response is deficient. It is hand-picking a few documents it wants to produce, and fails to confirm whether or not they even exist. Given the gravity of Moog's claims against its former employees, Moog is entitled to all documents related to the hiring of Kim and Pilkington, including information about compensation, incentives, conditions of employment, job requirements, and contracts.

The bad faith of Skyryse's response is highlighted by the fact that on March 17, 2022, Kim and Pilkington requested from Moog a production of all of their HR and personnel records. As you know, Moog produced these documents 11 days before the statutory deadline on April 5, 2022. For reasons which are unclear, Skyryse apparently believes it does not have to turn over all documents related to Kim and Pilkington's hiring at Skyryse. Skyryse must immediately provide a supplemental response agreeing to produce all non-privileged responsive documents.

8.     RFP No. 8

This request seeks: "Documents sufficient to show the structure of Skyryse's shared networks, software databases, internal data servers, and the access of Former Moog Employees

**Sheppard**Mullin

Josh Krevitt, Esq.
Kate Dominguez, Esq.
April 19, 2022
Page 17

thereto." In response, Skyryse answers: "Skyryse is willing to meet and confer with Moog regarding this Request."

This response is deficient, and essentially amounts to no response at all. Documents responsive to this request would show how Skyryse's systems and software databases are structured so that Moog can analyze how and in what manner its data was incorporated therein. They will also show who had access to Skyryse's systems and, in turn, any Moog data. Moog's expert is entitled to understand how Skyryse's networks and systems are structured.

To the extent Skyryse maintains concerns based on burden or overbreadth, it has not provided any specific supporting evidence as required. Notably, this request only seeks documents "sufficient to show," as opposed to "all documents." Skyryse must immediately provide a supplemental response agreeing to produce all non-privileged responsive documents.

9.      **RFP No. 9**

This request seeks: "All Documents and Communications, from January 1, 2021 to present, Concerning the development, testing, or certification of Skyryse's flight control software including, but not limited to, Source Code, software planning Documents, software testing or certification Documents, test equipment and simulations, and software quality control Documents." In response, Skyryse answers: "Skyryse is willing to meet and confer with Moog regarding this Request."

This response is deficient, and essentially amounts to no response at all. Moog requires access to Skyryse's flight controls source code and related planning and testing documents to determine to what extent Moog code or data has been used or incorporated. Notably, Moog has already provided considerable information about the trade secrets at issue in this case, including its source code, and will make the relevant source code available to Skyryse for inspection pursuant to an agreed upon source code review protocol. Skyryse must do the same. At minimum, Moog is entitled to the categories of documents enumerated in this request. Any confidentiality concerns are addressed through a stipulated protective order and source code review protocol, which the parties are negotiating.

To the extent Skyryse maintains concerns based on burden or overbreadth, it has not provided any specific supporting evidence as required. If any such burden can be properly shown, we are willing to meet and confer with you to reach mutually agreeable resolutions. Absent such a showing, however, Skyryse must immediately provide a supplemental response agreeing to produce all non-privileged responsive documents.

10.     **RFP No. 10**

This request seeks: "All deletion logs and versioning logs from Skyryse's software versioning and revision control systems, test tools, and software function names used in connection with its flight control software." In response, Skyryse answers: "Skyryse is willing to meet and confer regarding this Request."

**Sheppard**Mullin

Josh Krevitt, Esq.
Kate Dominguez, Esq.
April 19, 2022
Page 18

This response is deficient, and essentially amounts to no response at all. These records will show when Skyryse's software repositories started and their run time. To the extent the timeline coincides with Kim and Pilkington's copying of Moog data and their joining Skyryse, that is squarely relevant to Moog's trade secret claims. These records will also show when certain data was deleted or a new version was created, to accommodate Moog data.

To the extent Skyryse maintains concerns based on burden or overbreadth, it has not provided any specific supporting evidence as required. If any such burden can be properly shown, we are willing to meet and confer with you to reach mutually agreeable resolutions. Absent such a showing, however, Skyryse must immediately provide a supplemental response agreeing to produce all non-privileged responsive documents.

**11.    RFP No. 11**

This request seeks: "All Documents and Communications between Skyryse and any third party, including actual or prospective investors, Concerning Moog." In response, Skyryse answers: "Skyryse is willing to meet and confer with Moog regarding responding to a more reasonably tailored Request."

This response is deficient, and essentially amounts to no response at all. These relevance of these documents is self-evident. The Complaint alleges that Skyryse changed its business model to overlap with Moog's flight control business shortly after the parties engaged in a business relationship where Skyryse engaged Moog to provide flight control software and hardware. (Complaint ¶¶ 56-87). And, shortly after this pivot, Skyryse announced a $200 million Series B fundraise in October 2021. (*Id*.). Any communications between Skyryse and its investors regarding Moog, its software or other technology, or its employees, are squarely relevant to Moog's claims in this case.

To the extent Skyryse maintains concerns based on burden or overbreadth, it has not provided any specific supporting evidence as required. The request is only tailored to communications regarding Moog.  Skyryse must immediately provide a supplemental response agreeing to produce all non-privileged responsive documents.

**E.    Skyryse's Responses to Moog's RFAs**

**1.    RFA No. 1**

This request asks Skyryse to: "Admit Moog Confidential Information has been Used by Skyryse." In response, Skyryse answers: "Skyryse is engaged in an investigation that is ongoing and not yet complete, and therefore is not yet in a position to admit or deny."

