UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

MOOG, INC.,

Plaintiff,

v.                                                                     Case No. 22-cv-00187

SKYRYSE, INC., ROBERT ALIN PILKINGTON,
MISOOK KIM, and DOES NOS. 1 – 50,

Defendants.

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL WRITTEN DISCOVERY RESPONSES AND PRODUCTION OF DOCUMENTS

**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**
*Attorneys for Moog Inc.*
Rena Andoh
Travis J. Anderson (*pro hac vice*)
Tyler E. Baker (*pro hac vice*)
Kazim A. Naqvi (*pro hac vice*)
30 Rockefeller Plaza
New York, New York 10112
212.653.8700

**HODGSON RUSS LLP**
*Attorneys for Moog Inc.*
Robert J. Fluskey, Jr.
Melissa N. Subjeck
Reetuparna Dutta
Pauline T. Muto
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, New York  14202-4040
716.856.4000

## TABLE OF CONTENTS

PAGE

I.  INTRODUCTION ................................................................1

II.  LEGAL STANDARD........................................................3

III.  DESPITE THE COURT'S DIRECTIVES, SKYRYSE
REFUSES TO ANSWER MOOG'S QUESTIONS
REGARDING SKYRYSE'S DISCLOSURES ........................................4

IV.  SKYRYSE MUST PRODUCE RESPONSIVE SOURCE
CODE IMMEDIATELY .......................................................7

    A.  THE COURT HAS ALREADY UNDERTAKEN THE
BURDEN OF CONSIDERING AND APPROVING THE
INSPECTION PROTOCOL, WHICH GOVERNS
SOURCE CODE ........................................................8

    B.  THE INSPECTION PROTOCOL IS PRACTICAL
AND ENSURES SECURITY OF SOURCE CODE...............................10

    C.  SKYRYSE HAS ALREADY PRODUCED SOURCE
CODE DIRECTLY TO MOOG ................................................12

    D.  SKYRYSE'S CONCERNS OVER SPECIFIC
PROVISIONS CAN BE ADDRESSED IN AMENDMENTS
TO THE EXISTING INSPECTION PROTOCOL....................................12

    E.  THE TIMING OF SKYRYSE'S DEMAND
FOR A SECOND INSPECTION PROTOCOL
SHOWS THIS IS A DELAY TACTIC ....................................13

V.  SKYRYSE MUST PRODUCE MOOG DATA IT
DISCLOSED IN ITS OPPOSITION FILED ON JUNE 14 ................................13

VI.  FURTHER RESPONSES AND DOCUMENTS ARE
REQUIRED IN RESPONSE TO MOOG'S RFPS NOS. 8-10 ............................14

    A.  RFP NO. 8........................................................14

    B.  RFP NO. 9........................................................16

    C.  RFP NO. 10........................................................17

i

## TABLE OF CONTENTS - cont'd

PAGE

VII.   FURTHER RESPONSES ARE REQUIRED TO
       MOOG'S SPECIAL INTERROGATORIES NOS. 6-8 ........................................18

       A.   SPECIAL INTERROGATORY NO. 6......................................................18

       B.   INTERROGATORY NO. 7....................................................................19

       C.   INTERROGATORY NO. 8....................................................................20

VIII.  CONCLUSION....................................................................................................21

ii

## <u>TABLE OF AUTHORITIES</u>

<u>PAGE</u>

**Federal Cases**

*Abdi v. McAleenan*,
   No. 17 Civ. 721, 2019 WL 1915306 (W.D.N.Y. Apr. 30, 2019) ..............................................4

*In re Air Crash Near Clarence Ctr., New York, on Feb. 12, 2009*,
   No. 09-CV-961S, 2011 WL 6370189 (W.D.N.Y. Dec. 20, 2011) ...........................................3

*Barella v. Village of Freeport*,
   296 F.R.D. 102 (E.D.N.Y. 2013) ............................................................................................16

*Breon v. Coca–Cola Bottling Co. of New England*,
   232 F.R.D. 49 (D.Conn. 2005).................................................................................................4

*Daval Steel Prods. v. M/V Fakredine*,
   951 F.2d 1357 (2d Cir.1991)....................................................................................................3

*John Wiley & Sons. Inc. v. Book Dog Books, LLC*,
   298 F.R.D. 184 (S.D.N.Y.2014) .............................................................................................16

*LaForest v. Honeywell Int'l Inc.*,
   No. 03–CV–6248, 2004 WL 1498916 (W.D.N.Y. July 1, 2004) .............................................4

*Residential Funding Corp. v. DeGeorge Fin. Corp.*,
   306 F.3d 99 (2d Cir. 2002).......................................................................................................4

**Rules**

Fed. R. Civ. P 26(b)(1).....................................................................................................................3

Fed. R. Civ. P. 33(d) ...................................................................................................................1, 7

Federal Rules of Civil Procedure Rule 37(b)(2) .............................................................................4

I.    **INTRODUCTION**

After months of meeting and conferring, Moog moves to compel further discovery

responses, production of documents, and other discovery from Skyryse.  While it is unfortunate

that there are so many issues that require the Court's immediate intervention, Skyryse's

intractable positions and defiance of this Court's orders have left Moog no choice.

