UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

MOOG INC.,

                        Plaintiff,

      v.

SKYRYSE, INC., ROBERT ALIN
PILKINGTON, MISOOK KIM, and DOES
NOS. 1-50.

                    Defendants.

Civil Action No. 1:22-cv-00187-LJV-JJM

REDACTED

---

**DEFENDANT SKYRYSE, INC.'S OPPOSITION TO PLAINTIFF'S
MOTION TO COMPEL WRITTEN DISCOVERY RESPONSES AND
PRODUCTION OF DOCUMENTS**

## <u>TABLE OF CONTENTS</u>

**Page**

I.      INTRODUCTION ..................................................................................................1

II.     MOOG'S MOTION SHOULD BE DENIED....................................................................2

      A.      Moog's demand that Skyryse provide sworn responses to Moog's June 16
            questions should be denied. ..................................................................................2

      B.      Moog's demand that all source code discovery be managed by the neutral
            discovery vendor rather than through a conventional review process under
            Rule 34 is unsupported, unnecessary, and will lead to further risk and
            delay...........................................................................................................................6

      C.      Moog's request for information in the personal possession of Skyryse's
            current and former employees is moot..................................................................12

      D.      Moog's requests for further responses and documents pursuant to Moog's
            RFPs and interrogatories are coextensive with Moog's source code
            requests, unnecessary, or both. ..........................................................................14

III.    THE COURT SHOULD PUT A STOP TO MOOG'S LITIGATION TACTICS. ...........18

IV.     CONCLUSION...................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Colton v. Fuller*,
   21-CV-467 JLS(F),
   2022 U.S. Dist LEXIS 29130 (W.D.N.Y. Feb. 17, 2022) ....................................................19

*Elec. Scripting Prods., Inc., v. HTC America Inc.*,
   No. 3-17-cv-05806-RS (N.D. Cal. Mar. 10, 2020) ....................................................................9

*JobDiva, Inc. v. Monster Worldwide, Inc.*,
   SDNY-1-13-cv-08229, (S.D.N.Y Jan. 6, 2014)..........................................................................9

*Kaufman v. Salesforce.com*,
   SDNY-1-20-CV-06879 (S.D.N.Y. Jan. 22, 2021) ......................................................................9

*Maxell, Ltd. v. Apple Inc.*,
   EDTX-5-9-CV-00036 (E.D.T.X. July 2, 2019) .....................................................................9, 10

*SIMO Holdings Inc. v. uCloudlink Network Tech. Ltd., et al.*,
   1-18-cv-05427 (W.D.N.Y. Oct. 19, 2018) ...................................................................................9

*Thomas v. Prinzi*,
   15-CV-6061W, 2017 U.S. Dist. LEXIS 113976 (W.D.N.Y. July 21, 2017).............................20

*U.S. v. Amodeo*,
   71 F.3d 1044 (2d Cir. 1995)........................................................................................................4

### RULES

Fed. R. Civ. P. 34 ...........................................................................................................................7, 9

Fed. R. Civ. P. 37 ...............................................................................................................................19

Fed. R. Civ. P. 37(a)(1) ......................................................................................................................19

LOCAL R. CIV. P. 7(d)(3)....................................................................................................................19

## I.      INTRODUCTION

Moog's latest motion is an extension of its now familiar pattern of manufacturing disputes where none exist, refusing to meaningfully meet and confer over discovery issues or consider reasonable compromises, and rushing to the Court to demand "relief" to which it is not entitled or which it already is receiving. Each of Moog's four requests for relief is baseless.

*First*, Moog asks the Court to order Skyryse to answer the questions in its June 16 letter. Skyryse already did this, so the issue is moot. And Moog has not made any showing that it is entitled to a Court order allowing such unauthorized discovery through a letter-writing campaign, which is neither permitted nor contemplated by the order granting limited, expedited discovery or the Federal Rules.

*Second*, Moog seeks to compel Skyryse to produce source code, but there is no dispute: Skyryse is making its source code available for Moog's inspection, and Moog knows this. Moog just doesn't like the conventional, secure way Skyryse has proposed to arrange for the inspection of its code. Rather, Moog insists that the neutral third-party forensics vendor, iDS, host the code. There is no basis for this. iDS's Court-ordered role (which Moog proposed) is limited to hosting forensic images of documents that include *both* Skyryse's and Moog's information. That does not apply to the source code that Skyryse is making available for inspection, nor would it be appropriate.

*Third*, Moog seeks an order compelling Skyryse to produce third parties' documents outside of Skyryse's custody or control. There is nothing to compel here; Skyryse cannot produce what it does not have. Skyryse has asked the third parties to voluntarily provide their personal documents, and, where they have cooperated, Skyryse has turned them over to Moog.  Moog is free to seek any other third-party discovery it thinks it needs. In fact, after filing its motion, Moog

finally prepared third-party subpoenas for this very purpose—conceding there is nothing for the Court to compel Skyryse to do.

