UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MOOG INC., <br><br> Plaintiff, <br><br> v. <br><br> SKYRYSE, INC., ROBERT ALIN PILKINGTON, MISOOK KIM, and DOES NOS. 1-50. <br><br> Defendants. | Civil Action No. 1:22-cv-00187-LJV-JJM |

**MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S MOTION TO COMPEL DISCOVERY
NECESSARY FOR FURTHER TRADE SECRET
IDENTIFICATION**

**CONTENTS**

| | | |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | FACTUAL BACKGROUND | 2 |
| III. | MOOG'S DEMANDS FOR ADDITIONAL DISCOVERY SHOULD BE DENIED. | 5 |
| | A. None of the purported issues identified in Moog's motion prevent it from disclosing its own trade secrets and most are not within Skyryse's control. | 6 |
| | B. Moog's demand that Skyryse turn over to iDS nine additional laptops and two additional USB devices is without basis. | 8 |
| | C. Moog's demands for source code and documents Skyryse already has provided should not delay its trade secret identification. | 12 |
| | D. Moog's new unsubstantiated allegations are a red herring. | 13 |
| IV. | CONCLUSION | 14 |

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.*,
  1 F. Supp.3d 224 (S.D.N.Y. 2014) *aff'd* 610 F. App'x 69 (2d Cir. 2015) ............................ 5, 12

*MSCI Inc. v. Jacob*,
  36 Misc. 3d 211, 945 N.Y.S.2d 863 (N.Y. 2012) ................................................................... 13

*Proofpoint, Inc. v. Vade Secure, Inc.*,
  2020 WL 836724 (N.D. Cal. 2020) ........................................................................................... 5

*Quintara Biosciences, Inc. v. Ruifeng Biztech Inc.*,
  No. C 20-04808, 2021 WL 2166880 (N.D. Cal. May 27, 2021) ............................................. 13

*Rensselaer Polytechnic Inst. v. Apple Inc.*,
  No. 1:13-CV-0633 DEP, 2014 WL 1871866 (N.D.N.Y. May 8, 2014) ................................... 9

*Sit-Up Ltd. v. AC/InterActive Corp.*,
  2008 WL 463884 (S.D.N.Y. 2008) ........................................................................................... 4

*Switch Commc'ns Grp. v. Ballard*,
  No. 2:11–CV–00285–KJD, 2012 WL 2342929 (D. Nev. June 19, 2012) ............................... 9

*United States v. Consol. Edison Co. of New York*,
  No. CV-88-0049 (RJD), 1988 WL 138275 (E.D.N.Y. Dec. 15, 1988) .................................... 9

*Xerox Corp. v. Int'l Bus. Machines Corp.*,
  64 F.R.D. 367 (S.D.N.Y. 1974) ............................................................................................... 12

## STATUTES

18 U.S.C. § 1839(3)(B) .................................................................................................................. 13

## OTHER AUTHORITIES

https://www.parallels.com/pd/general/?gclid=EAIaIQobChMI8deox9PG-
  QIVnwytBh1QOwrUEAAYASAAEgKJe_D_BwE ............................................................. 8

I.      INTRODUCTION

Moog's motion fails to follow the Court's instruction to identify "the discovery allegedly necessary to enable Moog to identify its trade secrets." (*See* ECF 206.) Instead, Moog overreaches and makes excessive demands for information it does not need to identify its own trade secrets, and it deploys surprise tactics to make previously undisclosed allegations of misappropriation against Skyryse, based on discovery Moog already has taken. These accusations are cursory and unsubstantiated, and Skyryse will show they are baseless. But Moog's new accusations make Skyryse's point: Moog has received more than enough discovery, and does not need still more, to comply with its basic obligation to identify its own trade secrets.

