UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

MOOG INC.,

                              Plaintiff,

        v.                                                    Case No. 1:22-cv-00187

SKYRYSE, INC., ROBERT ALIN PILKINGTON,
MISOOK KIM, and DOES NOS. 1-50,

                              Defendants.

_____


# PLAINTIFF'S REPLY IN SUPPORT OF MOTION
# TO COMPEL DISCOVERY NECESSARY FOR
# <u>FURTHER TRADE SECRET IDENTIFICATION</u>

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

POINT I.   ALL DEFENDANTS CONTINUE TO RE-ARGUE THIS COURT'S
ORDER REGARDING MOOG'S FORTHCOMING TRADE SECRET
IDENTIFICATION...................................................................................2

POINT II.   SKYRYSE DOES NOT DEMONSTRATE THAT MOOG IS NOT
ENTITLED TO THE DISCOVERY IT SEEKS TO IDENTIFY ITS
TRADE SECRETS .................................................................................3

    A.   Moog Has No Access to Five Critical Devices ........................................3

    B.   Skyryse Concedes the Relevance of the USB Devices and Nine Laptops at
Issue ..........................................................................................................4

    C.   Moog's Examples of Evidence of Misappropriation are Not Red Herrings...........7

    D.   Volume Shadow Copies and Parallels ......................................................8

POINT III.   THE INDIVIDUAL DEFENDANTS ARE CONTINUING TO VIOLATE
COURT ORDERS BY EXCISING DOCUMENTS BASED ON
RELEVANCE...........................................................................................9

    A.   No Court Order or Procedure Permits Individual Defendants' Actions ...............10

    B.   Moog Has Demonstrated the Relevance of Communications After 2013.............11

    C.   Moog Properly Met and Conferred with Individual Defendants ..........................12

CONCLUSION.....................................................................................................13

**INTRODUCTION**

Defendants continue to ignore this Court's prior order by re-arguing its ruling on the timing of Moog's trade secret identification (ECF 205). They demand fulsome identification of trade secrets now, even though this Court has recognized that Moog must first have further time and access to the information misappropriated by Defendants. This conduct must stop, and Moog must be provided access to devices and documents that Defendants themselves concede are relevant.

The moving papers demonstrated why Moog requires access to two USB devices and nine Skyryse laptops that Skyryse identified in its May 4 letter as being involved in Kim and Pilkington's acts of misappropriation. While claiming Moog's arguments lack merit, Skyryse concurrently with its opposition agreed to produce one of the two USB devices and certain file and connection information for two Skyryse laptops. This is now the fourth time where Skyryse has refused to produce information in response to Moog's meet and confer requests, but produces such information in response to a motion to compel and before a hearing with the Court. This pattern forces Moog to incur otherwise unnecessary costs, while improperly delaying and impeding Moog's investigation and discovery efforts.

Regardless, Skyryse's remaining refusal to produce the second USB device is unjustified. Skyryse should also turn over images of the nine laptops at issue, which Skyryse has already imaged and preserved (minimizing any burden). These laptops were indisputably involved and connected to USB devices that Kim and Pilkington used to misappropriate Moog data, ***as admitted in Skyryse's May 4 Letter.***

Further, Moog has demonstrated why it needs access to five critically important electronic devices produced by the Individual Defendants to iDS (Device Nos. E0005, 18, 19, 23, and 25), two of which are the devices used to copy over 1.1 million files from Moog. This is not disputed. These devices must be promptly produced.

Finally, Individual Defendants have not demonstrated why they are permitted to unilaterally excise hundreds of thousands of communications from certain iDS devices for reasons other than privilege or privacy. No Court order or discovery procedure in this case authorizes such action and Moog has made a specific showing of how communications going back to 2013 may be relevant. The Court has already decided this issue via the stipulated March 11 Order; the Individual Defendants cannot pick and choose what aspects of that Order they now wish to comply with. Finally, the Individual Defendants' hail-Mary argument that Moog did not properly meet and confer with Individual Defendants before moving to compel is belied by the very e-mail correspondence submitted in connection with the Individual Defendants' opposition. It shows Moog diligently met and conferred over a period of two weeks, and specifically advised the Individual Defendants that the parties were at an impasse and Moog would move for relief if the Individual Defendants did not agree to the proposed 2013 time frame, which they did not.

