UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

MOOG INC.,

             Plaintiff,

     v.

SKYRYSE, INC., *et al.*,

             Defendants.

_____

        22-CV-187-LJV-JJM
        DECISION & ORDER

On March 7, 2022, Moog Inc., filed a complaint against Skyryse, Inc., and two of

Skyryse's then-employees, Robert Alin Pilkington and Misook Kim,[1] alleging that the

defendants "misappropriate[d] valuable confidential, proprietary, and trade secret

information" from Moog "by way of stealing it."  Docket Item 1 at ¶ 4.  The same day that

Moog filed its complaint, it also moved for a temporary restraining order and a

preliminary injunction.  Docket Item 4.

Four days later, the parties signed a stipulated order "re[garding the] production

of information, data preservation[,] and forensic searches."  Docket Item 25.  Six days

after that, the parties filed a second stipulated order "re[garding] expedited discovery

procedures and [a] briefing schedule for [Moog's] preliminary injunction motion."  Docket

Item 33.  Twelve days after the second stipulated order was filed, the defendants moved

to dismiss the case for lack of personal jurisdiction and improper venue or, in the

---

[1] Moog also sued fifty Doe defendants, *see* Docket Item 1; to date, those
defendants have not been identified and served.  So when this Court refers to "the
defendants" in this decision, it means defendants Skyryse, Pilkington, and Kim.

alternative, to transfer the case to the United States District Court for the Central District of California under 28 U.S.C. § 1404(a).  Docket Items 47, 48.

At issue now is the precise effect of those two stipulated orders on the defendants' motions.  On August 29, 2022, United States Magistrate Judge Jeremiah J. McCarthy, to whom this case was referred under 28 U.S.C. § 636(b)(1)(A) and (B), issued a Report, Recommendation and Order ("RR&O") denying the defendants' motions to transfer in part and recommending that their motions to dismiss be denied in part.  Docket Item 253.  More specifically, Judge McCarthy concluded that the defendants "consented to litigate Moog's preliminary injunction motion in this court" by agreeing to the March 17 stipulated order and therefore consented to personal jurisdiction and venue for the purpose of resolving that motion.  *Id.* at 1-4.  Judge McCarthy reserved "the question of jurisdiction and venue for the remainder of the case" until after "Moog's preliminary injunction motion is resolved."  *Id.* at 4.

The defendants objected to the RR&O on September 12, 2022.  Docket Items 263, 264.  They argue that they never consented to personal jurisdiction and venue by executing those two stipulated orders and that their motions to dismiss or transfer can and should be decided before this Court rules on Moog's motion for a preliminary injunction.  *See id.*  On September 27, 2022, Moog responded to the defendants' objections, *see* Docket Items 270, 271, and the defendants replied a week later, *see* Docket Items 274, 275.  This Court heard oral argument on the objections on November 29, 2022.  Docket Item 294.

A district court may accept, reject, or modify the findings or recommendations of a magistrate judge.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).  The court must

2

review *de novo* those portions of a magistrate judge's recommendation to which a party objects.[2]   28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).

This Court has carefully and thoroughly reviewed the RR&O; the record in this case; the objections, responses, and replies; and the materials submitted to Judge McCarthy.  Based on that review, the Court grants the defendants' motions to transfer the case to the Central District of California.  The defendants' motions to dismiss for lack of personal jurisdiction and improper venue are denied without prejudice.  The Court leaves the merits of all other pending motions to the Central District of California.

## FACTUAL AND PROCEDURAL BACKGROUND[3]

### I.     FACTUAL BACKGROUND

#### A.     Moog

Moog is an "aerospace and defense company" with "a world-wide workforce of over 13,000" that is headquartered in East Aurora, New York.  Docket Item 1 at ¶ 10.

---

[2] The parties dispute whether this Court should review Judge McCarthy's RR&O *de novo* or for clear error.  *Compare, e.g.*, Docket Item 270 at 18-20 (Moog arguing for clear error review), *with* Docket Items 274 and 275 (the defendants arguing for *de novo* review).  Judge McCarthy recommended denying the motions to dismiss in part, *see* Docket Item 253 at 1-4, and this Court agrees with Judge McCarthy that his ruling on those motions is a recommendation subject to *de novo* review.  And while a motion to transfer venue is non-dispositive, *see id.* at 4 n.2, this Court finds that, after reviewing the "entire evidence," it "is left with the definite and firm conviction" that the defendants did not agree that this case had to remain in this Court until Moog's motion for a preliminary injunction was resolved.  *See Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).  So this Court reaches the conclusions below under either standard of review.

[3] Unless otherwise noted, the following facts are taken from the complaint, Docket Item 1.  In resolving a motion to dismiss for lack of personal jurisdiction, the court "construe[s] the pleadings and affidavits in the light most favorable to [the] plaintiff[], resolving all doubts in [its] favor."  *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010) (quoting *Porina v. Marward Shipping Co.*, 521 F.3d

Moog designs and manufactures "electric, electro-hydraulic[,] and hydraulic motion[] controls and systems for applications in aerospace, defense, industrial[,] and medical devices." *Id.* "The company's largest business segment is aircraft controls, which generates revenues from military and commercial aircraft in addition to aftermarket support." *Id.* at ¶ 23.

"As part of its motion control product portfolio, Moog develops software that governs flight controls for airplanes and other aircrafts, including helicopters." *Id.* at ¶ 24. "Moog's flight control software works in tandem with an aircraft's computer to control its flight and navigation functionality." *Id.* at ¶ 25. "Moog's base flight control software for commercial use," Platform, "is in essence [an] 'operating system' that an aircraft's computer uses," which "allows the entire system and machine to work." *Id.* at ¶ 26. "The source code for Platform base software and related project-specific applications, as well as documentation and information regarding the development, modification, improvement[,] and deployment of [] Platform, constitute Moog's most valuable, sensitive, and proprietary information." *Id.* at ¶ 33. Moog "protect[s] its intellectual property" in several ways, including requiring its employees to sign "internal proprietary information agreements," limiting its employees' access to Platform software, and conducting background checks on prospective employees. *Id.* at ¶¶ 40-50.

---

122, 126 (2d Cir. 2008)). Likewise, on a motion to dismiss for improper venue, the court "accepts facts alleged in the complaint as true and draws all reasonable inferences in [the plaintiff's] favor." *Allied Dynamics Corp. v. Kennametal, Inc.*, 965 F. Supp. 2d 276, 287 (E.D.N.Y. 2013). Finally, "in deciding a motion to transfer venue, [the court] may consider factual submissions, including declarations, by defendants, who have the burden to justify a change of venue." *Everlast World's Boxing Headquarters Corp. v. Ringside, Inc.*, 928 F. Supp. 2d 735, 737 n.1 (S.D.N.Y. 2013).