Skyryse's response is evasive and unacceptable. This is a very straight forward request and plainly relevant to the case—Skyryse's use of Moog's Confidential Information. Indeed, Skyryse's Motion to Dismiss for Failure to State a Claim (ECF 49) and its various letters contend over and over again that Moog's lawsuit has been filed in bad faith against Skyryse, that Skyryse has done no wrongdoing, and that it has not acquired, used, or disclosed Moog's Confidential Information. This request puts those contentions to the test.  It is also concerning given Skyryse's

# SheppardMullin

Josh Krevitt, Esq.
Kate Dominguez, Esq.
April 19, 2022
Page 19

repeated protestations that it has fully complied with its obligations under the March 11 Order, which requires it to return any Moog non-public information. Necessarily, in order for Skyryse to have actually complied with that Order, it would have had to have located all Moog non-public information in its possession. Assuming Skyryse had actually done that, it should have also been able to ascertain whether any of it was used. Therefore this RFA response appears to also be an admission by Skyryse that it has not complied with the March 11 Order.

In the Stipulation Re: Expedited Discovery (ECF 33), Skyryse agreed to provide discovery responses within 21 days (which it specifically requested when Moog initially requested a 14 day turnaround). Skyryse has represented that its legal team has worked "around the clock" since this case was filed to investigate its systems to determine if Moog Confidential Information has been acquired or used by Skyryse. Skyryse has acknowledged that Kim's Skyryse-issued laptop received data from devices used to copy Moog data, and that over 11,000 identical Moog files were located on Pilkington's Skyryse-issued laptop. In light of all this, it strains credulity for Skyryse to claim it cannot determine, more than one month after this case has been filed, whether Moog Confidential Information has been used by Skyryse. While the extent of Skyryse's use can be further fleshed out in discovery, this request must be answered unequivocally now.

"Requests for Admissions are intended to narrow the factual issues of a case." *Cohane v. Nat'l Collegiate Athletic Ass'n*, No. 04-CV-0181S SR, 2012 WL 1029493, at *2 (W.D.N.Y. Mar. 26, 2012). That is exactly what Moog's RFA No. 1 is intended to do regarding one of the most important factual issues of this case. Qualifications should "provide clarity and lucidity to the genuineness of the issue" and not "obfuscate, frustrate, or compound the references." *Henry v. Champlain Enterprises, Inc.*, 212 F.R.D. 73, 78 (N.D.N.Y.2003). "When assessing the sufficiency of a party's responses, a court considers whether the response meets the substance of the request and whether any qualifications are demanded by, and made in, good faith." *Wiwa v. Royal Dutch Petroleum Co.*, No. 01CIV1909KMWHBP, 2009 WL 1457142, at *5 (S.D.N.Y. May 26, 2009)

Courts have rejected responses that simply indicate that, after reasonable inquiry, the responding party is unable to admit or deny the statement. *See, e.g., FTC v. Johnson*, No. 10-CV-2203, 2013 WL 5408272, at *5 (D. Nev. Sept. 25, 2013) (rejecting boilerplate response and directing further inquiry and a detailed statement regarding the extent of the responding party's inquiry in the event it is still unable to admit or deny the RFAs). When an RFA response is deemed improper, a court may deem the request admitted. Fed. R. Civ. P. 36(a)(6). Finally, in the event the party requesting the admissions later proves a matter to be true, it "may move that the party who failed to admit pay the reasonable expenses, including attorney's fees, incurred in making that proof." Fed. R. Civ. P. 37(c)(2); *see also Herrera v. Scully*, 143 F.R.D. 545, 548 (S.D.N.Y. 1992).

If Skyryse stands on its response that it cannot answer whether or not it has used Moog's Confidential Information, we will promptly bring this evasive conduct to the Court's attention to determine if Skyryse's answer is provided in good faith. And, if and when Moog proves that Skyryse has in fact used its Confidential Information, Moog will seek reimbursement of its attorneys' fees incurred in making that proof.

**Sheppard**Mullin

Josh Krevitt, Esq.
Kate Dominguez, Esq.
April 19, 2022
Page 20

       **2.**      **RFAs Nos. 2 and 3**

      These requests ask Moog to admit that "before the filing of this lawsuit, Skyryse was aware that [Kim and Pilkington] had retained Moog Confidential Information upon beginning her employment at Skyryse." Skyryse denied both requests.

      These denials are concerning. In their discovery responses, both Kim and Pilkington admit that Pilkington retained Moog Confidential Information (including source code) upon his beginning employment at Skyryse. And Kim admits that she retained Moog Confidential Information (including source code) upon her beginning employment at Skyryse. Both Kim and Pilkington are Skyryse employees and were so when they began employment at Skyryse with possession of Moog Confidential Information. So, Skyryse, at a minimum, was aware that Kim and Pilkington retained Moog Confidential Information upon beginning their employment at Skyryse because of Kim and Pilkington themselves. To the extent Skyryse attempts to disclaim the actions of all its employees and limit its responses on behalf of the corporate entity Skyryse, Inc., such a tactic is improper as described above in Section B(2).

Very truly yours,

Travis Anderson
for SHEPPARD MULLIN RICHTER & HAMPTON LLP

SMRH:4872-4897-7948.6

cc:    Rory S. Miller, Esq.
       Mitchell J. Popham, Esq.
       William Mullen, Esq.
       Joseph N. Froelich, Esq.
       Rena Andoh, Esq.
       Lai L. Yip, Esq.
       Kazim A. Naqvi, Esq.
       Robert J. Fluskey, Jr., Esq.
       Melissa N. Subjeck, Esq.