1.    On June 8, Moog moved the Court to order Skyryse to answer certain questions

related to its April 26 disclosures regarding possession of Moog data, deletion of data,

and employees placed on administrative leave. (ECF 142). During the June 16

hearing, the Court ordered Skyryse to answer these questions and directed Skyryse:

"you should treat them as though they were formally requested and answer in the

same way." (6/16/22 Tr. at 44:6-7). On June 24, Skyryse sent a letter essentially

refusing to provide any new information in response to Moog's questions. Skyryse

deliberately ignored the Court's directives, and Moog is now forced to move to

enforce the Court's prior orders that Skyryse fully answer these questions.

2.    In response to Moog's Interrogatory No. 1, Skyryse has stated it has responsive

source code to produce pursuant to its invocation of Fed. R. Civ. P. 33(d). However,

Skyryse has taken the incredible position that it cannot produce such source code

"until the Court has entered a protective order related to the production of source

code." The Court has already entered a protective order governing the production of

source code on May 13 when it approved Moog's proposed Inspection Protocol,

which thoroughly addresses the production and review of source code via iDS.  (ECF

Nos. 96, 96-02, 109). Skyryse's purported reasons for why another burdensome,

expensive source code review protocol are needed make no sense given that the Court

has already decided these issues and Moog's Inspection Protocol contains detailed provisions and extremely robust protections for review of source code, Skyryse and Moog have already produced large volumes of source code to iDS, and Skyryse has already produced almost 300 source code files to Moog without any additional protocol.  Any concerns (if appropriate) should be made to the existing Inspection Protocol in place. Skyryse raising this issue now, six weeks after the Court entered Moog's Inspection Protocol and several weeks after the June 2 production deadline, demonstrates that Skyryse's demand for a second layer of complexity here is a pretext for delay.

3.   In its June 14 Opposition (ECF 156), Skyryse identified groups of Moog-related documents collected from the personal devices from certain of Skyryse's employees. These files have not been produced to Moog.  On June 21, Moog requested that such files be produced.  In response, Skyryse did not agree to produce certain of the referenced documents.  Moog moves to compel the production of these clearly relevant files.

4.   Moog moves to compel further responses and production of documents in response to its Requests for Production Nos. 8-10.  These requests seek documents showing the structure of Skyryse's networks and servers related to flight control software, documents related to the development of Skyryse's flight control software, and deletion and versioning logs from Skyryse's software versioning control systems.  In response to RFPs Nos. 8 and 10, Skyryse has only asserted boilerplate objections and has not agreed to produce any responsive documents.  In response to RFP No. 9,

Skyryse has only agreed to produce a narrow subset of responsive documents. A Court order is required to compel further responses and production of documents.

5.  Moog moves to compel further responses in response to its Special Interrogatories Nos. 6-8.  These interrogatories generally ask that Skyryse describe the manner in which it stores data related to flight control software, the tools and processes used by Skyryse to develop, test, and certify its flight control software, and Skyryse's current configuration management repositories and software versioning and revision control systems for flight control software.  In response, Skyryse has provided extremely limited information and has not provided responsive information to the balance of these interrogatories.  A Court order is required to compel further responses.

## II.  <u>LEGAL STANDARD</u>

Fed. R. Civ. P 26(b)(1) provides: that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." *Id*. ("Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.").  "Discovery in federal court is broad and permissive." *In re Air Crash Near Clarence Ctr., New York, on Feb. 12, 2009*, No. 09-CV-961S, 2011 WL 6370189, at *2 (W.D.N.Y. Dec. 20, 2011).  Information is relevant so long as it is reasonably calculated to lead to the discovery of admissible evidence.  *See Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1357, 1367 (2d Cir.1991).

This relevance standard is "necessarily broad in scope in order to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *LaForest v. Honeywell Int'l Inc.*, No. 03–CV–6248, 2004 WL 1498916, at

3

*2 (W.D.N.Y. July 1, 2004) (internal citations omitted)); *see also Breon v. Coca–Cola Bottling Co. of New England*, 232 F.R.D. 49, 52 (D.Conn. 2005) ("Relevancy continues to be broadly construed, and a request for discovery should be considered relevant if there is any possibility that the information sought may be relevant to the claim or defense of any party.") (internal citations omitted).