*Fourth*, Moog seeks to compel additional responses and documents in response to its written discovery requests. This is another manufactured dispute that Moog did not need to burden the Court with. These requests for relief (1) are mooted by Skyryse making its source code available, (2) seek information that does not exist, or (3) are impermissible as they far exceed the scope of Moog's original discovery requests. Respectfully, Moog's motion should be denied in full.

## II.     MOOG'S MOTION SHOULD BE DENIED

### A.     Moog's demand that Skyryse provide sworn responses to Moog's June 16 questions should be denied.

Skyryse has complied with Your Honor's directive to answer the questions contained in Ms. Andoh's June 16 letter by June 24. (Ex. A (Excerpt from June 16 Tr.) at 43:18-21.) On the other hand, Moog ignored this Court's direction to "confer in good faith" regarding Skyryse's responses (*id.* at 45:9-13), and disregarded Your Honor's admonition that "there should be some limits on what needs to be formally responded to." (*Id.* at 43:18-21.)  But even setting those issues aside, Moog's Motion should be denied for the simple reasons that Skyryse has already provided Moog the information it seeks, and Moog is not entitled to still more unauthorized discovery.

#### 1.     Skyryse Employees on Leave

Moog first complains that Skyryse's June 24 letter fails to identify all the Skyryse employees who were placed on leave and "the reasons for being placed on leave (whether possession of Moog data, deletion of data, or both)." (Mot. at 6.) Moog's claims are misplaced. To begin, Skyryse's June 14 Opposition (ECF 156) clearly explained the reasons why fifteen Skyryse employees were placed on leave:  Skyryse, "out of an extreme abundance of caution, placed fifteen

employees who were formerly associated with Moog on administrative leave, 'including employ-ees who appear to have done nothing wrong.'" (June 14 Opposition ("Opp.") at 11 (explaining that "Skyryse provisionally put on leave employees who deleted any materials during this action—even routine, work-related deletions having nothing to do with Moog or this litigation" or "if Skyryse knew their files 'had hits' with the overly broad and unreliable 'hash values and file names that Moog provided' as search terms").)

Skyryse also explained that it had "learned that former Moog employees ██████████ ████████████████████████ have or had Moog-related information on personal devices or repositories," but that information "has not been loaded onto Skyryse's systems and has not been used at Skyryse." (Opp. at 16.) Skyryse explained that these four employees may have had access to Moog information, when they were put on leave, and if and when they returned. (Opp. at 16-18.) Skyryse further confirmed that, "[w]ith the exception of ████████, each relevant Skyryse employee appears to have followed the company's instructions and directives to preserve and not delete potentially relevant evidence from Skyryse computers and systems," (Opp. at 15.)[1] Skyryse's June 24 response to Ms. Andoh further updated Moog on these issues and confirmed that ████████ had resigned that day. (Ex. B (June 24 G. Gross Ltr.) at 2.)

Given those disclosures, there is no more non-privileged or work product information Moog needs or to which it is entitled. Skyryse has disclosed why it placed individuals on admin-istrative leave and provided the names of all individuals who were found to have had access to Moog data on their personal devices or accounts or had deleted potentially relevant information.

---

[1] Skyryse's Opposition was clear that apart from this single employee "deleting 44 potentially relevant files from Skyryse's systems" in direct violation of the Company's "explicit orders," Skyryse is not aware of other instances in which information known to be potentially relevant has been deleted from Skyryse computers or systems." (Opp. at 1-2.)

To the extent Skyryse may have chosen out of an abundance of caution and with the advice of

counsel to put other individuals on leave, their identities are not relevant to the claims or defenses

in this case, and Moog's attempts to impugn their reputations provides further reason why their

names should not be disclosed.[2]  *U.S. v. Amodeo*, 71 F.3d 1044, 1048–49 (2d Cir. 1995). Moog

weeks ago received all information necessary "to commence third party discovery on such indi-

viduals," which is the reason why Moog claims to need it. Beyond that, any information Moog

seeks is either unduly burdensome or irrelevant to the claims or defenses in this case, and impli-

cates privileged and work product information and need not be produced.

### 2.    Individuals Who Work on Pilkington and Kim's Teams

Skyryse's June 24 response also answered Moog's second question, which was:  "Which

of the employees involved in the possession of Moog data or deletion of data worked on defend-

ants' Pilkington and Kim's team." (ECF 176-3 (June 16 Ltr.) at 3.) Skyryse's June 24 letter an-

swered that question and explained, "of the individuals identified in Skyryse's Opposition, prior

to being put on administrative leave, ██████ worked on the team that formerly included Alin

Pilkington and Misook Kim, neither of whom are currently employed by Skyryse." (Ex. B (June

24 Ltr.) at 2.) Moog's Motion devotes only a single sentence to this issue and complains that

"[r]egarding the second question, Skyryse again provided no new information and only provided

a response limited to the 5 individuals addressed in Skyryse's June 14 Opposition." (Mot. at 6.)