Moog purports to have carried out a comprehensive forensic investigation into the basis of its claims before filing suit, from which it knows in granular detail many of the file names and types that correspond to its allegedly misappropriated trade secrets, but has refused to disclose its specific trade secrets in discovery. And since filing its complaint five months ago, Moog has received massive amounts of invasive discovery from the Defendants to support its investigation, more than is often exchanged over the entire duration of such a case. Yet Moog continues to leverage its failure to identify its own trade secrets, keeping the Defendants at a tactical disadvantage by not telling them what they are accused of misappropriating, and using that ambiguity to demand sweeping discovery untethered to any specific factual allegations. Moog now asks for even more discovery before it tells the Court and the parties what its purported trade secrets are, claiming it would be unfair to have to identify them before it has exhaustively examined virtually every source of electronically stored information in Defendants' possession.

Specifically, Moog demands significant additional discovery, beyond the nearly two terabytes of data and scores of devices Moog already has discovered. This includes, but is not limited to: (1) access to a number of devices withheld by the Individual Defendants pending the Court's ruling on their Fifth Amendment claims; (2) nine additional Skyryse laptops that Moog demands be turned over to iDS in their entirety with no showing of relevance or responsiveness; (3) USB

1

devices used by Skyryse's IT department and owned by a third-party Skyryse employee (in their entirety), again with no showing of relevance or responsiveness about their specific contents; (4) nearly a decade's worth of the Individual Defendants' personal communications; (5) virtual machines and automatically created backups contained on certain computers that already have been produced to iDS; (6) Skyryse source code that has been available to Moog for inspection since July 14; and (7) documents related to Skyryse's business that have been produced but are unrelated to Moog's own trade secrets. Moog does not explain why it needs this immense amount of *additional* discovery to identify its own trade secrets, offering only speculation that merely because these devices and repositories exist, they contain "critical" information that could help Moog decide what purported trade secrets it will try to enforce in this action.

At some point Moog's demands for still more information before it discloses its trade secrets must stop. The expansive discovery Moog has requested, received, and now wants more of, does not remotely resemble the limited "expedited discovery" to which the parties stipulated when they agreed to serve just 15 document requests on each other. As explained below, Skyryse already has provided or is in the process of providing all the discovery a plaintiff could possibly need before describing what its own trade secrets are. Nothing more is necessary—indeed, many jurisdictions require plaintiffs to identify their trade secrets with specificity before they are entitled to any discovery. Respectfully, Moog's motion should be denied and the Court should order immediate compliance with its July 22, 2022 order compelling Moog to provide a narrative description of its trade secrets with particularity, in response to Skyryse's Interrogatory No. 1.

## II.     FACTUAL BACKGROUND

Moog filed its complaint on March 7, 2022, leveling serious accusations of trade secret theft against Skyryse and the Individual Defendants. (ECF 1.) According to Moog, Skyryse engaged in an orchestrated conspiracy to target and steal some unidentified trade secrets from Moog (*id.* at ¶¶ 219-222), which Moog claimed were created as "the result of years of manpower and hundreds of millions of dollars invested by Moog." (*Id*. at ¶ 6.) Skyryse immediately agreed to

cooperate with Moog to investigate these allegations. And to alleviate Moog's most pressing concerns, Skyryse agreed to search for and produce directly to Moog, or to a neutral third-party forensics firm, any information that Moog might consider to be its confidential information, while the Court resolved Defendants' jurisdiction and venue motions. (ECF 25, 33.[1]) Skyryse has also repeatedly reached out to Moog to invite Moog's involvement and participation in Skyryse's own efforts to identify and remove any of Moog's potentially confidential information that Moog believes made its way onto Skyryse's systems. Moog repeatedly refused.