## POINT I.        ALL DEFENDANTS CONTINUE TO RE-ARGUE THIS COURT'S ORDER REGARDING MOOG'S FORTHCOMING TRADE SECRET IDENTIFICATION

After extensive motion practice regarding the timing and substance of Moog's trade secret identification obligations, this Court ruled that before making a complete and fulsome identification, Moog "need[s] to first examine the information which was admittedly

taken by its former employees Kim and Pilkington prior to their departure, particularly in view of Skyryse's admission that some of that information may now have been deleted." (ECF 205 at p. 3). Despite this order, Defendants continue to re-litigate that order in every single brief they file, and demand that Moog identify its trade secrets now. (*See generally* ECF 242, 244). The improper re-arguing of the Court's Order (ECF 205) needs to stop. The Court has already determined that Moog is not required to further identify its trade secrets now. Any argument that Moog must identify its trade secrets now cannot be used as a basis to shield Moog from lawful discovery that it needs to comply with the Court's orders.

**POINT II.** **SKYRYSE DOES NOT DEMONSTRATE THAT MOOG IS NOT ENTITLED TO THE DISCOVERY IT SEEKS TO IDENTIFY ITS TRADE SECRETS**

**A.** **Moog Has No Access to Five Critical Devices**

The moving papers demonstrated that Moog has never had any access to five critically important electronic devices produced by the Individual Defendants to iDS (Device Nos. E0005, 18, 19, 23, and 25).[1] (ECF 210 at pp. 6-7). Skyryse does not dispute Moog's lack of access to the already-produced drives but instead argues that "Moog has not provided any compelling reason why the information these devices is 'necessary' or 'required.'" (ECF 242 at p. 6).

But, Moog has expressly provided compelling reasons. As stated in the moving papers, two of the devices, E0018 (Serial Number AFDD0200107304) and E0019 (Serial Number S5SCNS0R700159M), *are the hard drives that Pilkington used to copy over*

---

[1] There are actually six devices to which Moog has never been granted access, but the sixth device is inaccessible due to Mr. Pilkington not remembering his bitlocker recovery password.

***1.1 million Moog files***.  (ECF 210 at pp. 6-7).  Notably, Skyryse does not dispute this. This Court has recognized "Moog's need to first examine the information which was admittedly taken by its former employees Kim and Pilkington prior to their departure," (ECF 205 at p. 3), and these two devices contain the vast majority of stolen files.  It is axiomatic that, pursuant to the Court's order (ECF 205), Moog cannot complete its trade secret identification without access to the very devices used to steal Moog's files.  Skyryse also does not address the other devices discussed in the moving papers (E0005, E0023, and E0025) (ECF 210 at p. 7), and therefore concedes their relevance.

Moog agrees that the Individual Defendants have prevented Skyryse from completing a privilege review on these devices, and that access to these devices is intertwined with Individual Defendants' motion to stay (ECF 229) and impermissible clawback of materials. However, if and when the Court denies a stay in this case, Moog has demonstrated it must have full access to these five devices in order to provide a complete trade secret identification.

**B.      Skyryse Concedes the Relevance of the USB Devices and Nine Laptops at Issue**

The moving papers identified multiple SanDisk Cruzer USB devices and nine Skyryse laptops that were involved in Kim and Pilkington's misappropriation, as identified in Skyryse's own May 4 letter, and that must be turned over to iDS for Moog's review.  (ECF 210 at pp. 7-9).  Skyryse argues all these demands are "without merit."  (ECF 242, p. 8).  Yet, in response to Moog's Motion, Skyryse has agreed to produce for the first time: (1) "the relevant connection history of Ms. Kim's USB device (VSN 80FC3195)," which has already been turned over to iDS; (2) USB Device (VSN EC979D10) that Moog identified as belonging to Kim but was not previously turned over to iDS; (3) the available connection history between two Skyryse

laptops at USB device 80FC3195; and (4) "a listing of the files that were accessed" from USB

device 80FC3195 on two Skyryse laptops. (ECF 242, pp. 10-11). Clearly, Moog's requests have

merit. It is unfortunate that Skyryse requires repeated motions to compel and an impending

hearing with the Court before turning over relevant and lawful discovery. Skyryse provides zero

explanation why these relevant materials were not produced before, including by the April 1

turnover deadline under the March 11 Order or the June 2 document production deadline.

While Moog appreciates that Skyryse has now committed to producing certain

categories of relevant materials, there remain several critical devices/files that Skyryse refuses to

turn over: (1) images of the nine laptops connected to the USB devices at issue; (2) USB Device

55D28D65; and (3) a fourth USB device purportedly owned by Skyryse employee Sathya Achar.