By late 2021, 51 software developers and engineers worked on Platform at Moog's Buffalo and California offices.  *Id.* at ¶ 55.  That included Pilkington and Kim, who worked as Software Manager and Software Engineer, respectively, in Moog's office in Torrance, California.  *Id.* at ¶¶ 12-13, 53-54.  Pilkington "was the lead architect . . . on the second iteration of the Platform base software for military purposes."  *Id.* at ¶ 53. Kim worked under Pilkington.  *Id.* at ¶ 54.

### B.    Moog's Relationship with Skyryse

In 2018, Moog's Growth and Innovation Group, which is tasked with "explor[ing] new and innovative business opportunities for Moog," started to "explor[e] a potential business opportunity with [] Skyryse."  *Id.* at ¶¶ 56-57.  Skyryse is a Delaware corporation with a principal place of business in El Segundo, California.  *Id.* at ¶ 11. During Moog's initial discussions with Skyryse, Skyryse "represented that it wanted to offer on-demand helicopter transportation to the general public[] through the use of automated flight system technology."  *Id.* at ¶ 60.

As the two companies began to interact more often, Moog and Skyryse entered into two non-disclosure agreements ("NDAs") in 2018 and 2019.  *Id.* at ¶¶ 64-66. "Under these NDAs, [Moog and Skyryse] agreed not to disclose any proprietary information disclosed by [each other]," and agreed that "the receiving party of [any] such information could only use it for the limited purpose of the contemplated engagement between Moog and Skyryse."  *Id.* at ¶ 67.  Moog and Skyryse "contemplated" that their business relationship would "be conducted in four separate phases, with the [p]arties agreeing to enter into a separate contract before each phase."  *Id.* at ¶ 68.

"Before the parties were to explore Phase 2, Skyryse intended to take its system live to the public."  *Id.* at ¶ 76.  But "Skyryse's launch did not go as planned and was not successful."  *Id.*  So by late 2019, "Skyryse stopped its business operations, fired many of its employees, and was looking to pivot its business model."  *Id.*  Skyryse then "pivoted" its business model "into exactly what Moog was doing"—that is, "offering an autonomous flight system as part of a flight control operating system."  *Id.* at ¶¶ 76-79.

In late 2019 and early 2020, Skyryse announced the development and launch of its autonomous flight control technology.  *Id.* at ¶¶ 76-80.  After announcing those developments, Skyryse issued a "request for quote" to Moog.  *Id.* at ¶ 82.  The quote was for work that would "provide flight control computers and actuator systems for Skyryse to use and to implement Skyryse's flight control operating system software."  *Id.* at ¶¶ 82-83.  Although Moog says that it was "reluctant to pursue that line of business with Skyryse" because "Skyryse had changed its entire business plan and model," Moog nevertheless submitted a bid because of its "prior business relationship with Skyryse" and because "several former respected Moog employees worked at Skyryse."  *Id.* at ¶¶ 83-84.

Skyryse declined Moog's bid due to its cost.  *Id.* at ¶ 85.  After that, "there was additional correspondence between the companies about closing up Phase 1," and the companies "did not pursue any further [mutual] business opportunities."  *Id.* at ¶ 86.

## C.    The Alleged Misconduct

The formal relationship between Moog and Skyryse ended there.  But Moog says that Skyryse still had its eye on Moog.  More specifically, Moog alleges that Skyryse, "[f]acing considerable pressure to meet investor expectations and obtain a significant

6

advantage against [its] competitors, [] made the strategic decision to . . . engage in a 'full court press' to take from Moog as many key employees as possible so that it [could] shortcut its own timeline and costs in developing automated flight software and related products."  *Id.* at ¶ 89.  As part of that "full court press," Skyryse "engaged in a methodical, intentional, and pervasive raid of Moog's developers who built Platform and resulting project-specific applications."  *Id.* at ¶¶ 89-90.   By "specifically targeting Moog's Los Angeles-area office," Skyryse "successfully raided 20 Moog employees, including high-level Moog officers, senior level engineers, coding engineers, and testers."  *Id.* at ¶ 209; *see also id.* at ¶ 91 (listing sixteen employees that Skyryse hired from Moog's California office and four employees that Skyryse hired from Moog's New York office).[4]  Those twenty employees included Kim and Pilkington.  *Id.* at ¶ 91.

In January 2022, "[s]uspecting that Skyryse was engaged in an all-out raid of its flight software employees," Moog investigated "whether individuals who had left Moog for Skyryse, or were soon leaving Moog to join Skyryse, had taken or copied any Moog data before their departure."  *Id* at ¶ 108.  That investigation "revealed that, while still a Moog employee, on November 19, 2021, Kim copied [a] significant volume of data from Moog's internal servers to an external hard drive, amounting to greater than 136,000 files."  *Id.* at ¶ 112.  She did that "less than one month before her last day at Moog[] and less than one week after Pilkington, her supervisor, left Moog for Skyryse."  *Id.* According to Moog, Kim copied that data "from her home or other remote location" before her "normal working hours" in "Moog's Torrance, California offices."  *Id.* at ¶ 114.

---

[4] According to Skyryse, one of the four former New York-based Moog employees listed in the complaint was never a Skyryse employee.  *See* Docket Item 48-5 at ¶ 24 n.1.

The data that Kim downloaded "include[d] nearly all of the source code, documentation, and related information regarding the composition, testing, and certification of Platform and project-specific applications."  *Id.* at ¶ 116.  In other words, "Kim essentially copied almost the entirety of Moog's flight control software engineering development efforts over the past 15 years."  *Id.* at ¶ 120.  According to Moog, Kim had "no legitimate purpose" to copy that data.  *Id.* at ¶¶ 126-29.  All the data that Kim copied "is located on Moog's central servers in East Aurora, New York."  *Id.* at ¶ 112.

"Moog's investigation" into the copying "show[ed] that Kim used" Pilkington's computer "branch," or "location on Moog's server," to "copy the data onto the external hard drive."  *Id.* at ¶¶ 121-22.  Moog says that Kim used Pilkington's branch because, "[o]n information and belief," Pilkington "guided and/or assisted [her] in identifying what files to download."  *Id.* at ¶ 124.

"Kim copied the data onto an external hard drive which was issued to her by Moog," which "she did not return . . . upon her departure from Moog."  *Id.* at ¶ 125.  After realizing that Kim had downloaded this data, Moog "requested that Kim return the company-issued external hard drive she had in her possession."  *Id.* at ¶ 130.  Three days later, Kim's sister, who also works at Moog, returned a different hard drive, which "had been completely wiped clean."  *Id.*  On February 18, 2022, Moog "sent a further letter to Kim demanding that she return the external hard drive."  *Id.* at ¶ 131.  Kim returned the Moog-provided external hard drive—again, now wiped clean—three days later.  *Id.* at ¶ 132.  Moog's follow-up investigation of that external hard drive revealed that it was intentionally reformatted, which "prevents [Moog's] ability to see the data that was erased on [it]."  *Id.* at ¶ 137.