"Rule 37(b)(2) of the Federal Rules of Civil Procedure provides, in relevant part, that if a party fails to obey a discovery order, the court 'may make such orders in regard to the failure as are just.'" *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106 (2d Cir. 2002) "[I]t is clear that appropriate discovery should be granted where significant questions regarding noncompliance with a court order have been raised." *Abdi v. McAleenan*, No. 17 Civ. 721, 2019 WL 1915306, at *2 (W.D.N.Y. Apr. 30, 2019) (internal citations omitted).

## III.   DESPITE THE COURT'S DIRECTIVES, SKYRYSE REFUSES TO ANSWER MOOG'S QUESTIONS REGARDING SKYRYSE'S DISCLOSURES

It is unfortunate that Moog has to enforce the Court's prior order for Skyryse to answer basic questions regarding its April 26 disclosures that Skyryse undisputedly has information about. On June 8, Moog moved the Court to order Skyryse to answer certain questions related to its April 26 disclosures regarding possession of Moog data, deletion of data, and employees placed on administrative leave. (ECF 142) – Moog had been seeking these answers since Skyryse's initial disclosures about spoliation and Moog non-public information in late April. In its opposition filed on June 14, Skyryse answered some but not all of these questions. (ECF 156). In a June 16, 2022 letter to the Court summarizing the remaining disputes, Moog identified the outstanding questions which remained unanswered, setting forth the following:

1. "While Skyryse has identified four employees placed on administrative leave, it has not identified all fifteen such employees, the reason why each employee was placed on administrative leave, or the current status of most those employees.[1]  The current status of each of these employees is critical as Moog may be required to commence third party discovery on such individuals.

2. Which of the employees involved in the possession of Moog data or deletion of data worked on defendants' Pilkington and Kim's team.

3. A list of the search terms that Skyryse ran in its search for Moog data/non-public information that hit on each Skyryse electronic device (or Skyryse employee personal device), and the number of hits for each term on each device.

4. Identification of any Moog non-public information located on Skyryse's systems that does not relate to Pilkington and Kim." (Declaration of Rena Andoh ("Andoh Dec."), Ex. A).

During the hearing on June 16, the Court ordered Skyryse to answer these questions by June 24: "you should treat them as though they were formally requested and answer in the same way." (6/16/22 Tr. at 44:6-7).  While the Court did not require such answers be verified, it again directed: "So I would ask you, to the extent possible, Mr. Gross, to treat them as formal requests and respond in an appropriate manner."  (*Id*. at 45:14-16).

---

[1]    The Opposition identifies the status of four of the fifteen employees – one of whom was fired on June 14, two of whom remain on investigative leave, and one of whom was reinstated on June 14.  In prior correspondence, Skyryse had indicated that one other employee had been reinstated.  This leaves the status of ten employees unaccounted for, including Mr. Rey, the verifier of Skyryse's initial interrogatory responses.

Skyryse served a letter on June 24 purporting to answer these questions, but in fact, the contents of the letter could not be further from the Court's clear directive.  (Andoh Dec., Ex. B). Regarding the first question, Skyryse stated that the limited information provided in the Opposition (limited to 5 of the 15 employees placed on leave) is "sufficient" and Moog's request for additional information "is unduly burdensome, irrelevant to the claims or defenses in this case, and implicates privileged and work product information." (*Id.*).  The only new information provided by Skyryse is that former employee Eric Chung resigned.  (*Id.*).  However, during the April 26 Conference, Skyryse's counsel unambiguously stated that the 15 employees placed on leave consisted of "individuals who have been identified as having possessed Moog information, and individuals who had both evidence of deletion on their devices, and file name hits." (ECF 95 at 15:4, 20:5-12).  How can the simple identification of 10 additional employees and the reasons for being placed on leave (whether possession of Moog data, deletion of data, or both) be unduly burdensome or irrelevant to the claims and defenses in the case given Skyryse's disclosures?  Skyryse must be ordered again to provide information about 10 of the 15 employees placed on leave.

Regarding the second question, Skyryse again provided no new information and only provided a response limited to the 5 individuals addressed in Skyryse's June 14 Opposition. (*Id.*).

Regarding the third question, Skyryse provided no information whatsoever and claimed Moog's request, which the Court ordered Skyryse to answer, is "unreasonable" and would "pose an unnecessary and undue burden on Skyryse." (*Id.*).

Regarding the final question, Skyryse did not provide any responsive information and did not specify which of Moog's non-public information located at Skyryse did not relate to Kim and Pilkington.  (*Id*.).

In sum, instead of following the Court's unequivocal order to provide substantive, detailed responses to the above 4 questions, Skyryse took it upon itself to assert improper objections and provide self-serving "answers" which ultimately amount to no new information being provided.  This deliberate violation of the Court's directives is part and parcel of Skyryse's litigation conduct throughout this case.  Skyryse should be ordered to fully answer the above four questions, under oath, within 7 days of the Court's order.