---

[2] In the parties' joint letter to the Court regarding sealing, Moog stated, wrongly and without basis, that "the employees are not 'innocent,'" accused them all of "spoliation," and stated that these employees engaged in "wrongful conduct." (Ex. B (June 24 Ltr.) at 5.)  These accusations are unsupported by any evidence and seem intended to distract the Court from the fact that Moog permitted, and in fact expected, its employees to use personal devices for Moog business. It then let them leave the company knowing Moog data was stored on their personal devices and took no steps to prevent that. Moog certainly knows that such failures to protect its information undermine its trade secret misappropriation claims.

But, as explained immediately above, Skyryse fully answered Moog's question by identifying the one "employee[] involved in the possession of Moog data or deletion of data [that] worked on defendants' Pilkington and Kim's team." (ECF 176-3 (June 16 Ltr.) at 3.)

### 3.  Search Terms

Skyryse's June 24 letter also responded to Moog's demand for a "list of the search terms that Skyryse ran in its search for Moog data/non-public information that hit on each Skyryse electronic device (or Skyryse employee personal device), and the number of hits for each term on each device." (Ex. B (June 24 Ltr.) at 2.) Skyryse already had explained that it had "worked with FTI to run searches on numerous electronic devices using the more than one-hundred-thousand search terms and file names [Moog] identified" and that it was "unreasonable for Moog to expect Skyryse to summarize for Moog all the search terms that hit on each and every Skyryse-issued electronic device, and the number of hits for each term on each device, which would pose an unnecessary and undue burden on Skyryse." (*id*.) The single sentence Moog devotes to this issue ignores Your Honor's warning that "there should be some limits on what needs to be formally responded to." (Ex. A (June 16 Tr.) at 43:18-21.) It also ignores the fact that—as Moog also knows—Skyryse voluntarily ran Moog's overbroad and unreliable search terms and sent the files and devices that hit on those search terms to iDS and Moog for Moog's review. This is more than sufficient. In this context, Skyryse's good faith agreement to run Moog's overbroad search terms should not be punished with more discovery about discovery, which is not relevant to either party's claims or defenses or authorized by the Court's order permitting limited, expedited discovery.

### 4.  Alleged Moog Information on Skyryse's Systems

Moog's motion also devotes only a single sentence to complaining that "Skyryse did not provide any responsive information and did not specify which of Moog's non-public information located at Skyryse did not relate to Kim and Pilkington." (Mot. at 7.) But Skyryse's June 24 letter

and June 14 Opposition "identified what Moog may consider to be its purportedly non-public information on Skyryse's systems as well as information not on Skyryse's systems, including personal devices used by former Moog employees while they were at Moog." (Ex. B (June 24 Ltr.) at 2.) Skyryse's response also explained that the company's "investigation into these issues is ongoing" and promised to "supplement its responses if any additional information is identified." (*Id.*) There is no further information to provide, and Moog could have easily confirmed this fact had it simply met and conferred with Skyryse regarding Skyryse's June 24 responses, as this Court specifically ordered Moog to do. (Ex. A (June 16 Tr.) at 45:9-13 ("I am not going to order that they – that the responses be verified but I am going to direct you to confer in good faith.").)

### B. Moog's demand that all source code discovery be managed by the neutral discovery vendor rather than through a conventional review process under Rule 34 is unsupported, unnecessary, and will lead to further risk and delay.

Through its motion, Moog essentially asks the Court to disregard the Stipulated Order entered on March 11 (the "Stipulated Order"), and put in place a new procedure for the review of *source code*, one that the parties never discussed and to which they never stipulated. This is an important issue, for a technology company's confidential and proprietary source code is often one of the most valuable and competitively sensitive assets the company has, and needs to be treated accordingly in discovery—for both sides' sakes.

Moog is well-aware that the Stipulated Order put in place a neutral third-party forensics firm as a middle-man of sorts, to host only files and data found on employees' devices that "necessarily" reflect *both* Moog's and Skyryse's confidential information. (Ex. A (June 16 Tr.) at 38:5-8 ("The March 11th order is very clear: Moog non-public information is to be presumptively turned over to Moog. It's only supposed to go to IDS if, quote, 'delivery necessarily includes property of any defendants.'")) As the Court has made clear, the only "type of information that you give to IDS" is when it's "got Moog information in it, [and] it may have Skyryse information as well."

(June 1 Tr. at 31:15-18.) And the Court has entered an order, which Moog proposed, setting up the "iDS Protocol," amending the existing protective order (ECF 89), governing the hosting and review of materials turned over to iDS because they contain both sides' information. (ECF 96-2, 109.)