During the five months since Moog filed its complaint, Moog has received vast amounts of discovery into Skyryse's business and its current and former employees' personal devices. This includes 50,000 pages of written discovery produced directly to Moog and scores of electronic devices, files, and repositories to the neutral forensics firm, iDS. This massive amount of discovery includes:

- Defendant and former Skyryse employee Misook Kim's Skyryse laptop (E0001), which was received by iDS on April 1, 2022, and made available for Moog's review on or around July 18, 2022;

- Defendant and former Skyryse employee Alin Pilkington's Skyryse-issued Mac laptop (E0027), which was received by iDS on April 29, 2022, and made available for Moog's review on or around July 18, 2022;

- Defendant Pilkington's Skyryse-issued Dell laptop (E00028), which was received by iDS on April 29, 2022, and made available for Moog's review on or around July 18, 2022;

- 11,093 files (E0002) from Mr. Pilkington's Skyryse-issued Dell laptop, which were received by iDS on April 1, 2022, and made available for Moog's review on or around July 18, 2022;

- 568 non-human readable files that hit on Moog's search terms (E0026), which were received by iDS on April 29, 2022, and made available for Moog's review on or around July 18, 2022;

---

[1] *See* ECF 33 at ¶ 14 ("By agreeing to this stipulated Order, Defendants consent to the jurisdiction and venue of the Court for purposes of this stipulated Order only and for no other purpose. Any and all other challenges to jurisdiction and venue in the Western District of New York are explicitly preserved.").

3

- Two of Skyryse's source code repositories (E0029), which were received by iDS on May 5, 2022, and made available for Moog's review prior to July 12, 2022;

- Source code related documents (E0041), which were received by iDS on June 3, 2022, and made available for Moog's review prior to July 12, 2022;

- Former Skyryse employee Alex Wang's Skyryse-issued laptop (E0039), which was received by iDS on June 15, 2022, and made available for Moog's review on or around July 18, 2022;

- Alex Wang's USB drive (E0040), which was received by iDS on June 15, 2022, and made available for Moog's review on or around July 18, 2022; and

- Skyryse's relevant source code repositories, which were made available for review by Moog on July 14, 2022.

In addition to the above, a number of Skyryse employees, non-parties to this action, have voluntarily produced in discovery information that Moog knew or should have known was on their personal smartphones, which they used during their employment with Moog. Skyryse and its current and former employees have produced to Moog and to iDS in an expedited fashion nearly two terabytes of data.[2] This is an astounding volume of discovery by any measure.

Moog, on the other hand, has failed to identify any of its alleged trade secrets. Moog first claimed that it had no obligation to do so because the case was still "at the pleading phase," four months into this lawsuit. (*See* June 1, 2022 Tr. at 10:18-11:10; *see also* ECF 180 at 15 (July 5, 2022 Opposition to Motion to Compel Trade Secret Identification).) When that argument failed, Moog tried to shift the burden, claiming that, if "Skyryse wants a more specific understanding of the nature and scope of Moog's trade secrets, it merely needed to obtain information from Kim and Pilkington." (ECF 180 at 23.) The Court rejected this, for Moog "is the only one who can know what it believes its trade secrets are." (ECF 205 at 3 (citing *Sit-Up Ltd. v. AC/InterActive Corp.*, 2008 WL 463884, *7 (S.D.N.Y. 2008).) Moog then admitted that it "might be able to approximate from [Moog's] own data what was taken," but claimed it would not be fair to make it do so because it would "have to be done again once we get access to iDS's images, and we can go through and actually comport what was actually taken." (July 15, 2022 Tr. at 23:5-10.) Based on

---

[2] This does not include the materials produced by the Individual Defendants.

4

that reasoning, Moog requested, and the Court granted, leave to file a brief identifying "the discovery allegedly *necessary* to enable Moog to identify its trade secrets." (*See* ECF 206.)

Moog now claims that it needs access to significant amounts of additional discovery—and six more weeks to review it—before it can even contemplate identifying its own trade secrets. (Mot. at 17-18.) But Moog fails to identify any discovery that is "necessary" for Moog to disclose its own trade secrets. As described further below, Moog's motion is another attempt to delay its own obligations while inflicting maximum pressure on Defendants.