First, as a threshold matter, Moog is entitled to review images of the nine laptops

connected to the USB devices at issue because they are expressly identified in Skyryse's May 4

letter, and they have already been imaged and preserved. There is minimal additional burden for

Skyryse to produce images of these laptops. Further, Skyryse expressly admits that two Skyryse

laptops (belonging to Mario Brenes and Sathya Achar) were connected to Kim's USB Device

80FC319F, and Skyryse has agreed to produce a connection history and file listing for the

Skyryse laptops. (ECF 242, pp. 10-11). But this is insufficient.[2] Skyryse's overall theme that

---

[2] To the extent the Court denies Moog's requested relief for turnover of the nine laptops at issue, the Court should order Skyryse to, in addition to the file listings that Skyryse has agreed to produce, provide a list of all folders that were accessed on USB Device 80FC3195 on any Skyryse computer. This would at least permit Moog to review the accessed files themselves to determine their contents (and whether they constitute Moog files). This can be accomplished by extracting Windows Shellbag registry information, Windows LNK files, and Windows Jumplist files. Skyryse should also be ordered to provide a list of all USB storage devices connected to the nine computers. This would allow Moog to understand the device connection history for the computers and then specifically demonstrate to the Court

Moog can prove up all its claims based on a listing of file names is improper and not supported by law.  The same types of information (connection history, file listings of files accessed from the USB devices, and the files themselves) should also be provided for the other 7 Skyryse laptops in question.  Again, Skyryse placed these devices at issue in the May 4 letter, not Moog.

Second, Skyryse claims that Moog is not entitled to USB Device 55D28D65 because its "investigation indicates that this USB device was not one of Ms. Kim's or Mr. Pilkington's personal devices" and was instead "used by Skyryse's IT department to set up computers at the company."  (ECF 242 at p. 11).  Critically, ***Skyryse does not represent that USB Device 55D28D65 is free of Moog data***.  It merely states that the device "includes miscellaneous files unrelated to Moog."  (*Id.*).  This sidestepping of a critical issue is glaring.  If there are irrelevant files on the device, then there is no prejudice to Skyryse.  But, Skyryse's May 4 letter and silence on whether USB Device 55D28D65 contains Moog information shows that Moog must have full access to this device.[3]  Kim and Pilkington frequently used USB Devices to copy Moog files and access them on their Skyryse computers, and it is likely that these USB devices were used to copy Moog data to other Skyryse computers.  Skyryse also admits that six of the nine laptops in question were connected to this USB device, ***which again was identified by Skyryse in its May 4 letter***.

Third, Skyryse identifies a "fourth USB device" that was "connected to Mr. Achar's Skyryse-issued laptop" and that it is "owned by Mr. Achar."  (ECF 242, p. 11).

---

which laptops were conclusively connected to the USB devices used to misappropriate Moog's information.

[3]   At minimum, Skyryse must turn over the USB device to iDS for imaging, and iDS can then recover deleted files and produce a complete file listing with relevant file information.

Again, ***Skyryse does not represent that this device does not contain Moog data***.  Regardless, Moog has subpoenaed Mr. Achar as Skyryse points out.  While Moog disagrees with Skyryse's characterization that it has "stipulated that third-party discovery related to his subpoena is on hold," Moog requires access to this additional USB device for obvious reasons.  This USB device must be turned over to iDS.  In the interim, Skyryse should be ordered to identify the make, model, serial number, and embedded USB serial number on this device so that Moog can determine if and how this device was used in acts of misappropriation.

**C.      Moog's Examples of Evidence of Misappropriation are Not Red Herrings**

Skyryse claims Moog's direct evidence of Skyryse's misappropriation of source code and checklists are "unsubstantiated," yet they devote just six lines in opposition addressing this incriminating evidence. (ECF 242 at p. 13). The Locke Declaration has many glaring issues:

- As a threshold matter, Mr. Locke only provides one example of his work on aviation related software (LAMPS helicopters, military) which does not use DO-178 to certify their software. (ECF 242-3, ¶ 8). Mr. Locke does not indicate any experience with flight control systems or automatic flight control system software (AFCS).

- Mr. Locke confirms that the Moog and Skyryse files in question "do show signs of having been derived from a common source" but contends that "without further information," he cannot conclude that Skyryse directly copied the files from Moog. (ECF 242-3). Thus, Mr. Locke cannot refute the direct copying.

- Mr. Locke's concludes that the development and contents of Moog's MDTE files and Software Process Checklist Templates are "readily available to people in this industry" and "could be readily created from publicly available information." (*Id*. at ¶¶ 22, 25). But, these opinions are directly undermined by the fact that there is evidence of direct, word-for-word copying by Skyryse throughout such documents. Even if the underlying information is

readily ascertainable or publicly available (which it is not), then Skyryse could have created them from scratch (or purchased them) instead of directly copying Moog.