8

Moog alleges that this copying was done "under Pilkington's instruction[] and in coordination with Skyryse."  *Id.* at ¶ 172.  That is, Moog says that "Kim copied and delivered to Pilkington and Skyryse the data files that she copied from Moog containing . . . confidential and proprietary information for . . . the advancement of Skyryse's business."  *Id.*

## II.     PROCEDURAL BACKGROUND

About two weeks after Kim returned the second hard drive, Moog filed its complaint in this case and moved for a temporary restraining order and preliminary injunction.  Docket Items 1, 4.  Moog also moved to expedite discovery.  Docket Item 6.

On March 11, 2022, the parties executed the first of two stipulated orders. Docket Item 25.  In that first stipulated order, the defendants agreed to "refrain from using, accessing, disclosing, copying, or transmitting[]" any of Moog's non-public information that was in their control.  *Id.* at ¶ 1.  In addition, the order established a discovery protocol and ensured that the parties would preserve evidence.  *See id.* at ¶¶ 1-10.

As relevant here, the parties also "agree[d] that the briefing and hearing dates for [Moog's] Motion for [a] Preliminary Injunction" would be "no earlier" than the parties' proposed dates in the stipulated order.[5]  *Id.* at ¶ 10.  The parties agreed that the stipulated order would "remain in effect until a hearing on [Moog's] Motion for [a] Preliminary Injunction takes place and a final ruling on the merits is issued."  *Id.* at ¶ 12. That provision does not say what court would rule on the motion for a preliminary

_____

[5] Those dates passed without briefing or a hearing on the motion.

injunction.  *See id.*  And in paragraph 11 of the first stipulated order, the defendants expressly noted that "[b]y agreeing to th[e] stipulated Order, [they] consent to the jurisdiction and venue of this Court for purposes of th[e] stipulated Order only and for no other purpose."  *Id.* at ¶ 11.

Six days after executing that first stipulated order, the parties filed a second stipulated order.[6]  Docket Item 33.  That second stipulated order reaffirmed the parties' obligations under the first stipulated order; it also established a process for deposing witnesses in connection with Moog's motion for a preliminary injunction.  *Id.* at ¶¶ 1-5.  And the second stipulated order, like the first, set deadlines for "briefing and [a] hearing in connection with Moog's Motion for [a] Preliminary Injunction," including a hearing "scheduled for July 6, 2022, or 14 days after Moog's Reply in Support of its Motion for [a] Preliminary Injunction is filed, whichever is later, subject to the Court's availability."[7]  *Id.* at ¶ 6.

The second stipulated order noted that its "procedures and agreements [were] solely for the purposes of expedited discovery, and d[id] not apply to discovery conducted following the hearing on Moog's Motion for [a] Preliminary Injunction."  *Id.* at ¶ 13.  Instead, the parties agreed to "meet and confer following the hearing and final ruling on the merits of Moog's Motion for [a] Preliminary Injunction regarding the scope and procedure for discovery in this case."  *Id.*  Like the first stipulated order, the second stipulated order does not say what court would issue the "final ruling on the merits" of

---

[6] The second stipulated order apparently was signed on March 16, 2022, but it was filed on the docket the next day.  *See* Docket Item 33.

[7] Those dates likewise passed without briefing or a hearing on the motion.

the motion.  *Id.*  And like the first stipulated order, the defendants expressly noted that "[b]y agreeing to [the second] stipulated Order, [they] consent to the jurisdiction and venue of the Court for purposes of th[e] stipulated Order only and for no other purpose." *Id.* at ¶ 14.  In fact, the defendants "explicitly preserved" their "other challenges to jurisdiction and venue in the Western District of New York."  *Id.*

Less than two weeks after filing the second stipulated order, the defendants filed timely motions to dismiss under Federal Rules of Civil Procedure 12(b)(2), "lack of personal jurisdiction," and (3), "improper venue."  Docket Items 47, 48.  In the alternative, the defendants asked that this case be transferred to the Central District of California under 28 U.S.C. § 1404(a).  *Id.*  After both sides fully briefed those motions, *see* Docket Items 62, 63, 77, 78,[8] Skyryse filed a supplemental brief in support of its motions on August 10, 2022, Docket Item 224, and Moog responded to that brief a week later, Docket Item 239.

Judge McCarthy heard oral argument on those motions on August 25, 2022. Docket Item 251.  During that argument, Judge McCarthy denied in part the defendants' motions on the record; a few days later, he issued the RR&O memorializing that decision.  Docket Items 251, 253.  The defendants subsequently objected to the RR&O, and the parties fully briefed and argued those objections.  *See* Docket Items 263, 264, 270, 271, 274, 275, 294.

---

[8] Skyryse filed an amended brief in support of its motion on May 20, 2022, Docket Item 117, and Moog replied on June 3, 2022, Docket Item 133.

## DISCUSSION

I.    **THE EFFECT OF THE MARCH STIPULATED ORDERS**

Moog argues that the "only sensible, and thus unambiguous, meaning of the stipulated orders" is that the defendants consented to personal jurisdiction and venue in this Court for the purposes of resolving Moog's motion for a preliminary injunction.  *See* Docket Item 271 at 26-27.  Stated another way, Moog says that by signing the stipulated orders, the defendants agreed that this Court would resolve the defendants' challenges to personal jurisdiction and venue only after the motion for a preliminary injunction was decided.  *Id*. at 19.  For that reason, Moog argues, this Court need not "decide all aspects and all issues presented in [the defendants'] Motion[s] to Dismiss" before deciding the motion for a preliminary injunction.  *Id.*

But Moog's interpretation is not supported by the case law or the text of the stipulated orders.

"A district court is 'powerless to proceed' on a motion for [a] preliminary injunction 'in the absence of personal jurisdiction.'"  *CleanSpark, Inc. v. Discover Growth Fund, LLC*, 485 F. Supp. 3d 494, 500 (S.D.N.Y. 2020) (quoting *Pablo Star Ltd. v. Welsh Gov't*, 170 F. Supp. 3d 597, 611 (S.D.N.Y. 2016)).  In other words, "[a] court may not grant a final, or even an interlocutory, injunction over a party over whom it does not have personal jurisdiction."  *See In re Rationis Enters., Inc. of Panama*, 261 F.3d 264, 270 (2d Cir. 2001); *see also Weitzman v. Stein*, 897 F.2d 653, 658-59 (2d Cir. 1990) ("The district court has no power to grant an injunction against a party over whom it has not acquired valid jurisdiction." (alterations omitted)).  Likewise, "[w]hen defendants object to venue, a district court must address venue before it can decide the merits of a motion

12

for a preliminary injunction." *Adrianza v. Trump*, 505 F. Supp. 3d 164, 173 (E.D.N.Y. 2020).