## IV.   <u>SKYRYSE MUST PRODUCE RESPONSIVE SOURCE CODE IMMEDIATELY</u>

Moog's Interrogatory No. 1 requests Skyryse to identify: "the Source Code languages and file names for Skyryse's flight control software."  In its most recent response provided on April 19, Skyryse provided limited information regarding its source code languages and then stated: ███████████████████████████████████████████████████████

████████████   (Andoh Dec., Ex. C).  Having received no responsive documents, on June 15 (almost two weeks after the Parties' document production deadline of June 2), Moog asked Skyryse when such documents would be produced.  (*Id*., Ex. D).

In response, Skyryse claimed that it "cannot produce that material until the Court has entered a protective order relating to the production of source code."  (*Id*.).  Skyryse then claimed that a ***second*** inspection protocol should be entered in this case, governing the inspection of only certain source code—yet Skyryse does not even explain what it is or why any

such source code should be subject to different treatment.  There is no reason why the parties or

Court should entertain such an unnecessary, wasteful proposal, as explained below.

**A.   The Court Has Already Undertaken the Burden of Considering and Approving the Inspection Protocol, Which Governs Source Code**

First, the Court *already* entered a protective order governing the **inspection** of source

code on May 13, when it approved Moog's proposed Inspection Protocol over Skyryse's (the

"Inspection Protocol") (ECF Nos. 96, 96-02, 109).  (*Id*.).  The Inspection Protocol is titled as

"ADDENDUM TO PROTECTIVE ORDER" and expressly states in the first paragraph that it is

intended to:

> add a new confidentiality designation, i.e., "HIGHLY
> CONFIDENTIAL – OUTSIDE COUNSEL & EXPERTS' EYES
> ONLY," which would cover ***Source Code*** [where "Source Code" is
> defined in the Protective Order] and other documents as further
> addressed below. This Addendum shall be considered part of the
> Protective Order as if it were fully incorporated therein.

(ECF 96-02, p. 1 & n. 1 (emphasis added)).  The materials covered by the Inspection Protocol

expressly include:

> physical devices (such as those provided to iDS in compliance with
> the March 11, 2022 stipulated order at Dkt. 25), all documents and
> materials on such devices, ***Source Code***, and other technical
> documents."

(*Id*., pp. 1–2 (emphasis added)).  The Inspection Protocol requires that a reviewer, prior to

inspection, "acknowledge that the Inspection Laptop provides access to highly confidential

information and ***Source Code***."  (*Id*., p. 7 (emphasis added)).  The Inspection Protocol

contemplates that the reviewers will use source code review tools, e.g., "***source code*** IDEs such

as Visual Studio," and "Understand from SciTools" (a source code analysis tool).  (*Id*., p. 11

(emphasis added)).  The Inspection Protocol provides:

> The Receiving Party shall not request production of **Source Code** in order to review **Source Code** outside of the Inspection Laptop in the first instance, as the parties acknowledge and agree that the purpose of the protections herein would be frustrated by such a request. Production of **Source Code** is permitted solely to enable use of such **Source Code** in filings, depositions, proceedings, contentions, expert reports, and related drafts and correspondence.

(*Id.*, p. 12 (emphasis added)).  In other words, the Inspection Protocol contemplates that ***all***

review of Source Code will be accomplished as an initial matter through the Inspection Laptops

configured and provided by iDS.  The Inspection Protocol defines the designation "HIGHLY

CONFIDENTIAL – OUTSIDE COUNSEL & EXPERTS' EYES ONLY" to specifically:

> include **Source Code**, associated comments and revision histories, design documents (software, hardware, and other), formulas, algorithms, engineering specifications and artifacts, and schematics.

In short, the Inspection Protocol clearly covers source code, and this has been known to Skyryse

since at least April 6, 2022, when Moog first sent its draft Inspection Protocol to Skyryse.

(Andoh Dec., Ex. I).

Moreover, source code was the subject of extensive briefing on the Inspection Protocol.

(*See* ECF 74 (Moog's April 19, 2022 Ltr. to Judge McCarthy), pp. 3-16; ECF 76 (Skyryse's

April 19, 2022 Ltr. to Judge McCarthy), pp. 1-6; ECF 96 (Moog's May 11, 2022 Motion for

Inspection Protocol); ECF 99 (Skyryse's May 11, 2022 Motion for Inspection Protocol).  Then,

as now, Skyryse argued there can or should be a separate protocol governing source code.  (*See*

*Id.*).  The parties also made arguments regarding source code during the hearing on the motion

for entry of the parties' dueling protocols.  The Court heard the issue, reviewed the briefing, and

decided that Moog's Inspection Protocol was the appropriate one, including to govern the

inspection of source code.  This issue was decided more than six weeks ago.