But the existing protective order *also* expressly contemplated that the parties would treat discovery of their own proprietary source code differently: "[t]he parties are discussing protocols pertaining to Source Code and will address these protocols in an addendum to be submitted to the Court." (ECF 89 at 18.) Nonetheless, Moog never proposed a source code review procedure to Skyryse, nor did the parties stipulate to one, nor has either side presented such "an addendum to be submitted to the Court." Despite this, Moog demands that Skyryse also turn over its own, highly confidential, proprietary source code *to iDS*, despite there being no evidence that it contains any "Moog information." Moog points to no evidence—and indeed none exists—that suggests that any of this additional source code that Moog now seeks includes a mix of Moog and Skyryse information. Thus, the Stipulated Order's provisions regarding the neutral forensics vendor do not apply to the discovery of Skyryse's own source code. While both sides' source code is discoverable in this case and needs to be inspected, that should proceed as normal under Rule 34, with each side's counsel having an opportunity to inspect the other's source code in a secure, orderly, and efficient way. Skyryse has proposed exactly this and Moog has inexplicably rejected it.

### 1. The iDS Protocol does not apply to Skyryse's own proprietary source code.

The scope and limitations of the iDS Protocol could not be clearer. The section entitled "SCOPE OF INSPECTION MATERIAL" defines the scope as "any material that is made available for inspection through iDiscovery" (iDS). (ECF 96-2.) Pursuant to the Stipulated Order, the

scope of materials made available to iDS is limited to "non-public information, documents, records, files or data *of Plaintiff*" that is intermixed with Skyryse property. (ECF 25, 28 (emphasis added)[3].) Skyryse's own proprietary source code does not meet this definition, and is therefore not subject to the iDS Protocol.

Notably, Moog fails to point to a single portion of the iDS Protocol contemplating *all* source code would be produced to iDS – even code that reflects only one party's information – because none exists. Instead, the iDS Protocol contains provisions that explain how to handle source code if it is contained on a device that includes a *mix* of Moog and Skyryse information that is therefore already subject to the iDS protocol. (ECF 96-2 at 1.) But Moog seeks to distort these provisions as allegedly supporting Moog's position by taking excerpts out of the context. (Mot. at 8.) The full provisions reaffirm that the iDS Protocol only covers the materials that must be sent to iDS as required by the Stipulated Order:

> This Addendum to the existing Protective Order is intended to: (1) **govern Discovery Material that is made available for inspection through neutral forensic vendor iDiscovery** (hereafter, "Inspection Material," as further defined below); and (2) add a new confidentiality designation, i.e., "HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL & EXPERTS' EYES ONLY," which would cover Source Code and other documents as further addressed below.

(ECF 96-2 at 1.)

> **"Inspection Material" encompasses any material that is made available for inspection through iDiscovery** (hereafter, "iDS"). Inspection Material may include physical devices (such as those provided to iDS in compliance with the March 11, 2022 stipulated order at Dkt. 25), all documents and materials on such devices, Source Code, and other technical document.

(ECF 96-2 at 1.) Contrary to Moog's allegation that the iDS Protocol covers *all* source code, the iDS Protocol merely contemplates that inspection materials "may include . . . Source Code." *Id.*

---

[3] All emphasis in quotations has been added unless otherwise noted.

## 2.       The iDS Protocol is insufficient to protect all source code productions.

Moog's request to inspect source code that is not subject to the iDS Protocol is subject to the normal bounds of discovery under Rule 34.   Skyryse is already in the process of making its source code available to Moog for inspection, and has proposed doing so under a standard, stipulated source code review order, as is typical in this type of intellectual property litigation—in fact, Skyryse has sent its proposal to Moog, which has ignored it. There is no reason to further complicate the issue by injecting a middle-man, iDS, into this process.

Skyryse's proposed source code review order contains common-sense and commonplace security restrictions to ensure, for example, that during an inspection of either party's source code, the source code is maintained on a non-networked computer without internet access, in a secure location, with reasonable limits on how much code can be copied or printed. (Ex. C (Proposed Source Code Protocol) at 7, 9.) This is standard practice in intellectual property cases where source code discovery is the norm. *See, e.g.*, *SIMO Holdings Inc. v. uCloudlink Network Tech. Ltd., et al.*, 1-18-cv-05427 (Dkt. 19) (W.D.N.Y. Oct. 19, 2018), *Kaufman v. Salesforce.com*, SDNY-1-20-CV-06879, (Dkt. 58, ¶ 22-23) (S.D.N.Y. Jan. 22, 2021), *JobDiva, Inc. v. Monster Worldwide, Inc.*, SDNY-1-13-cv-08229, (Dkt. 17 ¶ 4-5) (S.D.N.Y Jan. 6, 2014), *Elec. Scripting Prods., Inc., v. HTC America Inc.*, No. 3-17-cv-05806-RS, Dkt #92 (N.D. Cal. Mar. 10, 2020), *Maxell, Ltd. v. Apple Inc.*, EDTX-5-9-CV-00036, Dkt #45 at paragraph 11, (E.D.T.X. July 2, 2019).