### III.   MOOG'S DEMANDS FOR ADDITIONAL DISCOVERY SHOULD BE DENIED.

Moog's motion reads like a laundry list of facts Moog hopes to uncover through the ordinary course of *full* discovery in an effort to prove its case on the merits to a jury—hardly an itemization of just what discovery is purportedly "necessary" for Moog to finally identify its own trade secrets so this case can proceed in a more orderly, focused manner. Moog all but admits this, arguing about what it hopes to find to "develop its case" (Mot. at 4) and ultimately prove its misappropriation claims. (*Id.* at 7 (demanding "unrestricted access to all iDS devices to uncover additional evidence of misappropriation").) However, Moog does not explain why it is not already in a position to comply with the Court's order (ECF 205) to identify "its trade secrets with a reasonable degree of precision and specificity that is particular enough to separate the trade secret from matters of general knowledge"—which requires no more discovery from Skyryse. (*Id.* at 3 (quoting *Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp.3d 224, 258 (S.D.N.Y. 2014) *aff'd* 610 F. App'x 69 (2d Cir. 2015).) Nor does Moog explain why it cannot "sufficiently identif[y] its source code secrets" today, including "the specific lines of code or programs claimed to be secret," when Moog alone has exclusive possession and control of its own source code. (*Id.* at 4 (quoting *Proofpoint, Inc. v. Vade Secure, Inc.*, 2020 WL 836724, *2 (N.D. Cal. 2020).) For the reasons described below, Moog's demand for still more one-sided discovery before it finally identifies its alleged trade secrets should be denied.

5

### A. None of the purported issues identified in Moog's motion prevent it from disclosing its own trade secrets and most are not within Skyryse's control.

Moog's motion identifies a number of issues that it claims have prevented it from identifying its trade secrets in the five months since it filed its complaint. But none of these purported problems prohibits Moog from identifying its own trade secrets with particularity. And, in any event, as described further below, most of the problems Moog complains about are not within Skyryse's control to resolve.[3]

***Privilege Review of Individual Defendants' Devices***. Moog claims that "the Individual Defendants and Skyryse continue to prevent Moog from accessing five electronic devices produced by the Individual Defendants to iDS," which it claims "are particularly critical to Moog's ability to develop its case." (Mot. at 4; *see also id*. at 9-10.) But Moog has not provided any compelling reason why the information on these devices is "necessary" or "required," on top of the nearly two terabytes of data Moog already has received from Skyryse, to enable Moog to identify its own trade secrets. Nor does Moog identify anything Skyryse has done to prevent Moog's access to these five devices. In fact, Moog confirms that "the Individual Defendants are refusing to make the images available to Skyryse" so Skyryse can review their contents for potentially privileged material, "based on purported Fifth Amendment Concerns." (Mot. at 10.)[4] This issue is inextricably tied up with the Individual Defendants' pending stay motion (ECF 229) and their Fifth Amendment concerns, and should be resolved with that motion.

***Files Excised from the Individual Defendants' Personal Devices***. Moog argues it cannot identify its own trade secrets yet because "the Individual Defendants have unilaterally excised

---

[3] Moog's motion references "12 iDS devices" to which Moog claims it "currently lacks partial or any access." (Mot. at 6-7.) Moog does not specifically identify these twelve devices and Skyryse has been unable to determine, based on the allegations in Moog's motion, which devices purportedly fall into this category and whether those twelve devices overlap with other devices discussed in Moog's motion.

[4] This includes E0025 which Moog describes as "one of Pilkington's external hard drives, which iDS was only able to recently obtain access to due to device error that required time to resolve." (Mot. at 10.)

6

hundreds of thousands of communications from five personal devices that they had previously turned over to iDS." (Mot. at 5.) But Moog does not explain why nearly *a decade's worth* of Ms. Kim or Mr. Pilkington's communications on their personal devices are "necessary" or "required" to identify the purported trade secrets, which it alleges were misappropriated only in recent months. The only reasons identified in Moog's motion are: (1) Mr. Pilkington and Ms. Kim worked at Moog from 2012 and 2013 respectively; (2) that Moog has been developing certain of its flight control programs over the past 15 years; and (3) communications between Mr. Pilkington and Ms. Kim from December 2021 discuss Moog's eRTOS program. (Mot. at 14.) Each of these arguments fails.