- Finally, while Mr. Locke attempts to suggest that certain of Moog's MDTE files were created by Pilkington before he joined Moog, he merely speculates (without providing an actual opinion) that "Mr. Pilkington may have created these files prior to his time at Moog, which also may predate Moog having first obtained these files." (*Id.*, ¶ 20).

And, Skyryse runs silent regarding the chat communications involving Mr. Pilkington where he is openly discussing with a Skyryse contractor which Moog program to steal information from.

Moog provides these examples to demonstrate to the Court that the discovery it requires is not part of some fishing expedition. The iDS Devices have already demonstrated clear and unequivocal evidence of misappropriation. That is why Moog needs unrestricted access to the remainder of the iDS Devices and other related discovery.

**D.   Volume Shadow Copies and Parallels**

Skyryse does not dispute that Kim deleted 780 Moog files from her Skyryse-issued laptop, in yet another act of spoliation by Defendants. Skyryse instead argues that because Moog has identified the file names and sizes of these 780 files, it does not need actual access to the files themselves. (ECF 242 at p. 8). Under Skyryse's same arguments, Moog would not be permitted to access or review the 136,994 files stolen by Kim, even though Moog has generated the file names for that data. That is not the law. Indeed, Moog's expert expressly stated that Moog requires access to the Volume Shadow Copies for Windows laptops turned over to iDS because the "only way Moog can possibly see the contents of these deleted files (and to confirm that they are in fact Moog files) is by seeing if they can be recovered from the automatic

backup "Volume Shadow Copies."  (ECF 210-2 (Pixley Dec.), ¶ 21).  Moog cannot be prevented from accessing further evidence of misappropriation and spoliation by Defendants.

There are five devices impacted by the Parallels issue, one of which belongs to Skyryse (E0028), the other four of which belong to the Individual Defendants (E0014, E0015, E0016, E0017).  For E0028, Skyryse has agreed to Moog's proposed conversion method of Parallels, but claims it has no access to the device to complete a privilege review because the password for the device was set up by Pilkington and he will not provide a password.  The Individual Defendants have not consented to Moog's proposed process, and will not agree to turn over any other information in light of their pending motion.  If and when the motion to stay is denied, the Court should order all Parties to consent to Moog's Parallels conversion process, and complete a privilege review within 7 days before releasing the Parallels to Moog for review.

**POINT III.   THE INDIVIDUAL DEFENDANTS ARE CONTINUING TO VIOLATE COURT ORDERS BY EXCISING DOCUMENTS BASED ON RELEVANCE**

The Individual Defendants claim that their unilateral excision of pre-2021 communications from certain iDS devices is justified because: (1) Moog has made no showing of relevance of pre-2021 communications; and (2) Moog did not properly meet and confer with the Individual Defendants before moving for relief.  (ECF 244 at pp. 7-10).  Skyryse chimes in by arguing that Moog is not entitled to the requested discovery because its misappropriation "allegations refer primarily to conduct it alleges occurred" in 2021 and 2022.  (ECF 242 at p. 7). All of these arguments fail and contravene existing Court orders.

**A.       No Court Order or Procedure Permits Individual Defendants' Actions**

As the moving papers demonstrate, there is no Court order, stipulation, or other agreement between the parties that permits excision of materials from electronic devices turned over to iDS for any reason other than for privacy and privilege.  Defendants do not and cannot dispute this.  The Inspection Protocol entered by the Court on May 13 (ECF 96, 96-02, 109), and the Parties' June 2 Stipulation and ensuing Court order (ECF 137), only contemplate and permit the excision of privileged and/or private information from the electronic devices of the Individual Defendants.  ***Nothing related to the iDS Device Procedure (the March 11 Order or Inspection Protocol) permits wholesale removal of hundreds of thousands of records from a device based on relevance***.  Neither Moog nor Skyryse has excised files from iDS devices based on relevance. It is improper for the Individual Defendants to pick and choose which Court orders they want to comply with.

In an apparent last-ditch attempt to fall in line with the Inspection Protocol, the Individual Defendants appear to make the claim that all communications "stored on their private devices would be necessarily private" and that "all pre-2021 communications contained on the Individual Defendants' personal devices . . . are personally private communications."  (ECF 244 at pp. 5, 8).  The Individual Defendants' belated and blanket assertion of privacy is wholly improper.  The Inspection Protocol expressly requires that all documents excised for privilege and privacy be specifically identified and logged.  (ECF 96-02, § III.A.5).  The Individual Defendants have provided no such information.  Moreover, other than a blanket statement, Individual Defendants have provided no evidence that their assertion that these materials are "personally private communications" is true.  This is not surprising given that the Individual Defendants are employing a similar strategy by clawing back dozens of electronic devices and

millions of files based on a hypothetical assertion of the Fifth Amendment privilege.  This cannot be the way this case works.  If this Court permits the Individual Defendants to excise large volumes of documents based on relevance, then Moog must be permitted to do the same, which will only cause more delay in these proceedings.