So "[w]here a challenge to personal jurisdiction is interposed on an application for a preliminary injunction, the district court must determine that the party moving for the injunction has established 'at least a reasonable probability of ultimate success on the question of the court's *in personam* jurisdiction' over the non-moving party." *Lam Yeen Leng v. Pinnacle Performance Ltd.*, 474 F. App'x 810, 813 (2d Cir. 2012) (summary order) (italicization added) (quoting *Weitzman*, 897 F.2d at 659).  That standard is higher than what is required to survive a motion to dismiss under Rule 12(b)(2): "Although a *prima facie* showing of personal jurisdiction is all that is required to defeat a motion to dismiss under Rule 12(b)(2), a *prima facie* showing of jurisdiction will not suffice where a plaintiff seeks preliminary injunctive relief." *Homeschool Buyers Club, Inc. v. Brave Writer, LLC*, 2020 WL 1166053, at *7 (S.D.N.Y. Mar. 11, 2020) (italicization added) (citation and internal quotation marks omitted) (denying motion for a preliminary injunction because the plaintiff had not established a *prima facie* case of personal jurisdiction).

In other words, this Court cannot enter injunctive relief—even preliminarily— before addressing challenges to personal jurisdiction and venue.  *See Lam Yeen Leng*, 474 F. App'x at 813 (finding that "the district court erred in enjoining [the defendant] without first making any findings as to its jurisdiction over that party").  And that makes sense:  "Personal jurisdiction refers to a 'court's power to exercise control over the parties,'" *see Cohen v. Facebook, Inc.*, 252 F. Supp. 3d 140, 151 (E.D.N.Y. 2017) (quoting *Leroy v. Great W. United Corp.*, 443 U.S. 173, 180 (1979)), so a court must

ensure that it in fact has that power before it orders the defendants to do or to stop doing something. *See Weitzman*, 897 F.2d at 658-59.[9]

In light of that, Moog's argument that the defendants somehow consented to personal jurisdiction and venue for the purposes of resolving its preliminary injunction motion while simultaneously preserving their motions to dismiss until after that preliminary injunction was resolved makes no sense.[10]  In fact, if this Court entered preliminary injunctive relief and then found that it did not have jurisdiction over the defendants, the result would be dismissal of the action, and the preliminary injunction would be vacated. *See Weitzman*, 897 F.2d at 658-59 (vacating preliminary injunction where "it was not clearly established that the [district] court had jurisdiction").  What is more, Moog's interpretation of the stipulated orders makes sense only if, by entering into the stipulated orders, the defendants filed motions less than two weeks later that were essentially nullities.[11]  Moog offers no reason why the defendants would do that.

---

[9] Although venue does not implicate the same issues of "the court's power to exercise control over the parties," *see Leroy*, 443 U.S. at 180, this Court still would address the defendants' challenge to venue before adjudicating the preliminary injunction on the merits, *see Adrianza*, 505 F. Supp. 3d at 173.

[10] For the same reason, Moog's suggestion that the defendants should have requested that their "motion[s] to dismiss the case or transfer venue [be] expedited such that [they] would be determined prior to the hearing on Moog's" motion for a preliminary injunction lacks merit.  *See* Docket Item 271 at 12; Docket Item 270 at 25.  This Court would have had to at least resolve the motions to dismiss prior to granting Moog any sort of injunctive relief, so it was not incumbent on the defendants to spur the Court to do so.

[11] At oral argument, Moog also argued that the defendants consented to personal jurisdiction and venue wholesale by entering into the stipulated orders.  *See* Docket Item 295 at 32-33.  But that would read the reservation of rights provisions out of the stipulated orders, *see* Docket Item 25 at ¶ 11; Docket Item 33 at ¶ 14, and the Court presumes that the parties did not intend to render those provisions meaningless.  *See State St. Glob. Advisors Tr. Co. v. Visbal*, 431 F. Supp. 3d 322, 357 (S.D.N.Y. 2020) ("[C]ontracts must be construed to give a reasonable and effective meaning to all terms

And nothing in the stipulated orders suggests that they did.  The stipulated orders do not explicitly say anything about the defendants consenting to having this Court—as opposed to some other court—rule on the merits of the preliminary injunction motion. *See* Docket Item 25 at ¶ 12; Docket Item 33 at ¶ 13.  In fact, as noted above, the words "jurisdiction" and "venue" appear only when the defendants consented to personal jurisdiction and venue in this Court for the purposes of the orders; otherwise, the defendants explicitly reserved their right to challenge personal jurisdiction and venue. *See* Docket Item 25 at ¶ 11; Docket Item 33 at ¶ 14.  So any waiver of jurisdiction and venue challenges has to be inferred from something other than the explicit text of those provisions.

Moog maintains that this Court can draw that inference because the parties scheduled "briefing and [a] hearing on [the] preliminary injunction motion."  Docket Item 271 at 17 n.5; *see also* Docket Item 270 at 30 (citing a provision allowing the Court to "modify the briefing and hearing schedule").  In other words, according to Moog, the mere act of scheduling briefing and a hearing for a motion for a preliminary injunction is

---

and not to leave a part unreasonable or of no effect." (alterations, citation, and internal quotation marks omitted)).

Moog also contended at oral argument that the defendants consented to personal jurisdiction and venue because of their post-motion conduct. *See* Docket Item 295 at 30.  That argument is similarly unavailing.  The defendants asserted that this Court lacked jurisdiction and that venue was improper in the earliest stages of this case, before almost anything of substance occurred.  To say that the defendants waived their personal jurisdiction and venue defenses because "there[ have been] almost 300 docket entries" since this case was filed, *see id.*, is to say that *this Court* waived those defenses for the defendants by not acting on the motions sooner.  That cannot be the case. *Cf. In re Apple Inc.*, 979 F.3d 1332, 1343 (Fed. Cir. 2020) ("[T]he district court legally erred in concluding that the merits-related steps it had taken weighed heavily against transfer.").

sufficient to establish personal jurisdiction and venue for purposes of entering injunctive relief.

This Court disagrees.[12]  As noted above, at any hearing, this Court would have had to assure itself that venue and personal jurisdiction were proper before it entered relief.  And if consenting to personal jurisdiction and venue for purposes of setting a briefing schedule and a hearing date were sufficient to establish personal jurisdiction and venue, any defendant who bothered to respond to a motion for a preliminary injunction, agreed to a discovery schedule, or showed up at a hearing to address how to proceed could waive those defenses.[13]  This Court, like other courts, declines to endorse that sort of catch-22.  *See Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 442-43 (7th Cir. 2010) (concluding that the defendant did not waive "its right to argue lack of personal

---

[12] For similar reasons, this Court concludes that the stipulated orders do not mandate that this Court reserve decision on the defendants' alternative motions to transfer until after Moog's motion for a preliminary injunction is resolved.  The defendants did not waive their right to challenge venue until after the preliminary injunction was decided, and the stipulated orders do not say that this Court can or should resolve the motion to transfer only after ruling on the motion for a preliminary injunction.