Thus, for Skyryse to now demand a *second* inspection protocol is tantamount to requesting a do-over of what the parties and Court have already spent months resolving using significant resources and effort.  A *second* inspection protocol, governing only certain kinds of source code (but not others), will unnecessarily cause further burden (for both the parties and the Court), expense, delay in these proceedings, and add completely gratuitous complexity and inefficiency.  Skyryse's proposed second inspection protocol is attached here for the Court's reference.  (*See* Andoh Dec., Ex. J).  As is evident from a review of it, there is no reason the Court should undertake the additional significant burden of considering such a document.

Skyryse has argued that the fact that there is remains a "HIGHLY CONFIDENTIAL – SOURCE CODE" designation in the Protective Order shows that the parties intended there to be a separate protocol governing source code.  Not so.  Moog pointed out on April 6, 2022 to Skyryse that this designation would be moot in light of the Inspection Protocol, so Skyryse has been aware of this all along.  (*See* Andoh Dec., Ex. I (copy of draft Protective Order, with a comment from Moog indicating that the "HIGHLY CONFIDENTIAL – SOURCE CODE" designation would be moot)).  The Protective Order was entered before the Inspection Protocol, so there was not an opportunity for the designation to be formally removed, but it is nonetheless moot.

**B.      The Inspection Protocol Is Practical and Ensures Security of Source Code**

Whether the Inspection Protocol is adequate for the inspection of source code (it is) has *already* been decided by the Court.  The Inspection Protocol has been entered, and that should end the inquiry.  But we emphasize here only some of the reasons why the Inspection Protocol is adequate and practical.  First, it sets up an extremely secure and robust security mechanism through the neutral forensic vendor iDS for remote review.  Only iDS—and none of the parties—

10

have possession of the source code for inspection.  All of the source code is housed on iDS's

central servers—virtual machines—not on any local laptops in the possession of any parties or

reviewers.  In other words, the source code never leaves iDS premises.  While the reviewers

access iDS's virtual machines using laptops, those laptops contain *zero* source code.  No one can

access the virtual machines without presenting government-issued ID to an IDS inspection

supervisor via the webcam on the laptops and the entire visual stream of the inspection is

videorecorded.  The Inspection Protocol also details who can receive source code materials, and

how they are to be transmitted, stored and used.  (ECF 96-02, §§ I.1 and VIII).  As this Court

noted, "the measures which Moog proposes adequately address [Skyryse's] concerns" regarding

"potential disclosure of its own privileged and/or confidential information." (ECF 109 at p. 2).

     The inspection of source code under the Inspection Protocol is also practical, efficient,

and safe, because it is remote.  It minimizes, or even eliminates, in-person contact—a very

important consideration as we are still in the midst of a pandemic.  It also minimizes travel,

which is important given the expedited discovery proceeding and the amount of source code at

issue to be inspected (tens of thousands of source code files, and possibly hundreds of thousands

that were stolen by Skyryse employees).  Meanwhile, Skyryse's proposed ***second*** inspection

protocol would require the parties to travel to the offices of outside counsel to inspect the source

code in-person.  This is completely needless, expensive, inefficient, and injects health risks that

are completely avoidable.  That is the whole reason why the Inspection Protocol provides for

remote inspection through a reliable and secure neutral vendor.

     Moreover, the evaluation of trade secret theft requires comparison of files. Skyryse has

already admitted that it has produced voluminous source code files to iDS under the Inspection

Protocol.  If Skyryse's second inspection protocol were to be entered, there would be two

separate protocols for reviewing two separate groups of source code.  Separating source code
into two distinct and completely independent review environments would make any comparison
between the two groups of code impractical if not impossible.  Permitting this would also create
opportunity for gamesmanship—i.e., Skyryse could pick and choose which source code to
produce under which protocol.  If it wants to make inspection more difficult for the other parties,
it need only choose to produce under the second inspection protocol.  This would be highly
improper.

### C.      Skyryse Has Already Produced Source Code Directly to Moog

Skyryse's claim that a separate source code protocol is needed to govern source code
protocol is needed between the parties is undermined by the fact that to date Skyryse has already
produced to Moog at least 295 files designated as source code.  (Andoh Dec. ¶ 12).  Clearly, no
separate protocol was required to produce these files, nor is one needed now.