For example, in the Northern District of California, the District provides litigants a "Model Protective Order for Litigation Involving Patents, Highly Sensitive Confidential Information and/or Trade Secrets." https://www.cand.uscourts.gov/forms/model-protective-orders/.   This model offers the same common-sense security restrictions Skyryse proposes, including that "source code shall be made available for inspection on a secured computer in a secured room without Internet access or network access to other computers." (Ex. D (ND Cal Model PO) at

¶9(c).) "Unless the Court enters a different protective order," this model order is the default. https://www.cand.uscourts.gov/forms/model-protective-orders/; *see Elec. Scripting Prods., Inc.*, No. 3-17-cv-05806-RS, Dkt. 92 (adopting the District's model protective order). Similarly, the Eastern District of Texas, known for its high volume of intellectual property cases, also provides litigants a sample protective order for cases dealing with source code. (Ex. E (EDTX Sample PO).) Here too, this standard protocol requires the same security restrictions Skyryse proposes including that "[a]ccess to a Party's Source Code Material shall be provided only on 'stand-alone' computer(s) (that is, the computer may not be linked to any network, including a local area network ('LAN'), an intranet or the Internet)." *Id.* at ¶10(a). Skyryse provided its proposed standard source code review order to Moog, expecting the parties would quickly stipulate to it, for it will protect Moog's source code as well as Skyryse's. But Moog declined to even provide any comments or edits, and instead filed its motion.

The iDS Protocol, on the other hand, serves a different purpose altogether (the hosting and inspection of particular devices, not source code repositories), and accordingly lacks several fundamental security restrictions needed for the confidential treatment of the parties' source code. For example, under the iDS Protocol, there are no meaningful restrictions on how much code can be copied or printed. (ECF 96-2 at 12.) In theory, if Moog were allowed to apply the iDS Protocol to its inspection of Skyryse's source code, then without making any showing of need, proportionality, or even relevance Moog would be able to print out Skyryse's entire production of source code without limit. *Id.* Such a process would create a major and unnecessary security risk with no corresponding benefit in discovery.

The iDS Protocol is not just wholly inapplicable to the discovery of a party's proprietary source code, it has proved more challenging to work with than Moog may have anticipated when

it proposed it. For discovery of the devices and data that *are* subject to the iDS Protocol, the parties have faced significant challenges implementing the iDS Protocol and working with iDS, which have resulted in significant delays and hundreds of hours wasted. This is not a criticism of iDS, but a reality of the complexity of its charge under the Stipulated Order and the iDS Protocol, both of which Moog proposed. The parties have only just now begun their respective reviews of the electronically stored data in iDS's possession – weeks after they originally anticipated they would have completed the vast majority of their reviews. Moog's suggestions—unsupported by the Stipulated Order, the iDS Protocol, or common sense—that now the parties *also* go through iDS to conduct unrestricted inspections of each side's proprietary source code, would create only additional complexity, risk, and delay.[4]

Remarkably, Moog falsely alleges that Skyryse's insistence on a separate source code review order is merely a "delay tactic." (Mot. at 13.) Not so. The existing protective order (which again, Moog agreed to) expressly contemplated the parties agreeing to a source code review order as an "addendum to be submitted to the Court." (ECF 89 at 18.) If anyone has delayed, it is Moog, for it never even proposed such an addendum or discussed one with Skyryse. And Moog has been reminded of the need for a source code review order at least since prior to the Court's adoption of the iDS Protocol. (ECF 99-1 (Skyryse's Opposition to Moog's Forensic Protocol) at 13 (explaining that "if Moog has requests for specific source code files that are relevant and discoverable, there is no reason to think they necessarily will be found on the devices in iDS's custody," so the use of

---

[4] Moog's proposed solution of meeting and conferring to amend the iDS Protocol's deficiencies is similarly unworkable. Mot. at 12-13. Not only would the iDS Protocol need to be entirely rewritten to account for source code, but the meet-and-confer process would surely cause further delay.  Should the parties be unable to agree on appropriate additional security measures, further Court intervention would be necessary. Adopting Skyryse's proposed source code review protocol moots these issues and prevents any further delay.

"isolated, non-networked machines, at controlled, supervised locations" would be necessary).)
And despite Moog's refusals to engage with Skyryse over this non-controversial procedure,
Skyryse nonetheless drafted a source code review protocol and explained to Moog that it will make
its source code available to Moog in accordance with its standard review protocol, all before Moog
filed its motion. Skyryse currently estimates that its source code will be available for review later
this week, far sooner than it ever would be available under the inapplicable, less secure iDS Pro-
tocol.