Even if Ms. Kim or Mr. Pilkington worked on programs at Moog starting in 2012 and 2013, Moog's misappropriation allegations refer primarily to conduct it alleges occurred much later, in the few months before Moog filed its complaint in 2022—not during the bulk of the years in which they worked at Moog. (*See* ECF 1 at ¶ 90 (alleging that "Skyryse has engaged in a methodical, intentional, and pervasive raid of Moog's developers who built Platform and resulting project-specific applications . . . with most of these departures occurring in the past few months.").) And Moog undermines its own argument by pointing to communications from December 2021, which it claims reflect the Individual Defendants "openly discuss[ing] misappropriating Moog's proprietary information and source code and disclosing it to third parties." (Mot. at 14) In this way, Moog tacitly acknowledges that discovery going back more than a decade from the other defendants is not "necessary" or "required."

***Volume Shadow Copies***. Moog also claims that it needs "access to 'Volume Shadow Copies' for Windows laptops turned over to iDS because Moog has discovered that Kim deleted what appears to be approximately 780 Moog files from her Skyryse-issued Windows laptop (iDS Device No. E0001)" and "[t]he only way Moog can possibly see the contents of these deleted files (and to confirm they are in fact Moog files) is by seeing if they can be recovered from the automatic backup 'Volume Shadow Copies.'" (*Id.* at 15) Discovery of these automatically created backups is not necessary before Moog identifies it trade secrets.

7

As Moog's expert declaration confirms, Moog already has identified "the file name, file size, and date/time stamps, such as those pertaining to when files are created and modified" for every one of these 780 files. (Pixley Decl., ECF 210-2, ¶ 20.) Nothing has prevented Moog from using that highly specific information it already obtained in discovery—file names, file sizes, and date/time stamps—to find the corresponding files *in its own systems* and see what, if any, trade secret information they contain.

***Parallels***.  Moog also demands immediate access to the "Parallels" virtual machines[5] contained on four Apple devices delivered to iDS, three of which belong to the Individual Defendants and one of which is Mr. Pilkington's Skyryse-issued Macbook (E0028). (Mot. at 16.) Other than the simple fact that these virtual machines exist, Moog does not identify any specific basis as to why it needs them to identify its own trade secrets. (*See id.*) In any event, Skyryse has worked to provide Moog with access to the Parallels virtual machine on the E0028 device that Skyryse already produced to iDS. As Moog knows, Skyryse's investigation indicates that this Parallels virtual machine appears to have been created by Mr. Pilkington and was encrypted and password protected by him. Skyryse has requested the password information from Mr. Pilkington's counsel but has not received it, and so Skyryse cannot access the Parallels virtual machine on the E0028 device to make it available for Moog's review.

> **B.** **Moog's demand that Skyryse turn over to iDS nine additional laptops and two additional USB devices is without basis.**

Moog demands that Skyryse turn over, in their entirety, a number of computer devices identified in a May 4 letter documenting Skyryse's efforts to preserve potentially relevant evidence and investigate Moog's accusations. Moog claims it cannot identify its own trade secrets until after it has had six additional weeks to analyze these additional devices. (Mot. 10-13, 18.) This argument is also without merit.

---

[5] Parallels is a software program that permits a Mac user to run the Windows Operating System on their Mac-based device. (*See* https://www.parallels.com/pd/general/?gclid=EAIaIQob-ChMI8deox9PG-QIVnwytBh1QOwrUEAAYASAAEgKJe_D_BwE.)