**B.     Moog Has Demonstrated the Relevance of Communications After 2013**

The Individual Defendants claim Moog "has not established that any pre-2021 communications could be relevant" and has not "provide[d] an explanation why 2013 bears any relationship to its claims."  (ECF 244 at pp. 5, 8).  This is flatly incorrect.

The Complaint alleges that Mr. Pilkington was employed by Moog from July 2012 through November 2021.  (Comp., ¶¶ 12, 48).  It also alleges that Ms. Kim was employed by Moog from January 2013 through December 2021.  (*Id*. at ¶¶ 13, 48).  It alleges in several places that Moog has developed certain of the flight control programs at issue (and that were misappropriated by the Individual Defendants) over the past 15 years.  (*Id*. at ¶¶ 27, 35, 37, 51, 52, 148).  More specifically, Kim and Pilkington began working on certain of the flight control programs at issue (and that were misappropriated by the Individual Defendants) beginning in 2013.  Indeed, the Complaint expressly alleges that "Pilkington and his team built eRTOS beginning in 2013."  (*Id*. at ¶ 53).  eRTOS is one of the programs from which large volumes of files were copied and misappropriated.  (*Id*. at ¶ 117).  Thus, any communications between Pilkington and Kim during the pendency of their employment at Moog could reasonably contain important non-public information about Moog programs.

Thus, because Kim and Pilkington had access to eRTOS beginning in 2013, Moog requires access to communications on their personal devices from this time period.  Because

such communications remain on Kim and Pilkington's personal devices after they left Moog, they had access to all of these communications and pieces of information while being employed by Skyryse.  Moog has provided this Court with striking examples where Pilkington and Kim are discussing disclosing eRTOS data to a third party.  (ECF 210-05).  While any excision based on relevance is procedurally improper, Moog has worked in good faith to propose a time period that is reasonable and congruent to the trade secret programs at issue that have been misappropriated. The Individual Defendants have refused any compromise.

### C.    Moog Properly Met and Conferred with Individual Defendants

As the Individual Defendants' own evidence shows, the Parties exchanged detailed written meet and confer correspondence on this issue over the course of two weeks. (ECF 244-2).  On June 30, Moog interposed its objection to the proposed excision, and provided detailed grounds for its objection multiple times.  (*Id*. at pp. 9-11).  After the Individual Defendants, for the first time, substantiated their concerns by identifying the volume of communications at issue, Moog made its 2013 to present proposal on July 1.  (*Id*. at p. 6).  ***After not hearing back from the Individual Defendants for ten days, Moog followed up twice via e-mail***.  (*Id*. at pp. 5-6).  When the Individual Defendants finally responded on July 12, and still did not agree to the proposed time period, Moog once again explained why the proposed time period is relevant, proportional, and necessary.  (*Id*. at pp. 2-4).  Indeed, at the end of its July 13 e-mail, Moog's counsel warned: "Unless you immediately advise otherwise based on this additional information, we understand we are at an impasse and will raise this issue with Judge McCarthy."  (*Id*. at p. 3).  In response, the Individual Defendants made it clear that they did not agree with Moog's proposals.  (*Id*. at p. 1).  Moog then moved to compel more than two weeks

later on August 3.  Thus, Moog and the Individual Defendants properly met and conferred in detail on this issue for several weeks.  No further meet and confer was warranted.

## **CONCLUSION**

Moog respectfully requests that the Court grant the requested relief sought in the Motion.

Dated:  August 24, 2022

**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**
*Attorneys for Plaintiff Moog Inc.*

By:   s/Rena Andoh
     Rena Andoh
     Travis J. Anderson (admitted *pro hac vice*)
     Tyler E. Baker (admitted *pro hac vice*)
     Kazim A. Naqvi (admitted *pro hac vice*)
30 Rockefeller Plaza
New York, New York 10112
(212) 653-8700

and

**HODGSON RUSS LLP**

By:   s/Robert J. Fluskey, Jr.
     Robert J. Fluskey, Jr.
     Melissa N. Subjeck
     Reetuparna Dutta
     Pauline T. Muto
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, New York 14202
(716) 856-4000