[13] What is more, a court need not even hold a hearing to resolve a motion for a preliminary injunction.  *See Md. Cas. Co. v. Realty Advisory Bd. on Lab. Rels.*, 107 F.3d 979, 984 (2d Cir. 1997) ("[T]here is no hard and fast rule in this circuit that oral testimony must be taken on a motion for a preliminary injunction or that the court can in no circumstances dispose of the motion on the papers before it."); *Wall v. Constr. & Gen. Laborers' Union*, 80 F. App'x 714, 716 (2d Cir. 2003) (summary order) ("hold[ing] that the district court did not abuse its discretion in denying plaintiffs' motion for a preliminary injunction without a hearing").  That is not to say that this Court would not have held a hearing on Moog's motion; considering the myriad factual issues in this case, it almost certainly would have.  But it is a stretch to say that scheduling a hearing is sufficient to consent to personal jurisdiction and venue for a preliminary injunction motion if this Court could resolve that motion without a hearing.

jurisdiction when it asked for a continuance of the preliminary injunction hearing and an expedited discovery schedule"); *Shanghai Zhenglang Tech. Co. v. Mengku Tech. Co.*, 2020 WL 7481297, at *4 (E.D.N.Y. Dec. 18, 2020) ("Through defending the motion for a preliminary injunction, Defendants did not waive their rights to object based on personal jurisdiction[ or] venue."); *cf. Visual Scis., Inc. v. Integrated Comm'cns Inc.*, 660 F.2d 56, 58-59 (2d Cir. 1981) (contemplating that "there must be a hearing" where "essential facts are in dispute[]" on a motion for a preliminary injunction while still reiterating that "the plaintiff is required to adequately establish" personal jurisdiction before a court can enter a preliminary injunction (alterations omitted)).

The facts of *Mobile Anesthesiologists Chicago* are similar to those here. In that case, the plaintiff filed a complaint and a motion for a preliminary injunction in mid-February; the district court scheduled a hearing on the preliminary injunction for early March. *Mobile Anesthesiologists Chicago*, 623 F.3d at 443. The defendant then asked to reschedule that hearing and "requested expedited discovery to prepare for" it; later, the defendant moved to dismiss under Rule 12(b)(2). *Id.* On appeal, the plaintiff argued that the defendant "waived its right to argue lack of personal jurisdiction when it asked for a continuance of the preliminary injunction hearing and an expedited discovery schedule." *Id.* at 442-43. The Seventh Circuit summarily dispensed with that "bold argument," reasoning that the defendant "had the right to ask for more time to learn who was suing it and why without losing its right to object to personal jurisdiction." *Id.* at 443.

The stipulated orders in this case likewise are not such traps for the unwary. At bottom, the stipulated orders simply confirmed the parties' "procedures and agreements

. . . solely for the purposes of expedited discovery," Docket Item 33 at ¶ 13, and set a schedule for briefing Moog's motion for a preliminary injunction. To read a broad consent to personal jurisdiction and venue into provisions that schedule briefing and a hearing on a motion is to assume that the parties "hid[] elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Because the stipulated orders cannot be read to reach that result, this Court therefore need not address any extrinsic evidence of the parties' intent.[14]

In sum, there is no reason to resolve Moog's motion for a preliminary injunction before addressing jurisdiction and venue. On the contrary, there is good reason not to.

---

[14] In any event, extrinsic evidence supports the defendants' interpretation. Skyryse submitted two draft versions of the first stipulated order, *see* Docket Items 247-7 and 247-8, which Judge McCarthy declined to consider because he found the stipulated orders to be unambiguous, *see* Docket Item 253 at 3. In an earlier version of that stipulated order, the parties would have "stipulate[d] that any objections or arguments regarding the jurisdiction of this Court [would be] preserved until after the hearing on [Moog's] Motion for [a] Preliminary Injunction takes place and after a final ruling is issued by the Court." Docket Item 247-7 at 9. In a subsequent version, that language was removed and replaced with what ultimately was incorporated into paragraph 11 of the first stipulated order, in which the defendants "consent[ed] to the jurisdiction and venue of this Court for purposes of this stipulated Order only and for no other purpose." *Compare* Docket Item 247-8 at 7, *with* Docket Item 25 at ¶ 11. That change suggests that the defendants considered and rejected the very result that Moog now claims they consented to.

Although Moog argues that Skyryse's general counsel, who attested to the authenticity of those drafts, "did not have any direct communications with Moog's outside counsel" and has offered "no emails between counsel for the parties from the time of negotiations," Docket Item 271 at 27, Moog does not dispute the authenticity of those documents or offer any conflicting extrinsic evidence of its own. And while Moog asks for another opportunity to respond to that extrinsic evidence, *see id.* at 27 n.11, Moog had that opportunity when Skyryse raised the argument in its objection. Nevertheless, Moog declined to either offer any extrinsic evidence of its own or say why Skyryse offered "an incomplete recitation of events and relevant documents." *Id.* Regardless, because this Court finds that the stipulated orders are not ambiguous, any extrinsic evidence does not change the result here.

Because the parties' stipulations did not consent to venue and this Court's jurisdiction to enter injunctive relief, and because this Court would need such jurisdiction to grant such relief, the Court now addresses jurisdiction and venue.  And for the reasons that follow, the case is transferred to the Central District of California under 28 U.S.C. § 1404(a).

## II.   THE MOTIONS TO DISMISS OR TRANSFER

### A.   Personal Jurisdiction and Venue

"Although it is common to resolve challenges to personal jurisdiction before addressing motions to transfer venue, it is not required that courts do so."  *Everlast World's Boxing Headquarters*, 928 F. Supp. 2d at 741 (citations omitted).  "Courts may instead address venue applications at the threshold, 'when there is a sound prudential justification for doing so,' because 'neither personal jurisdiction nor venue is fundamentally preliminary in the sense that subject[ ]matter jurisdiction is."  *Id.* (quoting *Leroy*, 443 U.S. at 180).

Here, the parties have spilled considerable ink disputing whether this Court has personal jurisdiction over the defendants and whether venue is proper in this district.  But everyone agrees that the Central District of California has personal jurisdiction over the defendants and that venue is proper there.  *See, e.g.*, Docket Item 62 at 9 (Moog's conceding that it "could have filed this action in [the Central District of California]").  So this Court need not, and does not, address whether personal jurisdiction and venue is proper in this district in the first instance.[15]  *See Everlast World's Boxing Headquarters*,

---

[15] Because this Court does not pass on whether venue lies in this district, it likewise does not grant Pilkington's and Kim's request to dismiss the case outright for improper venue.