### D.      Skyryse's Concerns Over Specific Provisions Can Be Addressed in Amendments to the Existing Inspection Protocol

Skyryse has only provided limited examples of its concerns with any specific provisions
of the Inspection Protocol, such as the procedure for challenging the production of electronic
copies of source code.  But there is no reason why the parties cannot meet and confer and try to
reach an agreement on concerns around specific provisions of the Inspection Protocol—rather
than adding a whole new *second* inspection protocol.  For example, the parties have been
meeting and conferring about adjustments to a specific provision of the Inspection Protocol
pertaining to the locations where inspection laptops will be kept, in light of the current realities
of hybrid work arrangements.  The parties could take the same approach to the provision on
challenging the production of electronic copies of source code.  A separate protocol is not needed

12

to address a single minor issue.  There is no need to undermine the entire conceptual framework of the inspection of source code already provided for in the Inspection Protocol.

       **E.**      **The Timing of Skyryse's Demand for a Second Inspection Protocol Shows This is a Delay Tactic**

The timing of Skyryse's claim that a separate addendum for source code review between the parties is required speaks for itself.  Skyryse could have raised these issues or propose necessary modifications to Moog's Inspection Protocol immediately after it was entered by the Court on May 13.  But instead, Skyryse raised these issues well ***after*** Skyryse's June 2 production deadline, despite Skyryse being the party with responsive source code to produce. This strongly suggests that Skyryse's (belated) demand for a second inspection protocol is merely a delay tactic designed to create more complexity to an already complex inspection process.

Moog respectfully requests that the Court order that Skyryse produce to iDS all documents responsive to Moog Interrogatory No. 1 within 7 days of the Court's order.

## V.      SKYRYSE MUST PRODUCE MOOG DATA IT DISCLOSED IN ITS OPPOSITION FILED ON JUNE 14

In its Opposition filed on June 14, Skyryse stated the following:

- "Eric Chung has a personal repository, likely a Dropbox cloud account, in which he may have python code he wrote while employed by Moog around 2013 or 2014." (ECF 156, p. 18).

- "the investigation indicated that Tri Dao has photos or videos on his personal phone taken during his work at Moog." (*Id.*, p. 18).

13

These Moog files are clearly relevant to this case and should have been turned over a long time ago.  On June 21, Moog sent an e-mail to Skyryse requesting their production.  (Andoh Dec., Ex. E).  On June 27, Skyryse did not indicate it would produce the above-referenced files, instead stating: "With respect to Mr. Chung and Mr. Dao, we are again continuing our investigation and will update when we have more information to share."  (*Id*., Ex. F).  There is no basis for Skyryse to withhold these files.  Moog respectfully requests that the Court compel Skyryse to produce all the above-referenced files within 7 days of the Court's order.

## VI.   FURTHER RESPONSES AND DOCUMENTS ARE REQUIRED IN RESPONSE TO MOOG'S RFPS NOS. 8-10

### A.    RFP No. 8

Moog's RFP No. 8 seeks: "Documents sufficient to show the structure of Skyryse's shared networks, software databases, internal data servers, and the access of Former Moog Employees thereto."  In its RFP responses, Skyryse asserted a number of boilerplate objections, and did not agree to produce any responsive documents, instead baldly stating that it is "willing to meet and confer with Moog regarding this Request."  (Andoh Dec., Ex. G).  Documents responsive to this request would show how Skyryse's systems and software databases are structured so that Moog can analyze how and in what manner its data was incorporated therein.  They will also show who had access to Skyryse's systems and, in turn, any Moog data.  Moog's expert is entitled to understand how Skyryse's networks and systems are structured.  Any purported burden is eliminated because the request seeks documents "sufficient to show" as opposed to all documents.

During meet and confer, Moog narrowed the scope of this request to concern "Skyryse's flight control software only."  Despite this, Skyryse continued to refuse to produce any

responsive documents on the purported grounds that the term "flight control software" was undefined and overbroad.  In a June 7 e-mail, Moog explained why RFP No. 8 is sufficiently clear and well-defined.  (Andoh Dec., Ex. H).  Specifically, Moog explained its understanding that the only products and software that Skyryse develops relate to flight control, especially given Skyryse's statements in its filings "that it is a small company with approximately 70 employees and that its product is 'FlightOS,' a flight control operating system."  (*Id*.).  This is not a situation where Skyryse develops many different products that it needs to sift through in order to identify the product relevant to this case.  Moog advised Skyryse to advise if its understanding was incorrect and, if so, to provide examples and explanations of software or hardware that it develops unrelated to flight control.  (*Id*.).