In sum, the Court should deny Moog's request to shoehorn the procedures for inspecting
each side's proprietary source code (that is not commingled with material from the other side) into
the unsuitable "iDS Protocol," which does not apply and is wholly inadequate for this task. Rather,
the Court should enter as an order Skyryse's proposed source code review protocol, attached as
Ex. C, so the parties can proceed with source code inspections in discovery. To be clear, Skyryse's
proposal is bilateral and will serve both sides. Moog's source code will be entitled to the same
protections as Skyryse's, and when Skyryse's counsel inspects Moog's code they will be under
the same restrictions as Moog's counsel when it inspects Skyryse's code. Respectfully, this is the
most fair, reasonable, and common-sense way to proceed with discovery of the parties' confiden-
tial and proprietary source code.

### C.  Moog's request for information in the personal possession of Skyryse's current and former employees is moot.

As described in Section II.A. above, Skyryse's June 14 Opposition explained that its in-
vestigation revealed that former Moog employees were expected to use their personal devices and
materials while working at Moog, and consequently they had access to Moog information on their
personal devices and materials after leaving the company. (Opp. at 16.) Skyryse also disclosed that
its employees ████████████████████████, and ██████ each left Moog, apparently

without Moog taking any steps to inquire into the extent to which Moog information had been stored on their personal devices or materials during the course of their work. (*Id*. at 16.) Skyryse further confirmed that, although it does not have possession, custody, or control of the personal devices or materials owned by its employees, its outside counsel was working diligently to try to collect any relevant information from those employees that resides in their personal possession, to turn over to Moog. (*Id*. at 16-18.)

Consistent with the representations Skyryse made to Moog and the Court, Skyryse has done just that:

- On June 14, 2022, Skyryse produced directly to Moog images of ███████████ notebooks, which appeared to contain a mix of personal and Moog information. ████████████████████████████████████.

- On June 29, 2022, Skyryse produced directly to Moog the photos found on ████ ████ personal smartphone. ████████████████████████.

- On July 8, 2022, Skyryse confirmed for Moog that it had attempted to collect information from ██████, that ████████ counsel confirmed for Skyryse that he would not voluntarily produce it, and that Moog was free to seek it through third party discovery, and provided contact information for ██████ counsel.

- Skyryse is working with ██████ and expects to produce, directly to Moog, photos found on his personal smartphone next week.

Moog claims that "[t]here is no basis for Skyryse to withhold these files." Mot. at 14. But Skyryse has not withheld them. Instead, Skyryse has sought the cooperation of the third parties who have possession of the files, and where it received such cooperation Skyryse produced the relevant files. Much of this occurred even before the last discovery hearing and prior to Moog

filing its motion to compel. The remaining information, to the extent Skyryse was able to collect it, was produced recently. In a tacit concession that there is no discovery to compel from Skyryse, Moog finally has served subpoenas on the relevant Skyryse employees themselves.

### D.    Moog's requests for further responses and documents pursuant to Moog's RFPs and interrogatories are coextensive with Moog's source code requests, unnecessary, or both.

Moog's requests for further responses and documents pursuant to its Requests for Production ("RFPs") and Interrogatories fall into three buckets. First, the vast majority of Moog's complaints are addressed by Skyryse's forthcoming source code production and should be denied for that reason. As explained above in Section II.B., Skyryse is working diligently towards making additional source code available to Moog, and has proposed a standard procedure for such source code inspection.  In the event that any issues remain after Moog's review of Skyryse's source code, they are not ripe now, and Moog can raise them at the appropriate time—indeed, Skyryse has offered to stipulate to an extension to give Moog additional time to raise any issues. Second, several of Moog's complaints request additional disclosures of information that does not exist. For example, Moog continues to misread Skyryse's prior counsel's communications as in some way promising supplementations to each and every interrogatory. *See* Mot. at 18 ("Skyryse never supplemented this response, despite its commitment to doing so"). But as Skyryse made clear at the last hearing, Skyryse "supplemented the responses within there that were appropriate to supplement . . . So we have supplemented what needed to be supplemented"—and Moog has failed to identify any deficiency. (Ex. A (June 16 Tr.) at 15:21-25.) Third, Moog seeks to impermissibly broaden the scope of its discovery requests ex-ante to capture more information than was originally requested. This is impermissible and inappropriate.

14

### 1.    Moog's RFP No. 8

Moog's RFP No. 8 seeks: "Documents sufficient to show the structure of Skyryse's shared networks, software databases, internal data servers, and the access of Former Moog Employees thereto."  Despite Skyryse's countless attempts to meet and confer with Moog to understand what exactly Moog is requesting here, Moog has failed to provide any helpful guidance as to what additional documents it contemplates fall into this category.  As a small start-up which, until recently, didn't even have a single full-time IT employee, Skyryse does not have anywhere close to the sophisticated database structure that Moog may have, such that documentation would be necessary.  As Skyryse has explained, it is not withholding responsive non-privileged documents.  Rather, Skyryse has searched for documents consistent with its understanding of Moog's RFP, and has been unable to locate additional responsive documents.