The Parties' March 11 stipulation identified the specific devices Skyryse was obligated to turn over to iDS (ECF 25 at ¶ 5), and it is undisputed that Skyryse complied and turned them over. Moog has no basis for demanding now that Skyryse turn over still more devices, and so it instead resorts to mischaracterizing counsel's May 4 letter. That letter *did not*, as Moog claims, describe all of these devices "as being involved in the possession of Moog data." (Mot. at 5.) To the contrary, Skyryse identified them as devices that it had preserved and begun investigating in response to Moog's claim. Skyryse continued investigating these devices, and is producing other responsive, non-privileged information as it has been located. There is no basis to produce the numerous other devices identified in the May 4 letter, much less in their entirety, because no additional responsive and non-privileged information has been found on them to date. *See, e.g.*, *Rensselaer Polytechnic Inst. v. Apple Inc.*, No. 1:13-CV-0633 DEP, 2014 WL 1871866, at *5 (N.D.N.Y. May 8, 2014) (denying discovery because of plaintiff's failure to show relevance of unaccused source code); *United States v. Consol. Edison Co. of New York*, No. CV-88-0049 (RJD), 1988 WL 138275, at *2 (E.D.N.Y. Dec. 15, 1988) (denying motion to compel a "fishing expedition" to discover additional violations not relevant to the violations alleged in complaint); *Switch Commc'ns Grp. v. Ballard*, No. 2:11–CV–00285–KJD, 2012 WL 2342929, at *4 (D. Nev. June 19, 2012) ("[R]equiring the plaintiff to state its claimed trade secrets prior to engaging in discovery ensures that it will not mold its cause of action around the discovery it receives.").

Specifically, Moog demands that Skyryse turn over to iDS two more USB devices and nine more laptops, arguing without factual basis that these devices are "critical to determining whether Moog data was transferred to them from the various USB storage devices used by Kim and Pilkington, as well as understanding the connection history with such devices." (Mot. at 12.) Moog argues that "[t]hese devices were squarely placed at issue by Skyryse as being involved in the possession of Moog data." (*Id*. at 5.) This is incorrect. The May 4 letter never said these devices contained Moog data. Instead, Skyryse was clear that its "investigation into the interactions between Skyryse employees and the SanDisk Cruzer devices *is ongoing*" (May 4 Ltr., ECF 210-7, at 8), and that at that time, Skyryse's investigation showed that:

9

> Moog information *may* have been accessed on Skyryse-issued laptops primarily via: (1) *personal USB devices* held by Alin Pilkington or Misook Kim that we believe contained Moog information and which were inserted into the Skyryse-issued laptops of certain other Skyryse employees, (2) network resources to which Mr. Pilkington evidently uploaded certain files, which Moog may claim as its own, or which reflect information Moog claims as its own, and (3) Mr. Pilkington's and Ms. Kim's accessing of what may be Moog files stored on their *personal USB devices*.

(*Id*. at 3; *see also id.* at 7 ("based on our investigation to date, it appears that Moog information may have been accessed on Skyryse-issued laptops via *personal USB devices* held by Alin Pilkington or Misook Kim.").)

Skyryse has been forthcoming and continues to provide reasonable discovery. It is producing the relevant connection history of Ms. Kim's USB device (VSN 80FC3195) and has informed Moog and iDS that it is also planning to produce another USB device (VSN EC979D10) that may have been Ms. Kim's. And Skyryse will continue to supplement its productions if and when additional responsive, non-privileged information is located. But Moog's demand that Skyryse produce nine additional laptops and the millions of files they contain is unwarranted, excessive, and would impose needless delay before Moog finally identifies its own trade secrets.

Without revealing any privileged information or waiving any applicable protections from disclosure, Skyryse's continuing investigation has indicated that two of the three USB devices specifically identified in the May 4 letter were USB devices possessed by Ms. Kim or Mr. Pilkington. As Moog acknowledges, one of those USB devices (VSN 80FC319F) has already been turned over to iDS. (Mot. at 11.) The May 4 letter explains that this USB device was connected to three Skyryse laptops: Misook Kim's Skyryse-issued laptop, which also was turned over to iDS as E0001, as well as the laptops issued by Skyryse to Mario Brenes and Sathya Achar, both of which have been fully preserved. But Moog's only basis to demand the production of these two additional laptops its theory that inspecting them "is critical to determining whether Moog data was transferred to them from the various USB storage devices used by Kim and Pilkington, as well as understanding the connection history with such devices." (Mot. at 12.) But Skyryse has no objection to producing information reasonably in its possession, custody or control reflecting the available

10

connection history between those two devices and Ms. Kim's USB device, and a listing of the files that were accessed from that USB device by those laptops, and Skyryse is producing that information to Moog.