928 F. Supp. 2d at 742 (resolving motion to transfer venue first where both personal

jurisdiction and venue were disputed); *AGCS Marine Ins. Co. v. Associated Gas & Oil*

*Co.*, 775 F. Supp. 2d 640, 649 (S.D.N.Y. 2011) (declining to address motions to dismiss

for lack of personal jurisdiction and improper venue after concluding that transfer was

warranted under 28 U.S.C. § 1404(a)).  Instead, this Court turns to whether transfer of

this case is warranted under 28 U.S.C. § 1404(a).

### B.      Transfer Under 28 U.S.C. § 1404(a)

Under 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in

the interest of justice, a district court may transfer any civil action to any other district or

division where it might have been brought."  "[M]otions for transfer lie within the broad

discretion of the district court and are determined upon notions of convenience and

fairness on a case-by-case basis."  *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 117 (2d

Cir. 1992).  A party seeking transfer bears the burden of "making out a strong case for

transfer" through clear and convincing evidence.  *N.Y. Marine & Gen. Ins. Co. v.*

*Lafarge N. Am., Inc.*, 599 F.3d 102, 114 (2d Cir. 2010).

"In deciding motions to transfer venue under § 1404(a)," a court first asks

"whether the action could have been brought in the transferee district."  *Everlast World's*

*Boxing Headquarters*, 928 F. Supp. 2d at 743.  If the answer to that question is yes, the

court then asks "whether transfer would be an appropriate exercise of [its] discretion."

*Id.*

Here, all the defendants reside in the Central District of California.  *See* Docket

Item 1 at ¶¶ 11-13.  So this case certainly could have been brought in that district in the

first instance.  *See* 28 U.S.C. § 1391(b)(1) ("A civil action may be brought in[] a judicial

district in which any defendant resides, if all defendants are residents of the State in which the district is located.").

As a result, this Court turns to the second half of the section 1404(a) inquiry. To "[a]ssess[] whether transfer is a valid exercise of discretion," a court considers:

> (1) the convenience of the witnesses; (2) the convenience of the parties; (3) the location of relevant documents and the relative ease of access to sources of proof; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded [to] the plaintiff's choice of forum; and (9) trial efficiency and the interests of justice.

*Everlast World's Boxing Headquarters*, 928 F. Supp. 2d at 743 (collecting cases). After weighing those factors, this Court concludes that transfer to the Central District of California is appropriate here.

### 1. Moog's Choice of Forum and the Court's Familiarity with Governing Law Weigh Against Transfer.

#### a. *Moog's Choice of Forum*

Moog sued the defendants in the district where Moog has its corporate headquarters, and that choice of forum deserves "substantial consideration." *In re Warrick*, 70 F.3d 736, 741 (2d Cir. 1995). But as explained below, almost everything relevant that happened in this case occurred in California, where all the defendants and many of the witnesses are located. Accordingly, while Moog's choice of forum weighs against transfer, that weight does not overcome the remaining factors in the Court's section 1404(a) analysis. *See Everlast World's Boxing Headquarters*, 928 F. Supp. 2d at 748 (noting that the plaintiff's choice of forum "merits less deference where the connection between the case and the chosen forum is minimal" (citation and internal quotation marks omitted)).

21

###### b.      The Court's Familiarity with Governing Law

This Court's familiarity with governing law also weighs—albeit barely—against transfer.  This factor "is 'one of the least important factors in determining a motion to transfer, especially where no complex questions of foreign law are involved.'"  *Id.* at 747 (quoting *ACE Am. Ins. Co. v. Bank of the Ozarks*, 2012 WL 3240239, at *13 (S.D.N.Y. Aug. 3, 2012)).  Although some of Moog's claims arise under New York law, *see, e.g.*, Docket Item 1 at ¶¶ 67, 223-30, Moog points to no particularly unique questions of New York law that are or would be raised by those claims.  And this Court has no reason to doubt that the Central District of California would be just as capable as this Court of resolving whatever state law questions might arise in this case.  So to the extent that this factor weighs against transfer, that weight is minimal.

### 2.      The Location of Relevant Documents and the Relative Means of the Parties Do Not Weigh For or Against Transfer.

###### a.      The Location of Relevant Documents

The location of any relevant documents does not cut in favor of or against transfer.  Although many of the documents in this case are located in California, *see, e.g.*, Docket Item 224 at 11-12, Moog correctly notes that electronic discovery can mitigate much of any anticipated burden, *see* Docket Item 62 at 32.  And there does not appear to be any particular barrier to transporting whatever documents are necessary from one district to another.  This factor therefore does not weigh for or against transfer.[16]  *See Everlast World's Boxing Headquarters*, 928 F. Supp. 2d at 747 ("Given

---

[16] Although the fact that most of the relevant documents in this case are located in California rather than New York does not itself weigh in favor of transfer, it does underscore the fact that the locus of operative facts in this case lies outside this district.

electronic discovery, and absent any concrete illustration of inconvenience to either side relating to documents or other non-testimonial evidence, this factor does not materially favor either venue.").

> b.  *The Relative Means of the Parties*

The relative means of the parties also does not weigh in favor of or against transfer.  Considering the size and financial means of both Moog and Skyryse, this Court cannot say that retaining the case or transferring it would have some appreciable effect on either party's ability to litigate the case.  And while the possible financial strain on Pilkington and Kim—the two individual defendants in the case—would be far more salient and would almost certainly weigh in favor of transfer, they have not developed any argument toward that end or even attested to the strain that cross-country litigation would impose on them.  *See* Docket Item 77 at 15 (conceding that "Mr. Pilkington and Ms. Kim did not submit evidence of the relative burdens between them and a large corporation like Moog").  This factor therefore is neutral.

### 3.  The Remaining Factors Weigh in Favor of Transfer.

> a.  *Convenience of the Witnesses*

"The convenience of witnesses is an important consideration" in deciding a motion to transfer under 28 U.S.C. § 1404(a).  *Everlast World's Boxing Headquarters*, 928 F. Supp. 2d at 743.  Although a court considers the convenience of both party and non-party witnesses, the court "accord[s] more weight" to the convenience of non-parties.  *See Indian Harbor Ins. Co. v. Factory Mut. Ins. Co.*, 419 F. Supp. 2d 395, 402 (S.D.N.Y. 2005).