To date, Skyryse has not shown that it develops any software or hardware other than flight control.  Attempting to distract from its failure to demonstrate undue burden, in a June 24 e-mail, Skyryse stated the following: "Moog now states that flight control software is equivalent to all of Skyryse's software, which creates the same over-breadth problems we previously identified."  (*Id*., Ex. D).  But that is not what Moog said.  Rather, as Moog explained to Skyryse in a June 24 e-mail, in order for the definition of "flight control software" to matter, Skyryse would have to be developing SOMETHING in addition to "flight control software."  Skyryse has not identified any software or hardware that does not relate to flight control, therefore it cannot demonstrate overbreadth.  Skyryse also has not substantiated any purported burden as required by, for example, identifying the volume of source code at issue.  (*Id*.).  Skyryse does not provide any evidence through affidavits or other means to support its burden objections, as required by law.  *John Wiley & Sons. Inc. v. Book Dog Books, LLC*, 298 F.R.D. 184, 186 (S.D.N.Y.2014) ("Where a party objects to a discovery request, the objecting party bears the burden of

demonstrating specifically how each question is overly broad, burdensome or oppressive by submitting affidavits or offering evidence revealing the nature of the burden.  General and conclusory objections as to relevance, overbreadth, or burden are insufficient to exclude discovery of requested information."  (internal citations omitted); *Barella v. Village of Freeport*, 296 F.R.D. 102, 105 (E.D.N.Y. 2013) ("The party objecting to the discovery demands must, with some degree of specificity, illustrate the nature and extent of the burden of production.").

Because Skyryse has not agreed to produce a single document responsive to RFP No. 8 as narrowed, nor has it made any showing of burden or overbreadth, a Court order is required to compel a further response and production of documents.

**B.     RFP No. 9**

This request seeks: "All Documents and Communications, from January 1, 2021 to present, Concerning the development, testing, or certification of Skyryse's flight control software including, but not limited to, Source Code, software planning Documents, software testing or certification Documents, test equipment and simulations, and software quality control Documents."  In its RFP responses, Skyryse asserted a number of boilerplate objections, and did not agree to produce any responsive documents.  (Andoh Dec., Ex. G).  For obvious reasons, Moog requires access to Skyryse's flight controls source code and related planning and testing documents to determine to what extent Moog code or data has been used or incorporated.

During meet and confer, Skyryse maintained its same objection regarding the definition and scope of "flight control software" and agreed to only produce "documents and communications sufficient to show Source Code and software planning Documents."  (*Id*., Ex. D).  However, this request does not ask for documents "sufficient to show," and Moog is entitled

to review all of Skyryse's flight control source code and software planning documents, especially given Skyryse's failure to demonstrate it has any source code unrelated to flight control. Skyryse has also not supported its burden objections, as set forth above.  Because Skyryse has not agreed to produce all documents responsive to RFP No. 9, a Court order is required to compel a further response and production of documents.

C.     **RFP No. 10**

This request seeks: "All deletion logs and versioning logs from Skyryse's software versioning and revision control systems, test tools, and software function names used in connection with its flight control software."  In its RFP responses, Skyryse asserted a number of boilerplate objections, and did not agree to produce any responsive documents.  (Andoh Dec., Ex. G).  These records will show when Skyryse's software repositories started and their run time. To the extent the timeline coincides with Kim and Pilkington's copying of Moog data and their joining Skyryse, that is squarely relevant to Moog's trade secret claims.  These records will also show when certain data was deleted or a new version was created, to accommodate Moog data.

In meet and confer, Skyryse stood by its same burden objections as to the definition and scope of "flight control software" which are improper as explained above. Skyryse also claimed on June 24 that it produced to iDS "two source code repositories" which "included deletion logs and versioning from software versioning control systems, deletion logs and versioning from test tools, and software function names that are maintained in the ordinary course of business."  (*Id.*, Ex. D).  Based on the descriptions that Skyryse provided when it turned over the two source code files at issue on May 5, they do not appear to be source code "repositories" as opposed to standalone source code files.  Regardless, while these purported "repositories" may be responsive to some portions of RFP No. 10, they are not fully responsive and do not comply with

17

Skyryse's discovery obligations. RFP No. 10 seeks the production of "*All* deletion logs and versioning logs."  Skyryse has not demonstrated any burden or other objection that justifies withholding anything fewer than all such deletion and versioning logs.  Because Skyryse has not agreed to produce all documents responsive to RFP No. 10, a Court order is required to compel a further response and production of documents.

## VII.   FURTHER RESPONSES ARE REQUIRED TO MOOG'S SPECIAL INTERROGATORIES NOS. 6-8

### A.     Special Interrogatory No. 6

This interrogatory asks Skyryse to: "Describe in Detail the structure and manner in which Skyryse stores data related to its flight control software.  For the avoidance of doubt, Skyryse's answer should include (but not be limited to) identifying the configuration management tool, Source Code control tool, test equipment software, and problem reporting tool for Skyryse's flight control software (e.g., Jira, Github, Subversion, etc.)."  In its original response served on April 13, Skyryse answered as follows: ███████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████  (Andoh Dec., Ex. C).  Skyryse never supplemented this response, despite its commitment to doing so several times including in a May 4 letter to Moog.