### 2.    Moog's RFP No. 9

Moog's RFP No. 9 seeks: "All Documents and Communications, from January 1, 2021 to present, Concerning the development, testing, or certification of Skyryse's flight control software including, but not limited to, Source Code, software planning Documents, software testing or certification Documents, test equipment and simulations, and software quality control Documents."  Skyryse has agreed to produce relevant non-privileged documents responsive to this request to the extent they exist, and to the extent Skyryse understands Moog's request.  For example, Skyryse plans to produce or has produced source code and software planning documents.  Despite Skyryse's attempts to better understand Moog's additional requests for documents concerning topics such as "test equipment and simulations," Moog has failed to provide sufficient guidance as to what additional documents it requests or believes to exist.  But again, Skyryse is not withholding responsive non-privileged documents.

### 3.      Moog's RFP No. 10

Moog's RFP No. 10 seeks: "All deletion logs and versioning logs from Skyryse's software versioning and revision control systems, test tools, and software function names used in connection with its flight control software."  As Skyryse has explained to Moog several times, any responsive documents, to the extent they exist, are in Skyryse's source code repositories that are being made available for inspection, and the volumes of source code Skyryse has already made available to Moog via iDS, where appropriate, includes this information.

### 4.      Moog's Interrogatory No. 6

Moog's Interrogatory No. 6 asks Skyryse to: "Describe in Detail the structure and manner in which Skyryse stores data related to its flight control software.  For the avoidance of doubt, Skyryse's answer should include (but not be limited to) identifying the configuration management tool, Source Code control tool, test equipment software, and problem reporting tool for Skyryse's flight control software (e.g., Jira, Github, Subversion, etc.)."  Skyryse has sufficiently answered this interrogatory.  Skyryse provided its source code control tool, its test equipment software (despite still being in development), and its problem reporting tool.  (*See* ECF 176-5 (Skyryse's Third Supplemental Responses to Moog's Interrogatories) at 25-26.)

Moog now seeks to impermissibly broaden its interrogatory to request additional information it never asked for.  Moog seeks at least seven additional interrogatories including: 1) the frequency in which Skyryse stores data related to its flight control software; 2) Skyryse's policies for data storage; 3) Skyryse's policies for data retention; 4) the frequency in which Skyryse engineers store data; 5) whether Skyryse data is stored on network drives, laptop computers, etc.; 6) Skyryse's data management structure on Gitlab; and 7) Skyryse's structure of project folders and other repositories. Mot. at 18-19.  Moog has already used its allotment of interrogatories in expedited discovery, and Skyryse has answered those interrogatories.  While Moog may choose to try

16

exploring these topics in depositions or in the normal course of discovery, it does not have, and should not be granted, leave to propound additional interrogatories here.

### 5. Moog's Interrogatory No. 7

Moog's Interrogatory No. 7 asks Skyryse to: "Describe in Detail the tools and processes Used by Skyryse to develop, test, and certify its flight control software. For the avoidance of doubt, Skyryse's answer should include (but not be limited to) the processors Used by Skyryse to develop code, Skyryse's hardware architecture, Skyryse's software function names, and the tools and processes Used by Skyryse to conduct software testing." Again, Skyryse has answered this interrogatory, including the tools and processes used by Skyryse with respect to its flights control software. (*See* ECF 176-5 at 27-28.) Skyryse's response includes Skyryse's development hardware and software, the IDEs (integrated development environments) Skyryse uses for its specific flight processors, the specific processors used, the software used on its IDEs, as well as the open source tool Skyryse uses. *Id*. Skyryse's answer is thorough, complete, and does not require supplementation at this time.

### 6. Moog's Interrogatory No. 8

Moog's Interrogatory No. 8 asks Skyryse to: "Describe in Detail Skyryse's current configuration management repositories and current software versioning and revision control systems that are Used in connection with the development of its flight control software. For the avoidance of doubt, Skyryse's answer should include (but not be limited to) the time periods in which these repositories and systems have been running as well as deletion logs and versioning logs."  Skyryse has provided its configuration management versioning tool for configuration management, software versioning, and revision control. (*See* ECF 176-5 at 28-32.) To the extent Moog seeks specific data beyond the scope of this Interrogatory related to specific dates, deletions, or versioning edits, as opposed to describing Skyryse's current configuration management repositories as requested

by the Interrogatory, to the extent it exists, that specific granular information will be available to Moog through Skyryse's forthcoming source code production.  But Skyryse's answer is complete with respect to the Interrogatory, and does not require supplementation.

### III.    THE COURT SHOULD PUT A STOP TO MOOG'S LITIGATION TACTICS.

Skyryse has worked tirelessly to cooperate with Moog and to investigate its claims since this litigation began. Skyryse stipulated to Moog's proposed TRO and preliminary injunction order four days after this suit was filed (ECF 25) and to Moog's request for expedited discovery shortly thereafter (ECF 33, 36). Skyryse's cooperation has been met by Moog with tactics designed only to exert maximum pressure on Skyryse and its business and needlessly drive up the cost of this litigation. Moog has engaged in a pattern of manufacturing disputes where none exist, failing to meaningfully meet and confer, and repeatedly threatening to seek Court intervention and rushing to Court on abbreviated briefing schedules only to misrepresent the facts and demand relief to which it is not entitled or was already receiving. The record shows that Skyryse has gone far above and beyond its obligations and it is time for Moog's abusive tactics to stop.