Without revealing any privileged information or waiving any applicable protections, Skyryse's investigation to date indicates that a second USB device listed in the May 4 letter as VSN EC979D10 was also a personal USB device used by Ms. Kim. While Skyryse has no reason to believe that all of its files are relevant or responsive, out of an abundance of caution and because Moog might allege that it contains Moog's confidential information, Skyryse will be producing an image of the USB device to iDS, and has notified counsel for Moog and the Individual Defendants of the same.

A third USB device is identified in the May 4 letter as VSN 55D28D65. Moog points to the fact that six laptops were connected to this USB device, and argues that Skyryse should turn all six laptops over to iDS. This is overreaching. Without revealing any privileged information or waiving any applicable protections from disclosure, Skyryse's investigation indicates that this USB device was *not* one of Ms. Kim's or Mr. Pilkington's personal USB devices. This device was used by Skyryse's IT department to set up computers at the company and its contents includes miscellaneous files unrelated to Moog or the claims and defenses in this case, and so there is no basis to produce it.

A fourth USB device was connected to Mr. Achar's Skyryse-issued laptop. Without revealing any privileged information or waiving any applicable protections from disclosure, Skyryse's investigation indicates that this device is also not Mr. Pilkington's or Ms. Kim's personal USB device and is owned by Mr. Achar, who has been subpoenaed by Moog in his individual capacity as a non-party. Moog has stipulated that third-party discovery related to his subpoena is on hold and subject to the Court's discovery stay. (*See* Ex. A (Aug. 4, 2022 K. Naqvi email).)

### C. Moog's demands for source code and documents Skyryse already has provided should not delay its trade secret identification.

Moog also seeks to compel Skyryse to produce documents responsive to Requests for Production Nos. 8-10 but fails to explain why this is necessary for Moog to identify its own trade secrets. There is nothing to compel, however, because as Skyryse has explained repeatedly, it is not withholding non-privileged documents responsive to these requests. Any responsive, discoverable information either has already been produced or can be obtained by examining Skyryse's source code.[6] That code has been available for Moog's inspection since July 14, 2022 if Moog would agree to reasonable security provisions, but Moog has refused to look at it.

Moog argues that it "requires these documents to fully understand the extent of use of Moog's trade secrets by Skyryse." (Mot. 17.) But Moog does not need to complete an investigation into whether and how Skyryse allegedly "used" Moog's trade secrets to identify what those trade secrets are. Moog claims to be simplifying the issues for Judge Vilardo by identifying only what is allegedly used by Skyryse "as opposed to [identifying] generally everything that was copied." (*Id*.) But Moog's argument misses the point. Not "everything that was [allegedly] copied," or even allegedly used, could possibly be a trade secret. And the fact that "Moog intends to tailor its trade secret identification and presentation to Judge Vilardo at the Preliminary Injunction hearing" (*id.*) does not mean Moog cannot identify its alleged trade secrets to the Defendants and this Court now.

Moog's demand for still more discovery while its own obligations are stayed is the exact scenario courts routinely warn against in trade secret cases. *See, e.g., Big Vision Private Ltd*, 1 F. Supp. 3d at 262-63 (plaintiffs in trade secret cases must identify their purported trade secrets with "particularity" or they otherwise "impermissibly shift[ their] burden onto [defendant] (and the Court) to … ascertain [their] trade secret."); *Xerox Corp. v. Int'l Bus. Machines Corp.*, 64 F.R.D.

---

[6] For example, Moog requests Skyryse produce versioning and deletion logs. (Mot. at 17.) But this information is not maintained by Skyryse in documentary fashion—instead, versioning and deletion log information may be obtained by inspecting Skyryse's source code productions. Skyryse invited Moog to perform such inspections weeks ago, but Moog declined.