The location of both party and non-party witnesses favors transfer here.  When Moog filed its motion for a preliminary injunction in this case, it identified twelve "witnesses it intends to call at the preliminary injunction hearing."  Docket Item 4-30. Many of those witnesses are located in California.  *See id.*; *see also* Docket Item 48-5 at ¶ 26.  And in all likelihood, the defendants' witnesses reside in California as well.  *See* Docket Item 48-5 at ¶¶ 23 ("No Skyryse employee lives or works in the Western District of New York."), 24 ("Each of the former Moog employees identified in Paragraph 91 of the Complaint live[s] and work[s] in California."), 28 (naming four "witnesses having the greatest familiarity with the design, development, and implementation of Skyryse's technology and software," each of whom "live[s] and work[s] in California").

Likewise, the convenience of non-employee witnesses weighs in favor of transfer.  When the defendants initially moved to dismiss or transfer, they did not cite any non-employee witnesses who might be inconvenienced if this case proceeded in this Court.  But since that time, Moog has subpoenaed "at least three former employees of Skyryse" who reside in California.  Docket Item 263 at 15 n.2; *see also* Docket Item 239 at 7 (Moog agreeing that it "recently issued subpoenas" to "three former Skyryse employees" in the "Los Angeles area").  Although Moog contends that those subpoenas are "not evidence of any additional ties" between this case and California, it also concedes that the subpoenas are aimed at "identify[ing] the extent of Skyryse's theft of Moog data."  *See* Docket Item 239 at 7.  In other words, Moog has sought discovery from individuals not employed by Skyryse who reside on the west coast, not in western New York.  To the extent that non-employee witnesses will be called in this case, the track record so far therefore favors transfer.

Moog maintains that two of its New York-based witnesses "are key witnesses for Moog regarding the nature and value of the trade secrets at issue in this case."  Docket Item 62 at 28.  But presumably the other "key" witnesses in this case are those who allegedly misappropriated Moog's trade secrets—Pilkington, Kim, and other Skyryse employees.  *Cf. ESPN, Inc. v. Quiksilver, Inc.*, 581 F. Supp. 2d 542, 548 (S.D.N.Y. 2008) ("In an infringement action, the most critical witnesses may be those officers and employees who were involved in the design, production, and sale of the allegedly infringing products." (alterations, citation, and internal quotation marks omitted)).  The convenience of the witnesses therefore favors transfer here.

   b.   *Convenience of the Parties*

"A defendant moving for transfer must show both that the original forum is inconvenient for it and that the plaintiff would not be substantially inconvenienced by a transfer."  *Everlast World's Boxing Headquarters*, 928 F. Supp. 2d at 744.  "Where a group of defendants makes such a showing, that factor favors transfer."  *Id.*  But "[t]he convenience of the parties does not favor transfer when it would merely shift any inconvenience from [the] defendant to [the] plaintiff."  *Travelers Prop. Cas. Co. of Am. v. Ocean Reef Charters LLC*, 324 F. Supp. 3d 366, 376 (W.D.N.Y. 2018).

Here, the convenience to the parties favors transfer to the Central District of California.  "When analyzing the convenience to the parties, courts often look to the parties' principal places of business and the location of their offices."  *Id.*  All defendants in this case reside in California.  *See* Docket Item 47-2 at ¶ 3; Docket Item 47-3 at ¶ 3; Docket Item 48-5 at ¶ 18.  And Skyryse credibly argues that, as a smaller company, it will be inconvenienced if a significant portion of its workforce is called on to testify in this district.  *See* Docket Item 48-5 at ¶ 24.  That potential for inconvenience is further

reflected by the fact that, in its complaint, Moog identified nearly thirty percent of Skyryse's existing work force by name.  *See* Docket Item 1 at ¶ 91; Docket Item 48-5 at ¶ 17.

For its part, Moog cites the potential inconvenience to its witnesses, a factor this Court has resolved against it for the reasons stated above.  And transfer would not simply shift the inconvenience from the defendants to the plaintiff:  Moog has significant operations in California.  *See* Docket Item 48-4.  In fact, Moog alleges that much of the misconduct in this case occurred while Kim was an employee of its office in Torrance, California, and involved Skyryse's systematic targeting of Moog's Los Angeles-area employees.  *See, e.g.*, Docket Item 1 at ¶¶ 112, 209.  In light of the inconvenience to the defendants, this Court therefore cannot conclude that Moog will be more significantly inconvenienced by litigating the claims in this case—arising out of conduct related to its California office—in the Central District of California.

### c.    The Locus of Operative Facts

Most significantly, the locus of relevant facts in this case favors transfer to the Central District of California.  "The location of the operative events is [] a primary factor in determining a § 1404(a) motion to transfer."  *Matthews v. Bell*, 2019 WL 1117512, at *5 (W.D.N.Y. Mar. 11, 2019); *see also Smart v. Goord*, 21 F. Supp. 2d 309, 316 (S.D.N.Y. 1998) (same).  "To determine the locus of operative facts, a court must look to the site of the events from which the claim arises."  *Everlast World's Boxing Headquarters*, 928 F. Supp. 2d at 745.

Moog says that the defendants' "illegal and improper acts" in this case "are predicated on[] a prior business relationship between Moog and Skyryse from 2018-2020; Skyryse suddenly changing its business model to overlap with Moog's after the

business relationship ended; Skyryse hiring 20 of Moog's senior staff and best software engineers; and a former Moog employee . . . stealing over 136,000 files of Moog's most sensitive and proprietary data."  Docket Item 1 at ¶ 1.  By and large, that all happened in California.  Moog says that before Kim left her position in Moog's Torrance, California office, she used a Moog-supplied external hard drive to copy significant amounts of Moog data.  *See id.* at ¶¶ 114-15.  Although Moog did not specifically allege in its complaint where this happened, it subsequently conceded that "Pilkington copied Moog files from his Moog-issued laptop (located in California) to his personal USB drive (also located in California)."  *See* Docket Item 239 at 7-8.  So some of the alleged copying that is at the heart of many of Moog's claims occurred in California, where all the defendants reside.

Moog also alleges that this copying occurred because of a conspiracy among Pilkington, Kim, and Skyryse.  *See, e.g.*, Docket Item 1 at ¶¶ 169, 217-22.  In other words, Moog says that a California-based corporation and two former Moog employees—both of whom resided in California and worked in Moog's California office—conspired to steal Moog's data.  In fact, Moog alleges that the conspiracy unfolded while one or both of those employees were still working for Moog in its California office.  *See, e.g.*, *id.* at ¶ 6.

Moog's other claims likewise involve predominantly California-based conduct. Moog says that Skyryse engaged in unfair competition—conduct that Skyryse presumably engaged in from its headquarters in California—by, among other things, "*specifically targeting Moog's Los Angeles-area office*" for new employees.  *Id.* at ¶ 209 (emphasis added).  Likewise, Moog's claims for breach of fiduciary duty, *see id.* at ¶¶

193-206; breach of contract, *see id.* at ¶¶ 223-39; tortious interference with prospective economic advantage, *see id.* at ¶¶ 240-50; and unjust enrichment, *see id.* at ¶¶ 251-55, all relate to alleged conduct that occurred predominantly in California.[17]  So the center of gravity in this case, measured by the location of the alleged wrongs, is in California.