Skyryse's response is deficient and incomplete.  Skyryse only provided limited information in response to the examples offered by Moog.  Notably, and as reflected in the request, the specific examples in the request are not exhaustive, and Skyryse has not answered the primary portion of the interrogatory.  Skyryse has not described its policies for data storage and retention, or how often it stores data related to its flight control software.  Skyryse has not

described how often its engineers store data, and whether this data is stored on network drives, laptop computers, etc.  Skyryse has not explained its data management structure on Gitlab, such as the structure of project folders or other repositories.  This information is all relevant and necessary for Moog's experts to search for and direct or derivative Moog data and its incorporation into Skyryse's flight controls software.  This information is also especially important given Skyryse's disclosures regarding the deletion of data by its employees.  A Court order is required to compel Skyryse to provide a complete, verified response to Interrogatory No. 6.

### B.      Interrogatory No. 7

This interrogatory asks Skyryse to: "Describe in Detail the tools and processes Used by Skyryse to develop, test, and certify its flight control software.  For the avoidance of doubt, Skyryse's answer should include (but not be limited to) the processors Used by Skyryse to develop code, Skyryse's hardware architecture, Skyryse's software function names, and the tools and processes Used by Skyryse to conduct software testing."  In its response served on April 13, Skyryse answers: ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████ (Andoh Dec., Ex. C).  Skyryse did not supplement this response.

This response is deficient and incomplete.  Skyryse has only provided limited information about the processors and open source tool used for software development.  Skyryse has not provided any hardware architecture or a complete list of software function names.

19

Skyryse has provided no detail about its software testing or test tools, or its software certification tools or processes. This information is relevant and necessary for Moog to determine whether it was possible for Skyryse to build its flight control software without incorporation or reference to Moog data, and whether Skyryse's testing and certification tools were specifically tailored to integrate Moog data. A Court order is required to compel Skyryse to provide a complete, verified response to Interrogatory No. 7.

### C.     Interrogatory No. 8

This interrogatory asks Skyryse to: "Describe in Detail Skyryse's current configuration management repositories and current software versioning and revision control systems that are Used in connection with the development of its flight control software. For the avoidance of doubt, Skyryse's answer should include (but not be limited to) the time periods in which these repositories and systems have been running as well as deletion logs and versioning logs." In its response served on April 13, Skyryse simply answered: ████████████████████████████ ███████████████████████ (Andoh Dec., Ex. C). Skyryse did not supplement this response.

This answer is woefully deficient and not provided in good faith. Skyryse only identified its configuration management versioning tool. Skyryse has not described in any manner its configuration management repositories, software versioning, and revision control systems. Skyryse also has not described, among other things, the "time periods in which these repositories and systems have been running as well as deletion logs and versioning logs." This information is relevant and necessary because it will demonstrate how and over what period of time Skyryse has been building its flight control software code. The timing is relevant in conjunction with the timing of Kim and Pilkington's copying of Moog data and joining Skyryse. Moog is also entitled to information regarding deletions and changes made to Skyryse's software code to

demonstrate incorporation and alterations to accommodate Moog code or other data.  A Court order is required to compel Skyryse to provide a complete, verified response to Interrogatory No. 8.

## VIII.  <u>CONCLUSION</u>

Moog respectfully requests that the Court enter an order compelling the following within 7 days:

1.  Skyryse to fully answer under oath the four questions set forth in Section III above;

2.  Skyryse to produce all source code responsive to Moog's Interrogatory No. 1 to iDS, and finding that Moog's Inspection Protocol entered by the Court on May 13 adequately governs the production and review of source code in this case;

3.  Skyryse to produce the two categories of documents set forth above in Section V;

4.  Skyryse to provide responses agreeing to produce all non-privileged documents responsive to Moog's RFPs Nos. 8-10, and production of such documents; and

5.  Skyryse to provide complete and verified responses to Moog's Special Interrogatories Nos. 6-8.

Dated: Buffalo, New York
      June 30, 2022

                        **SHEPPARD, MULLIN,**
                        **RICHTER & HAMPTON LLP**
                        *Attorneys for Plaintiff Moog, Inc.*

                        By:   */s/ Rena Andoh*
                                 Rena Andoh
                                 Travis J. Anderson (*pro hac vice*)
                                 Tyler E. Baker (*pro hac vice*)
                                 Kazim A. Naqvi (*pro hac vice*)
                        30 Rockefeller Plaza
                        New York, New York 10112
                        212.653.8700

                        and

                        **HODGSON RUSS LLP**

                        By:   */s/ Robert J. Fluskey, Jr.*
                                 Robert J. Fluskey, Jr.
                                 Melissa N. Subjeck
                                 Reetuparna Dutta
                                 Pauline T. Muto
                        The Guaranty Building
                        140 Pearl Street, Suite 100
                        Buffalo, New York  14202-4040
                        716.856.4000