For example, Moog rushed into Court nearly two months ago demanding "urgent relief" and "Court intervention" to "implement a schedule with hard dates"—knowing that Skyryse already had stipulated to the purportedly "urgent relief" Moog claimed to have needed. (ECF 118 at 1.) And while Skyryse has complied with its discovery obligations, Moog has consistently failed to timely produce documents, and continues to make large document productions long after the "hard deadline" they demanded. (*See, e.g.,* Ex. F (July 7, 2022 K. Naqvi email transmitting supplemental production).) Similarly, Moog asserts that it does not have access to devices in iDS's possession because of "Skyryse's [alleged] delays in completing privilege review and fixing other technical issues (in contravention of the June 2 stipulation and order)." (ECF 180 at 9.) But Skyryse has strived to comply with the privilege review deadlines set by the Court and has spent countless

hours working with multiple vendors to help iDS identify and excise privileged documents. Moog also claims that Skyryse's request for a source code protocol covering materials not sent to iDS is "a delay tactic" but ignores that *Moog's own proposed discovery order*, which the Court implemented, required the parties to agree on such a source code protocol, but Moog failed to propose one or even discuss Skyryse's proposal for one, preferring instead to litigate the issue now.

Moog also has been derelict in its basic obligation to meet and confer to minimize and resolve, rather than escalate, discovery disputes. This includes failing to meet and confer with Defendants before filing formal discovery motions, including this one. And Moog has repeatedly raised issues via email with your Honor without first conferring with Defendants, including for example on June 29, 2022 when Plaintiffs falsely claimed that Skyryse had refused to agree to a reciprocal 7-day extension on motions to compel. (Ex. G (June 29, 2022 R. Fluskey email to the Court).) This, despite Your Honor's repeated instruction to the parties to meet and confer regarding their discovery disputes prior to raising them with the Court (Ex. A (June 16 Tr.) at 18:13-14, 36:13-16) and the clear local rule: "[n]o motion for discovery and/or production of documents under Fed. R. Civ. P. 37 shall be heard unless accompanied by an affidavit showing that sincere attempts to resolve the discovery dispute have been made" that "shall detail the times and places of the parties' meetings or discussions concerning the discovery dispute and the names of all parties participating therein, and all related correspondence must be attached." W.D.N.Y. LOCAL R. CIV. P. 7(d)(3).

Plaintiff's routinely and brazenly violate this Local Rule; its discovery motions contain no affidavits reflecting any attempts by Plaintiff to meet and confer with Defendants, because there were none. "For purposes of Rule 37(a)(1) 'confer' means to meet, in person or by telephone, ***and make a genuine effort to resolve the dispute***." *Colton v. Fuller*, 21-CV-467 JLS(F), 2022 U.S.

Dist LEXIS 29130 at *7 (W.D.N.Y. Feb. 17, 2022). Moog has failed to comply with these obligations, and for this additional reason its motion should be denied. *See Thomas v. Prinzi*, 15-CV-6061W, 2017 U.S. Dist. LEXIS 113976 at *1-2 (W.D.N.Y. July 21, 2017).

## IV.   CONCLUSION

Skyryse respectfully requests that Moog's motion to compel be denied.  Skyryse further requests that Skyryse's proposed source code review order (Ex. C) be entered to ensure both adequate protections for Skyryse's source code and timely production to Moog.

Dated: July 11, 2022                      */s/ Gabriel S. Gross*

**LATHAM & WATKINS LLP**

Douglas E. Lumish (Admitted *Pro Hac Vice*)
Gabriel S. Gross
Arman Zahoory (Admitted *Pro Hac Vice*)
Ryan Banks (Admitted *Pro Hac Vice*)
140 Scott Drive
Menlo Park, California 94025
Telephone: (650) 328-4600
Facsimile: (650) 463-2600
Email: doug.lumish@lw.com
         gabe.gross@lw.com

Joseph H. Lee (Admitted *Pro Hac Vice*)
650 Town Center Drive, 20th Floor
Costa Mesa, California 92626
Telephone: (714) 540-1235
Facsimile: (714) 755-8290
Email: joseph.lee@lw.com

Julianne C. Osborne (Admitted *Pro Hac Vice*)
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
Fax: (415) 395-8095
Email: julianne.osborne@lw.com

**HARRIS BEACH PLLC**
Terrance P. Flynn

726 Exchange Street, Suite 1000
Buffalo, New York 14210
Telephone: (716) 200-5050
Email: tflynn@harrisbeach.com

Counsel for Defendant Skyryse, Inc.