367, 371–72 (S.D.N.Y. 1974) (plaintiff has burden to specify alleged trade secrets *prior* to meaningful and effective discovery); *MSCI Inc. v. Jacob*, 36 Misc. 3d 211, 213-14, 945 N.Y.S.2d 863, 865-866 (N.Y. 2012) (allowing plaintiffs to discover defendant's trade secrets before revealing their own would be unfair and allow plaintiffs to impermissibly tailor their theory of misappropriation); *Quintara Biosciences, Inc. v. Ruifeng Biztech Inc.*, No. C 20-04808, 2021 WL 2166880 at *1 (N.D. Cal. May 27, 2021) (explaining that "trade secret cases are especially susceptible to pleading chicanery" because "it is all too easy for a plaintiff to allege trade secrets with calculated vagueness, then use discovery to redefine the trade secrets to be whatever is found in defendant's files" and the "fair and efficient resolution of disputes" requires "preventing parties from taking a shifting-sands approach to trade secret claims.").

### D. Moog's new unsubstantiated allegations are a red herring.

Moog in its motion makes new accusations about alleged misappropriation of source code files and checklists based on facts Moog claims to have learned in discovery. These new allegations are unsubstantiated, and they are irrelevant distractions from the issue before the Court: what additional discovery, if any, is necessary for Moog to finally identify its own trade secrets with particularity?

Moog's latest accusations do nothing to explain why Moog cannot identify its trade secrets now, nor do they justify the overreaching demands Moog makes for still more discovery. Nonetheless, they merit brief response. As explained in further detail in the accompanying declaration of C. Douglass Locke, Ph.D., Moog's new allegations appear to relate mostly to source code files and checklists that would be "readily ascertainable" to anyone with minimal training in the field. *See* Declaration of C. Douglass Locke, Ph.D ("Locke Decl.") ¶¶ 17, 22, 24-25. Moog thus is unlikely to be able to prove they are trade secrets. 18 U.S.C. § 1839(3)(B). With regard to the two slightly larger source code files identified in Moog's motion, the file headers appear to show that they were created by Mr. Pilkington in the years *prior* to his employment with Moog. (Locke Decl. ¶¶ 18-20.) Nonetheless, as stated above, these issues are entirely out-of-place. The issue today is

13

not about the scope of full discovery that will be taken over the course of this suit. The only issue is what additional discovery, if any, is "allegedly *necessary* to enable Moog to identify its trade secrets" at this stage, to let this case proceed in a fair and orderly manner. (*See* ECF 206.) Moog has failed to identify any that Skyryse has not already provided or is in the process of providing.

## IV.   CONCLUSION

Skyryse respectfully requests the Court deny Moog's motion for the reasons laid out above.

Dated: August 17, 2022                    *Gabriel S. Gross*

**LATHAM & WATKINS LLP**

Douglas E. Lumish (Admitted *Pro Hac Vice*)
Gabriel S. Gross
Arman Zahoory (Admitted *Pro Hac Vice*)
Ryan Banks (Admitted *Pro Hac Vice*)
140 Scott Drive
Menlo Park, California 94025
Telephone: (650) 328-4600
Facsimile: (650) 463-2600
Email: doug.lumish@lw.com
           gabe.gross@lw.com
           arman.zahoory@lw.com
           ryan.banks@lw.com

Joseph H. Lee (Admitted *Pro Hac Vice*)
650 Town Center Drive, 20th Floor
Costa Mesa, California 92626
Telephone: (714) 540-1235
Facsimile: (714) 755-8290
Email: joseph.lee@lw.com

Julianne C. Osborne (Admitted *Pro Hac Vice*)
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
Fax: (415) 395-8095
Email: julianne.osborne@lw.com

**HARRIS BEACH PLLC**
Terrance P. Flynn
726 Exchange Street, Suite 1000
Buffalo, New York 14210

        Telephone: (716) 200-5050
        Email: tflynn@harrisbeach.com

Counsel for Defendant Skyryse, Inc.