Moog makes much of the fact that its servers are located in New York and that Kim purportedly downloaded data from those New York-based servers.  *See, e.g.*, Docket Item 62 at 29.  The parties dispute whether that is sufficient to establish venue in the first instance.  *Compare, e.g.*, Docket Item 78 at 8-9 (Skyryse's citing *Crayola, LLC v. Buckley*, 179 F. Supp. 3d 473, 479 (E.D. Pa. 2016), which found no venue), *with* Docket Item 62 at 23 n.7 (Moog's citing *Argent Funds Grp., LLC v. Schutt*, 2006 WL 2349464, at *2 (D. Conn. June 27, 2006), which found venue).  Either way, that does not change the fact that Moog's claims predominantly hinge on conduct that occurred in California.  *See Everlast World's Boxing Headquarters*, 928 F. Supp. 2d at 746 (granting

---

[17] Moog says its "New York-centric contractual relationship" with Skyryse favors retaining the case.  *See* Docket Item 62 at 29 (citing in-person meetings between Skyryse and Moog in New York).  But Moog alleges in its breach of contract claim that Skyryse breached the NDAs by "develop[ing] its own flight control systems and software" and "raid[ing] and solicit[ing] Moog's key software engineering personnel who have [the] most knowledge of Moog's flight control software."  Docket Item 1 at ¶ 229.  Moog therefore alleges that Skyryse breached the NDAs not because of something that happened during the in-person meetings in New York, but because of something that happened later in California.  So even if some facts connect Moog's contractual claims to New York, that does not mean that those claims turn on conduct that occurred there. *See Everlast World's Boxing Headquarters*, 928 F. Supp. 2d at 745 ("In a contract case, the locus of operative facts is determined by the location where the contract was negotiated or executed, where the contract was to be performed, and where the alleged breach occurred."); *see also id.* at 746 (finding that this factor weighed in favor of transfer where "[t]he lawsuit . . . turn[ed] heavily on Everlast's claim of breach," which "turn[ed] on events that occurred in [the transferee state]").

motion to transfer after finding that "the central [events] on which th[e] lawsuit is likely to turn" occurred in the transferee district).  This factor therefore favors transfer.

><b>d.</b>   <i>Availability of Process to Compel the Attendance of Unwilling Witnesses</i>

The availability of process to compel witness attendance also weighs in favor of transfer.  This factor "reflects the dislocations and inequities that can arise when a court is unable to compel witnesses to testify."  <i>Id.</i>  As stated above, Moog has subpoenaed thirteen California-based witnesses since it commenced this case, including three witnesses who are not Skyryse employees.  <i>See</i> Docket Items 224, 239.  Although it is unclear whether any California-based witnesses would prove unwilling to testify in this district, those witnesses would reside outside this Court's subpoena power.  <i>See</i> Fed. R. Civ. P. 45.  This factor therefore weighs in favor of transfer.[18]  <i>See AEC One Stop Grp., Inc. v. CD Listening Bar, Inc.</i>, 326 F. Supp. 2d 525, 530-31 (S.D.N.Y. 2004) (finding that this factor weighed in favor of transfer because "any unwilling witnesses would likely be subject to process in California to compel their attendance but not in New York").

---

[18] Moog argues that any difficulties in securing witness testimony can be mitigated by replacing live testimony with witness depositions or remote testimony.  <i>See</i> Docket Item 239 at 19.  Other courts have declined to adopt that reasoning.  <i>See, e.g.</i>, <i>Romano v. Banc of Am. Ins. Servs.</i>, 528 F. Supp. 2d 127, 133 (E.D.N.Y. 2007) ("[C]ertainly to fix the place of trial at a point where litigants cannot compel personal attendance and may be forced to try their cases on deposition, is to create a condition not satisfactory to court, jury[,] or most litigants." (quoting <i>Gulf Oil Corp. v. Gilbert</i>, 330 U.S. 501, 511 (1947)).  For that same reason, the availability of the options Moog suggests does not alter this Court's analysis.

e.      *Trial Efficiency and the Interests of Justice*

Finally, trial efficiency and the interests of justice weigh in favor of transfer.  Both parties offer statistics suggesting that there is a significant chance that this case will proceed to trial sooner in the Central District of California than in this Court.  *See* Docket Item 62 at 32 n.14; Docket Item 117 at 23.  Moreover, there is no reason to believe that the Central District of California cannot resolve Moog's motion for a preliminary injunction just as expeditiously as this Court could when the parties have yet to brief that motion and no hearing has been scheduled.  So while Moog argues that it "will lose the benefit of [this Court's] significant familiarity with the facts and issues" of this case, *see* Docket Item 239 at 19, that prejudice is substantially reduced by the fact that the parties have not even briefed the merits of Moog's motion for preliminary injunctive relief and this Court has yet to pass on the merits of that motion or—for that matter—any of Moog's claims.[19]

---

[19] What is more, this Court gained most (if not all) of its familiarity with the facts of this case only *after* the defendants, in the earliest stages of this case, moved to dismiss it or transfer it to the Central District of California.  That familiarity should not count against the defendants here, particularly in light of this Court's resolution of the section 1404(a) factors.  *See In re Apple*, 979 F.3d at 1343 ("A district court's decision to give undue priority to the merits of a case over a party's transfer motion should not be counted against that party in the venue transfer analysis."); *In re Google Inc.*, 2015 WL 5294800, at *2 (Fed. Cir. July 16, 2015) ("remind[ing] the lower court that any familiarity that it has gained with the underlying litigation due to the progress of the case since the filing of the complaint is irrelevant when considering the transfer motion").

**CONCLUSION**

For the reasons stated above, the defendants did not stipulate to personal jurisdiction and venue in this Court for the purposes of resolving Moog's motion for a preliminary injunction.  And after weighing the relevant factors for a motion to transfer under 28 U.S.C. § 1404(a), this Court concludes that the case should be transferred to the Central District of California.  Although Moog's choice of forum deserves some deference, the gravity of this case is on the other coast.

The defendants' motions to transfer, Docket Items 47 and 48, therefore are GRANTED.  The defendants' motions to dismiss for lack of personal jurisdiction and improper venue are DENIED without prejudice.  The Clerk of the Court shall transfer this case to the United States District Court for the Central District of California and close the case.

SO ORDERED.

Dated:      December 15, 2022
            Buffalo, New York


                                         */s/ Lawrence J. Vilardo*
                                        LAWRENCE J. VILARDO
                                        UNITED STATES DISTRICT JUDGE